1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KULIK GOTTESMAN & SIEGEL, LLP
  Glen L. Kulik, Esq. (SBN 082170)
  Natalie N. Wright, Esq. (SBN 273381)
15303 Ventura Boulevard, Suite 1400
Sherman Oaks CA  91403
Tel:  (310) 557-9200; (818) 817-3600
Fax:  (310) 557-0224
gkulik@kgslaw.com; nwright@kgslaw.com

Attorneys for Plaintiff, Terry T. Gerritsen

FILED
CLERK, U.S. DISTRICT COURT

APR 29 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

TERRY T. GERRITSEN, an individual,

Plaintiff,

v.

WARNER BROS. ENTERTAINMENT, INC., A Delaware corporation; KATJA MOTION PICTURE CORP., a California Corporation; and NEW LINE PRODUCTIONS, INC., a  California corporation,

Defendants.

Case No. **CV14-3305** MMM CWx

**COMPLAINT FOR**

1.  **BREACH OF WRITTEN CONTRACT**

2.  **BREACH OF CONTINUING GUARANTY**

3.  **ACCOUNTING**

(Request for Jury Trial - Fed. R. Civ P. 38(b))

{00243521;1}

1

**COMPLAINT**

1      Plaintiff Terry T. Gerritsen alleges:

2                        **THE PARTIES**

3      1.     Plaintiff Terry T. Gerritsen, known professionally as Tess Gerritsen

4 ("Gerritsen"), is an individual domiciled in the State of Maine.

5      2.     Defendant Katja Motion Picture Corp. ("Katja") is a corporation

6 organized and operating under the laws of the State of California with its principal

7 place of business located in the County of Los Angeles, State of California.

8      3.     Defendant New Line Productions, Inc. ("New Line") is a corporation

9 organized and operating under the laws of the State of California with its principal

10 place of business located in the County of Los Angeles, State of California.

11      4.     Defendant Warner Bros. Entertainment, Inc. ("WB") is a corporation

12 organized and operating under the laws of the State of Delaware with its principal

13 place of business located in the County of Los Angeles, State of California.

14      5.     Gerritsen is informed and believes, and on that basis alleges, that in and

15 subsequent to 2008 each defendant was acting as the agent of each other defendant,

16 and, in committing the acts and omissions described below, was acting within the

17 course and scope of such agency with the knowledge, consent and ratification of

18 each other defendant.

19      6.     Gerritsen is informed and believes, and on that basis alleges, that in and

20 subsequent to 2008, New Line and Katja have been and continue to be shell

21 corporations wholly owned by WB and mere conduits through which WB conducts

22 business. To the extent New Line and Katja continue to transact any business at all,

23 it is at the sole direction and for the sole benefit of WB. Throughout the period 2008

24 to the present, WB exercised complete management, control, ownership, and

25 domination over New Line and Katja. As such, there has been and is today such a

26 unity of interest and ownership between New Line and Katja, on the one hand, and

27 their parent WB on the other, that the separate personalities of New Line and Katja

28

{00243521;1}

1  no longer exist and if their acts are not treated as the acts of WB an inequitable result
2  will follow.

3  ### JURISDICTION AND VENUE

4  7.    The Court has subject matter jurisdiction over this action by virtue of
5  the provisions of 28 U.S.C. Section 1332, in that there is complete diversity of
6  citizenship between the parties and the amount in controversy exceeds the sum of
7  $75,000 exclusive of interest and costs.

8  8.    Venue is proper in this action under the provisions of 28 U.S.C. Section
9  1391(a).  Defendants reside in this judicial district which is also the location where a
10  substantial part of the events or omissions giving rise to the claim occurred.  Further,
11  the contract which is the subject of the suit, as described below, expressly stipulates
12  that all disputes between the parties will be litigated exclusively in the federal and/or
13  state courts located in Los Angeles County.

14  ### FACTUAL ALLEGATIONS

15  9.    Gerritsen is an international best-selling, award-winning author whose
16  novels have frequently appeared on the New York Times Best-Seller lists.  More
17  than 25,000,000 copies of Gerritsen's books have been sold worldwide and from
18  time to time her novels are purchased or optioned by television and motion picture
19  production companies and studios.  Currently, for example, the television series
20  *Rizzoli and Isles* which airs on the TNT network is based on a series of books
21  Gerritsen wrote of the same name.  Prior to her career as an author, Gerritsen was a
22  medical doctor.

23  10.    WB is engaged in the business of developing, producing, distributing,
24  and marketing motion pictures including the 2013 motion picture entitled *Gravity*
25  (the "Film").

26  11.    This case concerns the damages suffered by Gerritsen because
27  defendants failed and continue to fail to acknowledge that the Film was based on a
28  novel she wrote. Gerritsen should have received a production bonus, a percentage of

1 the net proceeds, and a source material credit on the screen and in all paid
2 advertising for the Film, but she did not.

3      12.    In 1999, Gerritsen completed a novel she wrote entitled *Gravity* (the
4 "Book") which was published by Simon & Schuster in September 1999. The Book
5 is set in orbital space and features a female medical doctor/astronaut who is stranded
6 alone aboard a space station after a series of disasters kill the rest of the crew. The
7 Book details the astronaut's struggle to survive. Gerritsen did extensive amounts of
8 research prior to and during the writing of the Book so that the depiction of NASA
9 technology in the Book is realistic, which is unusual for a novel set in space.

10     13.    Based on the manuscript it had seen before the Book was published,
11 Katja purchased from Gerritsen the motion picture rights to the Book and "and any
12 and all versions thereof including the title(s), themes, contents, dialogue, characters,
13 characterizations, elements, translations, adaptations and any and all versions
14 thereof," under a written contract between the parties dated as of March 18, 1999
15 (the "Contract"). A true and correct copy of the Contract is attached hereto as
16 Exhibit 1 and incorporated by this reference.

17     14.    Under paragraph 2 of the Contract, Katja paid Gerritsen $1,000,000. In
18 addition, the Contract provided for the following if a motion picture "based on" the
19 Book (a "Picture") was produced: (a) Under Paragraph 2A, Gerritsen was entitled to
20 a production bonus in the amount of $500,000; (b) Under Paragraph 2B, Gerritsen
21 was entitled to contingent compensation in an amount equal to 2.5% of 100% of the
22 "Defined Net Proceeds" of the Picture; and (c) Under Paragraph 15, Gerritsen was
23 entitled to screen credit, on a separate card, in the main titles and in the billing block
24 of paid advertisements for the Picture.

25     15.    On pages 16 and 17 of the Contract, New Line executed and delivered a
26 Continuing Guaranty ("Guaranty") in which it guaranteed the "full and faithful
27 performance" by Katja of all of Katja's obligations under the Contract.

28

{00243521;1}                              4

1    16.    Gerritsen is informed and believes, and on that basis alleges, that at the
2    time the Contract was signed Katja was (a) a wholly-owned subsidiary of New Line,
3    (b) a shell entity completely dominated, directed, and controlled by New Line, (c)
4    regularly used by New Line as part of its overall business strategy to acquire literary
5    material and develop the material into a viable motion picture screenplay ready for
6    production, at which point the rights would be assigned to New Line or another
7    entity controlled by New Line which would produce and distribute the actual film.
8    Thus, it was understood and intended at the time the Contract was signed that when
9    the Picture was produced based on the Book, Katja would assign its rights to New
10   Line or to another entity controlled by New Line which would produce the Picture.

11   17.    Following Katja's acquisition from Gerritsen of the motion picture
12   rights to the Book, Katja and New Line, along with the production entity Artists
13   Production Group ("APG"), sought to develop the Book into a film (the "Gerritsen
14   Gravity Project"). The motion picture development process involves the writing of a
15   screenplay for a motion picture and often involves the attachment of a director to
16   supervise the process. Where the screenplay is based on a book, the director would
17   have access to the book. Gerritsen is informed and believes, and on that basis
18   alleges, that writer/director Alfonso Cuarón ("Cuarón") was attached to the
19   Gerritsen Gravity Project and worked on developing the Book into a Picture.
20   Gerritsen was not told of this attachment at the time.

21   18.    To assist in the development of the Gerritsen Gravity Project, Gerritsen
22   wrote and delivered additional material that constituted a modified version of a
23   portion of the Book. The additional material written by Gerritsen included scenes of
24   satellite debris colliding with the International Space Station ("ISS"), the destruction
25   of the ISS, and the surviving female medical doctor/astronaut left drifting in her
26   space suit, alone and untethered, seeking the means to return to earth. Since the
27   Contract defined the property acquired by Katja to include the Book "and any and all
28   versions thereof," this additional written work was also owned by Katja.

{00243521;1}                                        5

19. Gerritsen is informed and believes, and on that basis alleges, that sometime after 2002, Cuarón and his son Jonas Cuarón (collectively, the "Cuaróns") wrote a screenplay entitled *Gravity* (the "Cuaróns' Gravity Project"). The Cuaróns' Gravity Project featured a female medical doctor/astronaut who is stranded alone aboard a space station after a series of disasters kill the rest of the crew. The Cuaróns' screenplay details the astronaut's struggle to survive. The depiction of NASA technology in the Film is realistic, which is unusual for a film set in space.

20. In or about 2008, WB acquired control of New Line and Katja by means of a corporate transaction. Gerritsen is informed and believes, and on that basis alleges, that by virtue of the transaction the rights and duties of Katja and New Line under the Contract and Guaranty were transferred and assigned to WB so that as of 2008 WB owned and still owns today the motion picture rights to the Book.

21. On or about December 17, 2009, the Cuaróns granted all rights in the Cuaróns' Gravity Project to WB.

22. In or about 2011, WB commenced production of the Film. Cuarón was the Film's director. The Film included scenes of satellite debris colliding with the ISS, the destruction of the ISS, and the surviving female astronaut left drifting in her space suit, alone and untethered, seeking the means to return to earth. The screenplay credit for the Film was "Written by Alfonso Cuarón & Jonas Cuarón." By according this form of credit, WB represented to the public that the material for the Film was original with the Cuaróns. The Film was released to the public in the United States on or about October 4, 2013. The Film's reported box office gross to date is over $700,000,000, which in the motion picture business is an exceptionally high amount. The Film eventually won seven (7) Oscars. Katja should have objected to the production by WB of a film based on a literary property technically owned by Katja, but did not, because Katja is controlled by WB and WB is effectively the owner of the motion picture rights to the Book.

1

2

## FIRST CLAIM FOR RELIEF

### (Breach of Written Contract Against WB and Katja)

3      23.    Plaintiff realleges and incorporates herein by this reference each and

4  every allegation made above in paragraphs 1 through 22 of this Complaint.

5      24.    The Film was and is based on the Book within the meaning of

6  paragraphs 2A, 2B and 15 of the Contract. Under paragraph 15(a) of the Contract,

7  since the Film retained the same title as the Book, Gerritsen was supposed to receive

8  the following credit onscreen and elsewhere in all paid advertisements for the Film:

9  "Based on the book by Tess Gerritsen." The production bonus of $500,000 was

10 payable within 20 days after commencement of principal photography of the Film,

11 which occurred in 2011. Given the huge box office receipts of the Film, Gerritsen is

12 informed and believes, and on that basis alleges, that Defined Net Proceeds have

13 accrued, and that she is entitled to her 2.5% share thereof. However, none of the

14 Defendants paid the production bonus of $500,000 or the Defined Net Proceeds

15 compensation of 2.5% of 100%. None of the Defendants accorded Gerritsen the

16 contractually required credit. All of the foregoing failures to pay money and to

17 accord credit constitute breaches of the Contract.

18     25.    Gerritsen has performed all of the terms and conditions of the Contract

19 to be performed on her part. Without limiting the foregoing, she has notified

20 defendants in writing of the breaches and provided them with the specified time

21 within which to cure the breaches, as required by paragraph 21 of the Contract.

22 Defendants have failed and refused to cure such breaches of the Contract.

23     26.    As a direct and proximate result of the foregoing breaches of contract,

24 Gerritsen has been damaged in a sum which cannot presently be calculated with

25 certainty but which is believed to exceed $10,000,000 according to proof at trial.

26 These sums include, at a minimum and without limitation, the $500,000 production

27 bonus that is owed under paragraph 2A of the Contract, the participation in net

28 proceeds which is due and owing under paragraph 2B of the Contract, damages for

{00243521;1}

7

deprivation of the credits agreed upon in paragraph 15 of the Contract, and prejudgment interest.

### SECOND CLAIM FOR RELIEF

### (Breach of Guaranty Against WB and New Line)

27.    Gerritsen realleges and incorporates herein by this reference each and every allegation made above in paragraphs 1 through 26 of this Complaint.

28.    Under paragraph 1 of the Guaranty, WB and New Line guaranteed "full and faithful performance of all of Company's obligations pursuant to the Agreement [Contract]."

29.    Gerritsen has performed all of the terms and conditions of the Guaranty to be performed on her part. Without limiting the foregoing, she has notified defendants in writing that the Contract was breached and the nature of the breach, and she provided them with the specified time within which honor the Guaranty as required by paragraph 5 of the Guaranty.    Defendants have failed and refused to make any payments under the Guaranty.

30.    WB and New Line have breached the Guaranty by failing to pay the consideration and afford the credit to which Gerritsen was due under the Contract.

31.    As a direct and proximate result of the foregoing breaches of the Guaranty, Gerritsen has been damaged in a sum which cannot presently be calculated with certainty but which is believed to exceed $10,000,000 according to proof at trial.    These sums include, at a minimum and without limitation, the $500,000 production bonus that is owed under paragraph 2A of the Contract, the participation in net proceeds which is due and owing under paragraph 2B of the Contract, damages for deprivation of the credits agreed upon in paragraph 15 of the Contract, and prejudgment interest.

32.    The prevailing party is entitled to recover its reasonable attorneys' fees and costs pursuant to paragraph 6 of the Guaranty.

### THIRD CLAIM FOR RELIEF

#### (Accounting Against All Parties)

33.     Gerritsen realleges and incorporates herein by this reference each and every allegation made above in paragraphs 1 through 32 of this Complaint.

34.     Under Paragraph 2B of the Contract, Gerritsen is entitled to contingent compensation in an amount equal to 2.5% of 100% of the "Defined Net Proceeds" of the Film.     The term "Defined Net Proceeds" is defined in Exhibit DNP to the Contract ("Exhibit"). The Film has been a huge financial success, grossing in excess of $700,000,000 to date in box office receipts alone which does not include any revenue from exploitation of ancillary rights such as music publishing and soundtrack royalties, cable and network television deals, DVD and Blu-ray releases, and the like.

35.     Under paragraph 9 of the Exhibit, defendants were and are obligated to deliver written statements to Gerritsen reflecting the financial performance of the Film and any payments due Gerritsen under the Contract and Exhibit.  Defendants have failed to deliver any statements to Gerritsen and refuse to do so now.

36.     Under paragraph 10 of the Exhibit, Gerritsen is entitled to audit the books and records of the Film, which are in the exclusive possession and control of defendants. Defendants have not recognized Gerritsen's right to conduct such an audit.

37.     The determination of the amount of Defined Net Proceeds which are due and owing by defendants to Gerritsen must be based on a complex analysis of financial data and documentation that is within defendants' exclusive possession and control.

38.     Defendants are in possession of money which they are obligated to remit to Gerritsen which they refuse to do.  Therefore, Gerritsen needs, and is entitled to, an accounting from defendants showing the amount of Defined Net Proceeds which are owing to her.

1         **WHEREFORE**, Gerritsen prays for judgment as follows:

2                     **First and Second Claims**

3       1.    For damages believed to exceed $10,000,000 according to proof,

4  including without limitation the $500,000 production bonus, damages resulting from

5  deprivation of the contractually-mandated credit, and loss of the Defined Net

6  Proceeds;

7       2.    For interest thereon at the maximum legal rate;

8                     **Third Claim**

9       3.    For an accounting of the Defined Net Proceeds generated by the Film

10  and those sums due and owing to Gerritsen;

11                     **All Claims**

12       4.    For all costs allowable by law, including her reasonable attorney's fees;

13  and

14       5.    For such other and further relief as the court deems just and proper.

15

16  Dated: April 29, 2014              KULIK GOTTESMAN & SIEGEL LLP

17

18                                By:

19                                  Glen L. Kulik

20                                  Attorneys for Plaintiff

21

22

23

24

25

26

27

28

# REQUEST FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, to the extent permitted by law, Plaintiff Terry T. Gerritsen hereby demands a trial by jury of all claims, defenses and issues raised in this case.

Dated: April 29, 2014                    KULIK GOTTESMAN & SIEGEL LLP

By: _____
                    Glen L. Kulik
                    Attorneys for Plaintiff

{00243521;1}

11

COMPLAINT

EXHIBIT 1

KATJA MOTION PICTURE CORP.
C/O NEW LINE PRODUCTIONS, INC.
116 NORTH ROBERTSON BOULEVARD, SUITE 200
LOS ANGELES, CA 90048

As of March 18, 1999

Terry T. Gerritsen
c/o Joel Gotler
Renaissance
9220 Sunset Boulevard, Suite 302
Los Angeles, CA 90069

Re:  "Gravity"/Purchase Agreement

Ladies and Gentlemen:

This will confirm the agreement between KATJA MOTION PICTURE CORP. ("Company")
and TERRY T. GERRITSEN ("Owner") with respect to that certain original to be published
novel entitled "GRAVITY" written by Owner and any and all versions thereof including the
title(s), themes, contents, dialogue, characters, characterizations, elements, translations,
adaptations and any and all versions thereof (hereinafter referred to as the "Property").

1.  CONDITIONS PRECEDENT:  All of Company's obligations hereunder are subject to
satisfaction of the following conditions precedent:

  (a)  Signature by Owner and delivery to Company of this agreement;

  (b)  Company's receipt and approval of all chain-of-title documentation to the
Property, including, but not limited to, a publisher's release in the form of Exhibit B attached
hereto;

  (c)  Company's receipt of a complete "Annotation" from Owner, if Paragraph 14
applies.

2.  PURCHASE PRICE:  As full and complete consideration for all of the rights granted
hereunder (including, without limitation, the "Rights" as defined in Paragraph 3 below) and the
promises, representations and warranties made by Owner hereunder.  Company shall pay
Owner the sum of One Million Dollars ($1,000,000) (the "Purchase Price") upon satisfaction of
the conditions precedent set forth in Paragraph 1 above.

2A.  PRODUCTION BONUS:  In addition to the Purchase Price, and provided Owner is not
in material default hereunder, then, if Company produces a live action theatrical motion picture
based on the Property ("Picture"), Company shall pay Owner a production bonus in the amount of

Screenplay Option-Purchase  07/31/97
Gravity/Gerr04BE.002/5.13.99

-1-

Five Hundred Thousand Dollars ($500,000) payable within twenty (20) days after commencement of principal photography of the Picture.

2B.     CONTINGENT COMPENSATION:  In addition to the Purchase Price, and provided Owner is not in material default hereunder, then, if Company produces and releases a live action theatrical motion picture based on the Property ("Picture"), Company shall pay Owner the following contingent compensation:

(a)     Net Proceeds: Owner shall receive an amount equal to two and one-half percent (2.5%) of one hundred percent (100%) of the "Defined Net Proceeds" (as that term is defined below), if any, of the Picture.

(b)     Defined Net Proceeds Defined: For purposes of this agreement, "Defined Net Proceeds" shall be defined in accordance with Company's standard definition of net profits, attached hereto as Exhibit "DNP" as modified by the Rider attached thereto. Nothing contained herein shall be construed as an undertaking by Company to maximize the "Defined Net Proceeds" of the Picture.

3.     **GRANT OF RIGHTS.**

(a)     Conditioned only upon Company's payment of the Purchase Price, Owner hereby sells, grants, conveys and assigns the Rights to Company. Upon payment of the Purchase Price, the Rights shall irrevocably vest in Company.

(b)     The "Rights" means the following rights on an exclusive basis throughout the world in perpetuity:

(i)     The entire copyright and all rights of every type and nature now known or hereafter devised in and to the motion picture, television, allied and ancillary rights in and to the Property.

(ii)     The right to develop and produce any number of audio and audio visual works ("Productions") including without limitation feature films, television movies, television series, other television productions, direct to video productions, stage plays and interactive productions based upon or utilizing the Property or any part of the Property.

(iii)     The right to make any changes in, deletions from or additions to the Property which Company in its sole discretion may consider necessary or desirable.

(iv)     The right to copyright in any name Company may designate and to distribute, exhibit, exploit and deal in and with the Productions in such manner as Company elects in all media now known or hereafter devised (including without limitation in the theatrical, non-theatrical, all forms of television and home and electronic video media) and to exploit the phonograph record, merchandising, CD-Rom, interactive, music publishing, live stage theme park, studio tour, print publication, still photograph and artwork, film clip and advertising, "making of," promotional and publicity rights in the Productions and in all materials contained in the Productions.

(v)     The right to use Owner's name, approved (with respect to Owner's likenesses as they appear in still photographs and artistic renderings only) likeness, logo, voice and biographical material (which Owner shall promptly provide to Company) in connection with the exploitation of the rights granted under this agreement.

(vi)     The rental and lending and performance property rights set forth in paragraph 16 below.

(c)     To the fullest extent not prohibited by applicable law, Owner waives the benefits of any provisions of law known as "droit moral" and of similar laws.

3A.     RESERVED RIGHTS.  Owner hereby reserves and does not grant to Company the following rights in and to the Property (collectively the "Reserved Rights"); provided, that notwithstanding anything which might be construed to the contrary, Owner's reservation of rights shall not be construed as a grant by Company to Owner of the right to exercise the Reserved Rights in any material written or prepared by Company or at Company's request.

(a)     Print Publication Rights:  Owner hereby reserves all print publication rights in the novel Gravity (including, without limitation, electronic publishing of the text of the novel without visual accompaniment and non-dramatic recorded readings by a single or dual narrator of the text of published print editions of the novel in the form of audiocassettes, audiodisks, or similar audio-only devices individually purchased by the end-user) provided, however, that Company shall have the right to publish excerpts or synopses of the Property or the productions based thereon for the purpose of advertising and exploiting any production produced hereunder, provided that no such summary or synopsis may include more than 7,500 words taken directly from the Property and shall not be for sale in the U.S.  Notwithstanding anything which might be construed to the contrary in this Agreement, Owner's rights shall not apply to any material written or prepared by Company or at Company's request, including, publication of the screenplay and graphic novels for the Productions.

(b)     Radio and Live Television Rights:  Owner reserves the following rights in and to the Property: (i) all radio rights (except that Company shall have simulcast rights as well as the right to broadcast over radio, advertisements with respect to motion pictures or other productions produced hereunder); and (ii) all live television rights.

(c)     Author-Written Sequels:  Subject to the terms of this Paragraph, Owner reserves all rights in any "author-written sequels."  Author-written sequels, for purposes of this Paragraph, shall be defined as works written by Owner or upon Owner's death, works authorized by the representation of his estate, before or after the date hereof which use any of the characters depicted in the Property, participating in entirely different events from those depicted in the Property, whether such events are prior to, concurrent with or subsequent to the events in the Property, and whose plot is substantially new.

(i)     If Owner writes or authorizes the writing and publication of any sequel to the Property, Company shall have a "Right of Last Refusal" with respect to the acquisition of any of the Rights to such author-written sequel.

(ii)     The term "Right of Last Refusal" shall mean that if Owner makes or receives a bona fide offer for the acquisition of any Rights in any author-written sequel which Owner is desirous of accepting, Owner will give Company written notice of such proposed offer, in which notice Owner shall set forth the name and address of the proposed acquirer and the consideration to be paid.  Company shall thereafter have the exclusive right, exercisable for a period of thirty (30) days following Company's receipt of the aforesaid notice from Owner to elect to acquire the rights set forth in said notice on the terms therein stated (except that Company shall not be required to match any non-monetary term of any such third party offer which is not as readily capable of being performed by one person as another).  If, however, Company shall fail or refuse to acquire such rights on the terms so offered, Owner will have the right to enter into an agreement with the party and upon the specific terms set forth in the aforesaid notice to Company; provided, that any material modification to such

terms will require resubmission of the offer, as so modified, to Company. Should Owner fail to enter into an agreement with such third party within sixty (60) days after the expiration of the aforesaid thirty (30) day last refusal period, the procedure stated above shall be repeated on the next occasion on which Owner desires to enter into an agreement with any third party regarding such author-written sequel.

(iii)   Owner agrees not to exercise, or to authorize or permit the exercise of, or to sell, license, or otherwise dispose of the rights referred to in this Paragraph 3A or to any author-written sequels (other than print publication rights), or agree to do so, until after the expiration of the "holdback period" as hereinafter defined. The holdback period shall mean the period commencing on the date of this Agreement and expiring five (5) years after the first theatrical exhibition or national television broadcast, as the case may be, in the United States of the first production produced hereunder, or seven (7) years after the date of exercise of the option, whichever first occurs. If Company commences principal photography of any remake, sequel, television motion picture or mini-series or television series, then the foregoing restriction shall also apply during the period commencing, in each case, on commencement of principal photography of such remake or sequel or television motion picture or mini-series or each episode of such television series and ending five (5) years after the first theatrical exhibition or television broadcast, as the case may be, in the United States of such remake, sequel, television motion picture or mini-series or episode. Notwithstanding anything contained in the foregoing to the contrary, in no event shall Owner's exercise of the Reserved Rights be construed as limitation or restriction on Company's rights to use the characters contained or described in the Property in any remake, sequel or television production based on the Property or in any other manner permitted hereunder.

3B.   ADDITIONAL PAYMENTS. If the Picture is produced and released by Company pursuant to this agreement and if Owner shall not then be in material breach of any representation, warranty or agreement contained herein, then, with respect to any subsequent production, Owner shall receive the following:

(a)   Sequels: If Company produces a feature length live action theatrical motion picture sequel ("Sequel") to the Picture for initial exhibition in theatres in the United States, Owner shall be entitled to receive for the first Sequel, a sum equal to fifty percent (50%) of the Purchase Price and Production Bonus paid pursuant to Paragraph 2 above as contingent compensation, a percentage of the Defined Net Proceeds of such Sequel, if any, which percentage shall be equal to one-half (1/2) of the percentage which Owner was entitled pursuant to Paragraph 2B above.

(b)   Remakes: If Company produces a feature length live action theatrical motion picture remake of the Picture ("Remake") for initial exhibition in theatres in the United States, Owner shall receive for the first Remake an amount equal to thirty-three and one-third percent (33-1/3%) of the Purchase Price and Production Bonus paid to Owner pursuant to Paragraph 2 above, plus as contingent compensation, a percentage of the Defined Net Proceeds of such Remake, if any, which percentage shall be equal to one-third (1/3) of the percentage which Owner was entitled pursuant to Paragraph 2B above.

(c)   Television Motion Picture: If, following the production of the Picture, Company produces a live action motion picture based on the Property intended for initial exhibition on United States network prime-time television ("Television Movie") Owner shall receive the sum of Five Thousand Dollars ($5,000) for each hour of the first Television Movie actually telecast, but not to exceed a total of Forty Thousand Dollars ($40,000) which shall constitute full payment for any re-runs or other exploitation thereof.

(d)   Theatrical Release of Television Production:

(i)     If a Television Movie has a theatrical exhibition in the United States prior to its initial broadcast on television in the United States, Owner shall be entitled to an additional sum equal to one hundred percent (100%) of the applicable compensation paid pursuant to Paragraph 3B(c) above;

(ii)    If a Television Movie has a theatrical exhibition in the United States subsequent to its initial broadcast on television in the United States, Owner shall be entitled to an additional sum equal to Fifty Percent (50%) of the applicable compensation paid or payable to Owner pursuant to Paragraph 3B(c) above;

(iii)   If a Television Movie has a theatrical exhibition outside the United States prior to its initial broadcast on television in the United States or if a Television Movie has a theatrical exhibition outside the United States subsequent to its initial broadcast on television in the United States, Owner shall be entitled to an additional sum equal to Fifty Percent (50%) of the applicable compensation paid or payable to Owner pursuant to Paragraph 3B(c) above.

(e)     Television Series Royalties.  For an episodic television series based on the Picture produced for exhibition on United States network prime-time television ("Prime Time Series") Owner shall be entitled to receive the following applicable per episode royalty, payable on a one-time basis within thirty (30) days after the initial telecast of the respective episode:

(i)     One Thousand Dollars ($1,000) per episode for episodes of thirty (30) minutes or less in length.

(ii)    One Thousand Five Hundred Dollars ($1,500) per episode for episodes between thirty (30) and sixty (60) minutes in length.

(iii)   Two Thousand Dollars ($2,000) per episode for episodes of between sixty (60) and ninety (90) minutes in length.

(f)     For premium cable prime time series, Owner shall be entitled to two-thirds (2/3) of the applicable royalty set forth in Paragraph 3B(e) above on a one-time only basis.

(g)     Unless specified otherwise, theatrical payments due under this Paragraph 3B shall be payable on the commencement of principal photography.  Television payments shall be payable upon the later of receipt of the license fee or initial United States broadcast.

## 3C.    STAGE RIGHTS.

(a)     Reversion.  In the event that Company does not exploit the legitimate stage rights to the Property granted hereunder within ten (10) years following the initial theatrical release of the Picture and provided that Owner is not in material default hereunder, then such legitimate stage rights to the Property shall revert to Owner, subject to the following:

(i)     Owner shall, prior to disposing of any of the legitimate stage rights in the Property, in each instance first negotiate in good faith exclusively with Company for thirty (30) days.  If upon the completion of the 30 day period, the parties have not reached an agreement, Owner shall be free to dispose of the legitimate stage rights which were the subject of the negotiation, subject paragraph 4C(a)(ii) below.

(ii)    If Owner makes or receives a bona fide offer for the acquisition of any legitimate stage rights to the Property which Owner is desirous of accepting, Owner will give

Company written notice of such proposed offer, in which notice Owner shall set forth the name and address of the proposed acquirer and the consideration to be paid. Company shall thereafter have the exclusive right, exercisable for a period of thirty (30) days following Company's receipt of the aforesaid notice from Owner to elect to acquire the rights set forth in said notice on the terms therein stated (except that Company shall not be required to match any non-monetary term of any such third party offer which is not as readily capable of being performed by one person as another). If, however, Company shall fail or refuse to acquire such rights on the terms so offered, Owner will have the right to enter into an agreement with the party and upon the specific terms set forth in the aforesaid notice to Company; provided, that any material modification to such terms will require resubmission of the offer, as so modified, to Company. Should Owner fail to enter into an agreement with such third party within sixty (60) days after the expiration of the aforesaid thirty (30) day last refusal period, the procedure stated above shall be repeated on the next occasion on which Owner desires to enter into an agreement with any third party regarding such exploitation of legitimate stage rights to the Property.

(iii)     Nothing contained in this paragraph 4C shall be construed as a restriction on the exploitation by Company of its merchandising, soundtrack, or advertising rights. Notwithstanding anything which might be construed to the contrary, any reversion to Owner of the legitimate stage rights pursuant to this paragraph 4C shall not be construed as a grant or license by Company to Owner of any right in any Production or material written or prepared by Company or at Company's request or by any person granting rights or furnishing services to Company.

(b)     Royalty.

(i)     In the event that Company produces a dramatic stage play based on the Property presented to a live audience ("Play") and provided that Owner is not in material default hereunder, Owner shall be entitled to an amount equal to one percent (1%) of the gross weekly box office receipts of each performance week of the Play ("Owner's Royalty") (provided that if the royalty of the author of the Play ["Author's Royalty"] is calculated based on a percentage of the company share [as such term is defined in the theatrical industry] when the producing entity producing the Play is compensated on a company share basis, Owner's Royalty shall be based on the company share in the same proportion to the Author's Royalty based on the company share that Owner's Royalty bears to the Author's Royalty). Owner's Royalty under this paragraph 4C(b)(i) shall be subject to such waivers, deferments, and reductions as the Author's Royalty is subject.

(ii)     The gross weekly box office receipts and production costs shall be computed and defined and such royalty paid in accordance with the normal custom and usage of then current Broadway theatrical practice (including accountings and right of audit).

4.     REPRESENTATIONS AND WARRANTIES    Owner represents, warrants and agrees that:

(a)     The Property has not been published. The Property is scheduled to be published by _____ on _____ ;

(b)     The Property was written solely by Owner and is wholly original with Owner except for incidental public domain material;

(c)     Solely with respect to non-trademark and non-copyright-related claims, the foregoing representations and warranties are made to the best of Owner's knowledge (including that which Owner should have known in the exercise of reasonable prudence), neither the

Screenplay Option-Purchase  07/31/97
Gravity/Gerr04BE.002/5.13.99

-6-

Property, nor any part or element thereof: (i) infringes upon or violates the personal or property rights or any other rights of any person or entity (including, without limitation, the rights of copyright, trademark, privacy and publicity); or (ii) contains any element or material which in any manner constitutes a libel, slander or other defamation of any person or entity;

(d)     The Property is wholly fictional and is not based in whole or in part on any actual individual, whether living or dead, or any "real life" incident, except if and to the extent specified on the "Annotation" furnished by Owner concurrently with the execution of this agreement pursuant to Paragraph 14 below;

(e)     The Property, the Rights and all other rights and privileges granted or to be granted to Company hereunder are and shall at all times be free and clear of any liens, claims, charges or encumbrances;

(f)     To the best of Owner's knowledge, (or that which Owner should have known in the exercise of reasonable prudence), no claims, litigation or other proceedings have heretofore been asserted and/or brought and no claims, litigation or proceedings are pending or threatened relating to the Property, the Rights and/or to any of the other rights and privileges granted or to be granted to Company hereunder;

(g)     Owner is the sole and exclusive owner of the Property, and all of the Rights, and of all other rights and privileges granted or to be granted to Company hereunder and Owner has full right, power and authority to make and perform this agreement without obtaining the consent or approval of any person or entity;

(h)     No part of the Property is in the public domain;

(i)     Owner has not heretofore in any way exercised or disposed of the Rights or any part thereof. Without limiting the generality of the foregoing, the Property has not previously been performed, exploited or exhibited as a motion picture, television production, audio-visual production, play or other form, and no rights have been granted or licensed to any third party to do so;

(j)     The Property may be validly copyrighted and registered for copyright in the United States of America and may similarly be protected elsewhere to the maximum extent that the laws of other countries provide for such protection;

(k)     All material furnished in the "Annotation" furnished by Owner pursuant to Paragraph 14 below (if applicable) shall be complete, truthful and accurate in all respects; and

(l)     Owner has not done or omitted to do, nor will Owner do or omit to do, any act or thing which would impair, encumber or diminish Company's full enjoyment of the Rights and all other rights and privileges granted and to be granted to Company under this agreement.

(m)     Owner represents that he/she has not entered into any agreement (written or oral, implied or express) with any third party which relates to the Picture of the production of the Picture nor have they made any promises to any third party in connection with the Picture or the production of the Picture.

## 5.   INDEMNITY:

5.1.   Owner will defend, indemnify, make good, save and hold harmless Company, its parent, successors, licensees and assigns and their respective officers, agents and employees, from all claims, liabilities, damages, costs, charges, reasonable attorney's fees,

Screenplay Option-Purchase  07/31/97
Gravity/Gerr04EE.002/5.13.99

-7-

recoveries, actions, judgments, penalties, expenses and other losses whatsoever which may be obtained against, imposed upon or suffered by Company, its parent, successors, licensees and assigns arising from a breach or alleged breach of any of Owner's representations, warranties or agreements hereunder.

5.2. Company hereby agrees to defend, indemnify and hold harmless Owner against any and all third party claims and expenses incurred by Owner by reason of the material breach of any representation, warranty, undertaking or agreement of Company hereunder with respect to which Owner has no obligation to indemnify Company pursuant to Paragraph 5.1 above; provided, that such claims do not arise out of Owner's tortious or criminal conduct or contractual breach.

5.3. Owner shall have the right as well as the obligation to consult and cooperate with Company in connection with any claim, subject to the indemnity set forth in Paragraph 5.2 above and, upon Company's request, to furnish Company with any and all evidence, materials or other information relevant thereto. Owner shall have the right (at Owner's sole expense) to have Owner's own counsel present in connection with the defense of any such claim, provided that such counsel fully cooperates with Company's counsel and in no way interferes with the reasonable handling of the case by Company's counsel. All aspects of the defense of such claim, whether as part of any litigation, negotiation or otherwise (including, without limitation, any decision regarding any settlement), shall be controlled by Company, Company shall be free to use counsel of Company's choice in connection therewith, and such control shall in no way abrogate or diminish Owner's obligations under Paragraph 5.1 above.

6. WAIVER OF "DROIT MORAL": Owner hereby waives, for itself and on behalf of his or her heirs, executors, administrators and assigns, all right of "droit moral" or any similar laws or legal principles, and agrees, for itself and on behalf of his or her heirs, executors, administrators and assigns, not to institute, support, maintain or permit directly or indirectly any litigation or proceedings instituted or maintained on the ground that Company's exercise of its rights in the Property in any way constitutes an infringement or violation of any right of "droit moral" or is in any way a defamation or mutilation of the Property, or any part thereof, or contains unauthorized variations, alterations, modifications, changes or translations.

7. ADDITIONAL DOCUMENTS: Concurrently with the execution of this agreement Owner will execute the "Assignment" attached hereto as Exhibit "A" ("Assignment"). Owner shall execute and deliver any further and additional consistent documents which Company may deem necessary to carry out and effectuate the purpose and intent of this agreement. If Owner fails to execute and deliver to Company any such further documents required of them under this agreement within three (3) business days after Company's written request therefor, or if Owner fails to take any action necessary or desirable to effectuate the purposes of this agreement (including, without limitation, renewing copyrights and initiating and maintaining actions of infringement), and Owner fails to respond within three (3) business days of Company's notice or request therefor, then Owner hereby irrevocably appoints Company as its attorney-in-fact to execute such documents and take any such actions. Said appointment is coupled with an interest and shall be irrevocable.

8. INSTITUTION OF LEGAL ACTION: Owner hereby grants to Company the free and unrestricted right, exercisable at Company's cost and expense, to institute in the name and on behalf of Owner suits and proceedings at law or in equity to enjoin and restrain any infringement(s) of the rights herein granted; Owner hereby assigns to Company any and all causes of action arising from any such infringement(s) and any and all recoveries obtained in any such action, Owner agrees that it will not compromise, settle or in any manner interfere with any such litigation.

9.      COPYRIGHT OF LITERARY PROPERTY: Owner shall take and complete any and all steps and proceedings required by the law of any country in the world in which the Property is hereafter published to secure copyright in the Property and to prevent the Property from falling into the public domain by reason of any such publication. Owner shall take such steps as may be reasonably necessary to renew or extend, insofar as possible, any and all copyrights now or hereafter secured upon the Property. As a material part of the consideration moving to Company for its execution of this agreement, Owner agrees that in the event the termination of transfer provisions of Section 203 of the United States Copyright Act shall be applicable prior to the termination of Company's rights hereunder, Company shall have a right of first negotiation and right of last refusal with respect to the renewal of the rights granted to Company hereunder. If Owner fails to do any of the things specified in this paragraph, Company is hereby irrevocably granted the power coupled with any interest to perform such acts and take such proceedings in the name and on behalf of Owner as its attorney-in-fact.

10.     NAME/LIKENESS/VOICE: Owner hereby grants to Company, its successors and assigns, the irrevocable right, forever and throughout the world, to use, for no additional consideration, Owner's name, image, approved (with respect to Owner's likenesses as they appear in still photographs and artistic renderings only) likeness, voices and/or approved biographical material (which Owner shall promptly provide to Company) in connection with the production, exhibition, advertising, publicity, and other exploitation of any motion pictures produced hereunder and all subsidiary, ancillary, and derivative rights therein and thereto, and/or any other use or exploitation of any of the rights herein granted to Company with respect to the Property; provided, that in no event shall Owner be depicted as directly endorsing any product without Owner's prior consent.

11.     ASSIGNMENT: Owner agrees that Company may assign this Agreement, in whole or in part, at any time to any person, corporation or other entity, provided that unless this assignment is to a so-called major or mini-major production company or distributor or similarly financially responsible party or purchaser of substantially all of Company's stocks or assets which assumes in writing all of Company's obligations, Company shall remain secondarily liable for all obligations to Owner hereunder.

12.     NOTICES: All notices hereunder shall be in writing and shall be given by personal delivery, unless personal delivery is impracticable, in which case notice may be given by overnight courier, facsimile transmission or by registered or certified mail (postage prepaid), and shall be deemed given hereunder on the date delivered or faxed, the day after a notice is sent by overnight courier or a date forty-eight (48) hours after the date mailed. The time to respond to notices given during the Christmas-New Year's week shall be tolled until five (5) business days following New Year's Day. Until further notice, the address of the parties shall be as follows:

OWNER

Terry T. Gerritsen
c/o Joel Gotler
Renaissance
9220 Sunset Blvd., Suite 302
Los Angeles, CA 90069
Fax: (310) 858-5389

COMPANY

Katja Motion Picture Corp.
c/o New Line Productions, Inc.
888 Seventh Avenue
New York, NY 10106
Attn: Judd Funk
Exec. V.P. Business & Legal Affairs
Fax: (310) 289-5167

With a copy to:

Linda Lichter, Esq.
Lichter, Grossman, Nichols
   & Adler, Inc.
9200 Sunset Boulevard
Suite 530
Los Angeles, CA 90069
Fax: (310) 205-6990

With a copy to:

Meg Ruley
Jane Rotresen Agency
318 East 51st Street
New York, NY

With a copy to:

Benjamin Zinkin
Sr. Exec. V.P. Business & Legal Affairs
New Line Cinema Corp.
888 Seventh Avenue
New York, NY 10106
Fax: (212) 956-1931

13.    LIMITATION OF REMEDIES:  Owner acknowledges that in the event of a breach of any of Company's obligations under this agreement, the damages (if any) caused to Owner thereby is not irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief; and Owner's rights and remedies in the event of a breach of this agreement by Company shall be limited to the right, if any, to recover damages in an action at law and Owner shall not be entitled to any equitable relief to restrict or interfere with Company's right to produce, distribute, market or exploit all motion pictures or other productions produced pursuant to this agreement or contemplated herein (including, but not limited to, derivative works) and the ancillary rights therein or to otherwise exploit or exercise any of the rights granted to Company hereunder.

14.    ANNOTATION GUIDE:  If and to the extent any material (including, without limitation, characters and characterizations) contained in the Property is based in whole or in part on any actual individual, whether living or dead, or any "real life" incident, Owner shall prepare and deliver to Company, not later than the date of execution of this agreement, a complete, true and accurate written annotation of such material, in accordance with the guidelines provided in the Annotation Guide attached hereto (the "Annotation").  Owner shall also accurately provide such other information as may be reasonably required by Company or its insurance carrier for the purpose of evaluating the risks involved in the utilization and exploitation of the Rights.

15.    CREDIT:  In the event that Owner fulfills all of its obligations hereunder and is not in breach of this Agreement, Company shall accord Owner credit on screen, on a separate card in the main titles and in the billing block of paid advertisements for the Picture, subject to Company's standard and customary exclusions and practices and applicable guild and union restrictions and insurance carrier parameters, in the following form:

     (a)    If the Picture has the same title as the title of the Property, such credit shall read substantially as follows:

"Based on the book by Tess Gerritsen"

     (b)    If the Picture has a different title than the title of the Property, such credit shall read substantially as follows:

"Based on the book 'Gravity' by Tess Gerritsen"

Owner's credit shall also appear in all so-called excluded advertising issued by or under Company's control (except for award, nomination and congratulatory ads naming only the honored individual) wherever the writer for the Picture is accorded credit in such excluded ad. It is specifically understood that no casual or inadvertent failure by Company to comply with the provisions of this Paragraph shall be deemed a breach of this Agreement; provided, that upon receipt of written notice of such failure, Company shall take reasonable steps to prospectively cure any failure to accord credits which are economically practicable to cure. Owner's sole remedy for any breach of this Paragraph shall be in an action at law for damages and in no event shall Owner be entitled to equitable relief therefor.

16.     PUBLIC RIGHTS: Nothing contained in this agreement shall be construed to be or operate in derogation or limitation of any rights to which Company may be entitled as a member of the public if this agreement were not in existence.

17.     EUROPEAN COMMUNITY ("EC") DIRECTIVES:

(a)     Rental and Lending Rights: Owner acknowledges that the compensation payable under this agreement includes adequate and equitable remuneration for the "Rental and Lending Rights" (as defined below) and to the fullest extent permitted by applicable law, constitutes a complete worldwide buyout of all Rental and Lending Rights, in perpetuity. Owner hereby assigns the Rental and Lending rights to Company. Owner hereby irrevocably grants to Company throughout the world in perpetuity, the right to collect and retain for Company's own account all amounts payable to Owner in respect of Rental and Lending Rights and irrevocably directs any collecting societies or other persons or entities receiving such amounts to pay them to Company.

(b)     Definition: "Rental and Lending Rights" means all rights of Owner to authorize, prohibit, control or receive money (other than as provided in this agreement) from the rental, lending, fixation, reproduction of other exploitation of the materials, results and proceeds of Owner's services, or any motion picture, program or other production based thereon, by any media or means now known or hereafter devised as may be conferred upon Owner under applicable laws, regulations or directives, in any jurisdiction throughout the world, including any so-called rental and lending rights pursuant to the European Community directives or enabling or implementing legislation, laws or regulations enacted by member nations of the European Community. The payments made by Company to Owner under this agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to the EC directives, enabling or implementing legislation, laws and regulations enacted by the member nations of the EC.

18.     ERRORS AND OMISSIONS INSURANCE. Company agrees to name Owner as an additional insured on Company's Errors and Omissions insurance policy with respect to the Picture for so long as, and only to such extent as such policy is carried by Company. The provisions of this Paragraph shall not be construed so as to limit or otherwise affect any obligation, representation or agreement by Owner hereunder.

19.     VIDEOCASSETTE AND DVD: At such time as videocassettes and DVDs of the Picture are generally commercially available, Owner shall be entitled to receive one (1) videocassette and one (1) DVD of the Picture at no charge.

20.     PREMIERES: Owner and one (1) guest shall be invited to the U.S celebrity premiere of the Picture, if any. If such premiere occurs more than seventy-five (75) miles from

Owner's residence Company shall provide Owner with business class travel for two (2) and reimburse Owner for Owner's (only) pre-approved expenses for accommodations.

21.    NOTICE FOR COMPANY'S FAILURE TO PERFORM: No failure on the part of Company to perform any of its obligations hereunder shall be deemed a breach of this agreement unless and until Company fails to cure such failure within thirty (30) calendar days after written notice by Owner to Company of such failure to perform.

22.    COMPLETE UNDERSTANDING: This agreement sets forth the complete understanding between Owner and Company with respect to the subject matter hereof, and all prior agreements have been merged herein, whether written or oral, and may not be modified except by a written instrument signed by the party to be charged. Owner acknowledges that no representation or promise not expressly contained in this agreement has been made by Company or any of its agents, employees or representatives.

23.    AMENDMENTS: This agreement may not be modified or amended except by written instrument signed by all parties hereto.

24.    GOVERNING LAW: This agreement shall be governed by the laws of the State of California applicable to agreements entered into and to be wholly performed therein and shall not be modified except by a written document executed by both parties hereto. All disputes arising out of this agreement shall be exclusively resolved and adjudicated in the Federal and State Courts in Los Angeles, California. Each of the parties hereby submits to the exclusive jurisdiction and venue of said courts and waives its rights to have disputes arising out of this agreement adjudicated in any other forum.

If the foregoing accurately reflects your understanding of our agreement, please confirm by signing in the space provided below.

Very truly yours,

KATJA MOTION PICTURE CORP.

By: _____  KM
Its: _____

ACCEPTED AND AGREED TO:

TERRY T. GERRITSEN
S.S.#: 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

Screenplay Option-Purchase  07/31/97
Gravity/Gerr04EE.002/5.13.99

-12-

**EXHIBIT A**
**ASSIGNMENT**

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, TERRY T. GERRITSEN (the "Assignor"), sells and assigns to KATJA MOTION PICTURE CORP., its successors and assigns, forever and throughout the world, all right, title and interest in the original literary material and/or dramatic work (the "Property ") described as follows:

TITLE:      "GRAVITY"

AUTHOR:      TERRY T. GERRITSEN

The Property includes, but is not limited to: (i) all contents; (ii) all past, present and future adaptations and versions; (iii) the title, characters and theme; and (iv) the copyright and all renewals and extensions of copyright.

This Assignment is executed in accordance with and is subject to the agreement (the "agreement") between the Assignor and Company dated as of March 18, 1999 relating to the sale and assignment to Company of the above-mentioned rights in the Property, which rights are more fully described in the agreement.

IT WITNESS WHEREOF, the undersigned has executed this Assignment on the date indicated below.

DATED:      March 18, 1999


TERRY T. GERRITSEN
S.S.#: 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

ACKNOWLEDGED:
KATJA MOTION PICTURE CORP.

By:
Its:

STATE OF  Maine )
) ss:
COUNTY OF Knox )

On this _____21st_____ day of _____May_____ , 1999, before me, the undersigned, a Notary Public in and for said State, personally appeared Terry T. Gerritsen, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is (are) subscribed to the foregoing instrument and acknowledged to me that Terry T. Gerritsen executed the same.

IN WITNESS WHEREOF, I have hereunto set my have and affixed my official seal this day of _____May 21_____ , 1999.

Nancy L. Hutchinson
Notary Public

NANCY L. HUTCHINSON
Notary Public, Maine
My Commission Expires July 30, 2005

Tori Coombs
Witness
Keri L Coombs

## EXHIBIT C
## PUBLISHER'S RELEASE

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby acknowledges and agrees, for the express benefit of KATJA MOTION PICTURE CORP. and its representatives, successors and assigns forever, that the undersigned has no claim to or interest in the worldwide motion picture or television rights or customary ancillary or subsidiary rights or any other rights of any kind other than publication rights heretofore granted to the undersigned, in or to that certain literary work published by the undersigned and described as follows:

Title:             "GRAVITY"

Author:          TERRY T. GERRITSEN

Date/Place of Publication:

Copyright Registration:

The undersigned hereby consents to the publication and copyright by and/or in the name of said author, author's heirs, representatives, licensees and assigns, in any and all languages, in any and all countries of the world, in any form or media, of synopses, excerpts and summaries, not exceeding 7,500 words in length each, of said literary work based principally upon said literary work, for the purpose of advertising, publicizing and/or exploiting any such motion picture, television or other version, but there shall be no limitation in length with respect to any motion picture, television or other version not based principally upon said work, including, but not limited to, sequel motion pictures and television series.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _____ day of _____, 19_____.

_____

By: _____

Its: _____

## CONTINUING GUARANTY

1.      As an inducement to Terry T. Gerritsen ("Owner") to enter into that certain agreement (the "Agreement"), dated as of March 18, 1999, between Katja Motion Picture Corp. ("Company") and Owner pertaining to the services of Owner with respect to that certain proposed motion picture project entitled "Gravity" and for Owner to perform the services and in consideration of the benefits the undersigned guarantor ("Guarantor") will derive from the execution of the Agreement, and provided that Owner is not materially in default under the Agreement, Guarantor guarantees full and faithful performance of all of Company's obligations pursuant to the Agreement (the "Guaranteed Obligations").

2.      The Guaranteed Obligations hereunder are independent of the obligations of Company and a separate action or actions may be brought against Guarantor whether an action is brought against Company or whether Company is joined in any such action or actions. Guarantor agrees that its obligations hereunder shall not be exhausted by any number of actions until the Guaranteed Obligations have been fully paid and performed. This Guaranty shall remain in effect until the Guaranteed Obligations are fully paid, performed or discharged, and this Guaranty shall continue to be effective or reinstated, as the case may be, if at any time payment of any amount paid under the Agreement is rescinded or otherwise returned by Owner upon the insolvency, bankruptcy or reorganization of Company, as if such amount had not been paid. Except as set forth in Paragraph 4 below, Guarantor's obligations under this Guaranty are subject to all defenses which Company may have against Owner with respect to enforcement by Owner of the Guaranteed Obligations.

3.      This Guaranty is a Continuing Guaranty of the Guaranteed Obligations, including any and all Guaranteed Obligations that are renewed, extended, compromised or restructured from time to time. Guarantor agrees that any modification of the Agreement shall not affect or impair Guarantor's obligations under this Guaranty and authorizes Owner and Company upon their mutual agreement without notice or demand and without affecting or impairing Guarantor's liability hereunder, from time to time to renew, compromise, extend, accelerate or modify the Agreement or otherwise change the terms of the Guaranteed Obligations or any part thereof. No assignment permitted by the Agreement will relieve Guarantor of its obligations to Owner with respect to the Guaranteed Obligations.

4.      Subject to the demand requirement set forth in Paragraph 5 below, Guarantor waives: (i) any right to require Owner to proceed against Company; or (ii) any right to require Owner to pursue any other remedy in Owner's power whatsoever prior to proceeding against Guarantor; (iii) any right of subrogation; (iv) any right, remedy or defense based upon an offer of performance of the principal obligation as set forth in Section 2839 of the California Civil Code; and (v) any right, remedy or defense based on the provisions of Section 2845 of the California Civil Code to the extent that such does not restrict the rights of Company or Guarantor in the event of default by Owner. Guarantor waives any defense arising by reason of: (a) the insolvency or bankruptcy of Company; (b) lack of authority of Company or the person signing the Agreement on behalf of Company; and/or (c) any disability or incapacity of Company or person signing the Agreement on behalf of Company. Until all of the Guaranteed Obligations have been performed in full, Guarantor waives all presentments, notice of or right to consent to any modification, extension or alteration (provided that no such modification, extension or alteration shall increase the obligations of Guarantor with respect to the Guaranteed Obligations); notices of non-performance (except as provided in Paragraph 5 below); protest, notices of protest; notices of dishonor; and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional obligations.

5.   Guarantor shall have no obligation to Owner hereunder with respect to any compensation unless and until such compensation shall have accrued and been payable to Owner in accordance with the provisions of the Agreement and Company shall have failed to pay such compensation as and when due and Owner shall have given Guarantor written notice thereof and a period of five (5) business days shall have elapsed from the date Guarantor shall have received such notice pursuant to Paragraph 15 of the Agreement.

6.   In the event of litigation arising out of or relating to this Guaranty, the prevailing party shall be paid its costs and expenses including reasonable attorney's fees relating thereto by the losing party.

7.   This Guaranty shall be governed by and construed under the laws of the State of California to whose jurisdiction the parties hereto agree to submit.

AGREED & ACCEPTED for

_____
TERRY T. GERRITSEN

AGREED & ACCEPTED for

NEW LINE PRODUCTIONS, INC.

By: _____

Its: _____

## EXHIBIT "DNP"

### DEFINED NET PROCEEDS

Reference is hereby made to the Agreement dated as of March 18, 1999, between Terry T. Gerritsen ("Participant") and Katja Motion Picture Corp. ("Company") to which this Exhibit is attached.

1.    Definitions: As used in this Exhibit, the following terms shall have the meanings indicated:

    A.    "Participant": The party to the Agreement to which this Exhibit is attached is entitled to receive sums calculated on the basis of the net profits of the Picture;

    B.    "Picture": The motion picture referred to in the Underlying Agreement to which this Exhibit is attached;

    C.    "Territory": Unless otherwise defined in the Underlying Agreement to which this Exhibit is attached, the entire universe.

2.    "Gross Receipts": As used in this Exhibit, "gross receipts" shall mean the aggregate of:

    A.    All sums actually received by Company from the following:

        (i)    Licenses from Company directly to exhibitors of the right to exhibit the Picture for any and all purposes (including reissues) on any and all sizes and gauges of film, in any and all languages or versions, by any means, method, process or device now or hereafter known, invented, discovered or devised including, without limitation, free television, video cassettes and video discs,

        (ii)    Licenses from Company to a third party (hereinafter referred to as "subdistributor") of the right to distribute the Picture (i.e., the right to license exhibitors to exhibit the Picture),

        (iii)    The license or lease of positive prints and/or trailers of the Picture (as distinguished from the licenses referred to in [i] and [ii] preceding); the sale or lease of souvenir programs and booklets; recoveries by Company from infringements of copyrights in the Picture; and the receipts from the exhibition of the Picture where Company has taken over the operation of the theatre (i.e., so-called "four-wall deals") specifically for exhibition of the Picture.

    B.    All aid, subsidies (including so-called Eady monies) and cash prizes actually received by Company in connection with the Picture.

    C.    Royalties with respect to the exploitation of home video devices embodying the Picture, computed in accordance with Exhibit "DNP-1."

    D.    Royalties with respect to the exploitation of soundtrack recordings, music publishing and merchandising relating to the Picture, computed in accordance with Exhibits "DNP-2," "DNP-3" and "DNP-4," respectively.

Gross receipts shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation, by boards of censorship, settlement of disputes or otherwise. Non-returnable advance payments and guarantees shall not be included in gross receipts until earned by the exhibition of the Picture or applied by Company to the Picture. Other advance payments and security deposits shall not be included in gross receipts until earned by the exhibition of the Picture, forfeited, or applied by Company to the Picture. Gross receipts shall not include (i) any portion thereof which is contributed to charitable organizations; (ii) the receipts of the following parties, whether or not divisions, subsidiaries or affiliates of Company or any company comprising Company: (a) exhibitors or others who may use or actually exhibit the Picture, (b) radio or television broadcasters (including, without limitation, cable and closed circuit systems), (c) book or music publishers, (d) phonograph record producers or distributors, and (e) merchandisers, manufacturers and the like; (iii) any sums paid or payable to, or derived by, Company for or in connection with, or as a result of, Company's production and/or exploitation of any motion picture(s) which constitute a remake of, or sequel to, the Picture, or the sale, transfer or assignment of all or any part of Company's right to produce and/or exploit same; and (iv) any sums paid or payable to Company or any company comprising Company or any of its or their subsidiaries, affiliates or divisions for or in connection with, or as the result of their furnishing, supplying, rendering, procuring, arranging for or making available any materials, equipment, facilities or services in connection with the production of the Picture.

3.      Defined Net Proceeds:  The "defined net proceeds" of the Picture shall mean the gross receipts remaining after the deduction therefrom on a continuing basis, regardless of when incurred or payable, of the following items, such deductions and the application of the amounts deducted to be in the following order:

A.      Company's distribution fees as set forth in Paragraph "4" hereof;

B.      Company's distribution expenses as set forth in Paragraph "5" hereof with interest thereon at the rate of 2-1/4% above the prime rate of Chase Bank, New York, from time to time in effect;

C.      To the extent not included in the cost of production, all contingent amounts (if any) paid, or earned or payable whether or not payment is then due or made, with the consent of Company to any person, firm or corporation based upon, or computed in respect of, the gross receipts of the Picture;

D.      The cost of production of the Picture as defined in Paragraph "6" hereof (the financing cost therein provided to be charged to be recouped before the other items therein referred to);

E.      All deferred amounts payable with the consent of Company to any person, firm or corporation (including, without limitation, Participant) in connection with the Picture (other than deferred amounts included in the cost of production of the Picture).

4.      Distribution Fees:  Distribution fees shall be computed as follows:

A.      Thirty-five percent (35%) of the gross receipts of the Picture derived by Company from all sources in the United States except United States free network television, as to which the distribution fee shall be twenty-five percent (25%).  As to all other United States free television, the distribution fee shall also be thirty-five percent (35%);

B.      Thirty-five percent (35%) of the gross receipts of the Picture derived by Company from all sources in Canada, the United Kingdom of Great Britain and Northern

Ireland, Isle of Man, Malta, Gibraltar, the Republic of Ireland, Channel Islands, and ships flying the flags of all nations, other than those flying the American flag, which are serviced from the United Kingdom;

     C.     Thirty percent (30%) of the amounts included in the gross receipts of the Picture pursuant to "C" of Paragraph 2 hereof;

     D.     Forty percent (40%) of the gross receipts derived by Company from any and all sources other than those referred to in "A," "B," "C" and "E" of this Paragraph 4;

     E.     All distribution fees shall be calculated on the basis of the aggregate gross receipts without deductions or payments of any kind; provided, however, that no distribution fee shall be payable with respect to gross receipts included pursuant to "B" or "D" of Paragraph 2 hereof.

5.     Distribution Expenses: Company's distribution expenses shall include all costs, charges and expenses incurred by Company, or a subdistributor accounting to Company in respect of the subdistributor's receipts as set forth in Paragraph 2(A)(ii) hereof, in connection with the distribution, exhibition, advertising, exploitation and turning to account of the Picture, or in the exercise of any of Company's other rights in the Picture, of whatever kind or nature, including, without limitation, all costs, charges and expenses incurred for or in connection with any of the following:

     A.     All negatives, sound tracks, prints and other physical properties utilized in connection with the distribution of the Picture and all services and facilities rendered or utilized in connection with such physical properties.

     B.     Advertising, promoting, exploiting and publicizing (hereinafter collectively referred to as "advertising") the picture in any way, including, without limitation, all costs of cooperative, theatre or joint advertising in connection with exhibition of the Picture in theatres or other places where an admission is charged, which Company or any subdistributor pays or is charged with; tours and personal appearances; audience testing and market research; salaries, living costs and traveling expenses of regular employees of Company where such employees are assigned to render services in connection with the advertising of the Picture, appropriately allocated to the Picture; trailers, including, without limitation, the cost of production thereof, to the extent not included in the cost of production of the Picture; and advertising overhead, which shall be an amount equal to ten percent (10%) of the aggregate of all other amounts which constitute advertising expenses under this Paragraph "B." Rebates shall not offset expenses nor be considered as receipts of any kind.

     C.     To the extent not included in the cost of production of the Picture, all costs of preparing and delivering the Picture for distribution, including, without limitation, all costs incurred in connection with screenings, the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, all costs and expenses in connection with changing the title of the Picture for release in any part of the Territory or for exhibition on television or other media, or in order to conform to the peculiar national or political prejudices likely to be encountered in any part of the Territory, or for any other purpose or reason.

     D.     All sales, use, receipts, excise, remittance, value added and other taxes (however denominated) to any governmental or taxing authority assessed upon or with respect to, the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, and any similar authority to secure the entry, licensing, exhibition, performance, use

or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the recoupable amount of any such tax (however denominated) imposed upon Company be decreased (nor the gross receipts increased) because of the manner in which such taxes are elected to be treated by Company in filing net income, corporate, franchise, excess profits or similar tax returns. Subject to the foregoing, Participant shall not be required to pay or participate in (i) Company's or any subdistributor's United States Federal and State income taxes and franchise taxes based on Company's or such subdistributor's net income; or (ii) any income tax payable to any country or territory by Company or any subdistributor based on the net earnings of Company or such subdistributor in such country or territory. Company shall be entitled to claim and receive, and in no event shall Participant be entitled, directly or indirectly, to claim, share or participate in or otherwise receive or derive, any and all tax or other benefits of any kind or nature arising out of, in connection with or otherwise accruing in respect of any and all taxes (however denominated) described in this Paragraph D, including, without limitation, any and all tax credits or deductions directly or indirectly attributable thereto or based thereon. Expenses of transmitting to the United States any funds accruing to Company from the Picture in foreign countries, such as cable expenses, or any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars and the cost of contesting or settling any of the matters described above, with a view to reducing the same, shall similarly be deducted.

E.     Copyright, patent and trademark expenses; royalties payable to manufacturers of sound recording and reproducing equipment; dues and assessments of the Motion Picture Association of America or other associations or bodies, including payments for the support of the Academy of Motion Picture Arts and Sciences, legal fees, and any and all other expenses in addition to those referred to herein incurred by Company in connection with the licensing of the Picture for exhibition or for other uses of the Picture.

F.     Costs and expenses (including reasonable attorneys' fees), incurred by Company in connection with any action taken by Company (whether by litigation or otherwise) in enforcing collection of gross receipts; or (on a pro rata basis) for checking attendance and exhibitors' receipts; or to prevent unauthorized exhibition or distribution of the Picture; or to prevent any impairment of, encumbrance on or infringement upon, the rights of Company in and to the Picture; or in connection with the auditing of books and records of any exhibitor, subdistributor or licensee; or to recover monies due pursuant to any agreement relating to the distribution or exhibition of the Picture.

G.     All costs where Company has taken over the operation of the theatre (i.e., so-called "four-wall deals") or guaranteed a minimum payment to the exhibitor;

H.     All payments paid or payable pursuant to applicable collective bargaining agreements by reason of any exhibition of the Picture or by reason of, or as a condition for, any use, re-use of re-run thereof for any purpose or in any manner whatsoever (herein called "residuals"), and all taxes, pension fund contributions, and other costs and payments computed on or payable in respect of any such residuals or participations in the net profits or gross receipts of the Picture to any person, firm, corporation, guild, union, trustee or fund (other than Company); provided, however, that if Participant, or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder are entitled, either directly or by way of participation in any pension fund, to any such residuals, the amount payable on account thereof shall not be deducted under this Paragraph "H", but shall (to the extent permissible under applicable collective bargaining agreements) be treated as an advance against Participant's share of the receipts hereunder, and conversely, any share of the receipts paid to Participant hereunder shall constitute an advance

Screenplay Option-Purchase 07/31/97
Gravity/Gen04EE.002/5.13.99

-21-

Ex. 1 - p. 32

against such residuals payable to or for the benefit of Participant or any principal stockholder of Participant, or any such heirs, executors, administrators, successors or assigns.

I.    All insurance (to the extent not included in the cost of production) covering or relating to the Picture, including, but not limited to, errors and omissions insurance; provided, however, that Company shall not be obligated to take out or maintain any such insurance, provided, however, that any and all monies recovered pursuant to an approved insurance claim from the applicable insurance carrier for the Picture shall be deemed included in "Gross Receipts" of the Picture pursuant to Paragraph 2 above.

J.    No (i) discounts, rebates or credits received by Company or a subdistributor as a result of or based on (a) the volume or quantity of advertising placed or prints ordered, or (b) the manner or time of payment made for any distribution expense, or (ii) advertising agency commission rebates received by Company or a subdistributor, shall be taken into account in computing distribution expenses.

6.    Cost of Production:  The "cost of production" of the Picture shall mean the aggregate of the following:

A.    Direct Costs:  All costs, charges and expenses (hereinafter referred to as "direct costs") incurred in connection with the production of the Picture, computed and determined in all respects in the same manner as Company customarily determines the cost of other motion pictures produced, distributed and/or financed by it. Such direct costs shall include all deferments and participations payable prior to net profits being realized hereunder, whether such amounts are denominated as a fixed sum the payment of which vests upon the expiration of a period of time or upon the occurrence of a certain event or upon the attainment of a specified level of receipts or profits, or as a percentage of the receipts of the Picture (however calculated).

B.    (1)    Supervisory Fee:  A supervisory fee to Company equal to twelve and one-half percent (12-1/2%) of (i) all direct costs, (ii) all amounts deductible pursuant to Paragraph 3 (E) above, and (iii) all gross participations which are payable prior to Company's recoupment of all amounts deductible pursuant to Paragraph 3 hereof.

(2)    Overhead Charge:  An overhead charge to Company equal to ten percent (10%) of (i) all direct costs, (ii) all amounts deductible pursuant to Paragraph 3 (E) above, and (iii) all gross participations which are payable prior to Company's recoupment of all amounts deductible pursuant to Paragraph 3 hereof.

C.    Interest:  For the purpose of reimbursing Company for its financing costs, an amount (herein referred to as the "financing cost") equal to the equivalent of interest on the aggregate (hereinafter referred to as the "negative cost") of (i) the direct costs, and (ii) Company's supervisory fee, which financing cost shall be computed and charged from the date of the applicable advance or expenditure and continue until the midpoint of the accounting period with regard to which such advance or expenditure is recouped by Company and shall be at a rate which is one hundred twenty-five percent (125%) of the prime interest rate being charged, from time to time, by The First National Bank of Boston.

D.    Overbudget:  If the negative cost of the Picture shall exceed the total cost reflected in the budget therefore approved by Company by five percent (5%) ("Cushion") or more, then, to compensate Company for the additional financial risk it will have taken with respect to the Picture, there shall be added to and made a part of the cost of production a sum, which sum shall not bear interest, equal to the amount by which such negative cost exceeds the total of such budgeted cost and the Cushion; provided, however, that for purposes of this

Paragraph D only, costs resulting from the following shall not be taken into account in determining such excess: (i) new scenes added at the request of Company which were not required by the approved screenplay; (ii) "cover shots" or alternative scenes required to make the Picture acceptable for television broadcast which could not have been reasonably anticipated at the time the screenplay for the Picture was approved by Company; (iii) increases in minimum compensation required to be paid for the services of personnel engaged in connection with the Picture pursuant to any applicable collective bargaining agreement to the extent that such increases could not have been reasonably anticipated at the time the budget for the Picture was approved by Company; (iv) changes in the screenplay or the production schedule or other plans for the production of the Picture required by Company after the approval by Company of the budget; and (v) the occurrence of an event of force majeure.

7.      Allocations: Whenever Company (i) makes any expenditures or incurs any liability in respect of a group of motion pictures, which includes the Picture, or (ii) receives from any licensee either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures, which includes the Picture, under any agreement (whether or not the same shall provide for the exhibition, sale, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), then in any and all such situations, Company shall, in good faith, include in, or deduct from, the gross receipts, as the case may be, such sums as may be reasonable. If Company reasonably anticipates retroactive wage adjustments, taxes, residuals, uncollectable accounts, or other reasonably anticipated costs, expenses or losses relating to the Picture, which, if and when incurred, will be properly deductible hereunder, Company may set up appropriate reserves therefor. Company agrees to liquidate any such reserves within a reasonable time.

8.      Foreign Receipts: No sums received by Company in respect of the Picture shall be included in gross receipts or in statements hereunder for the purpose of determining any amount payable to Participant, unless such sums are freely remittable to Company in U.S. dollars in the United States, or used by Company. Sums derived from territories outside of the United States, or used by Company. Sums derived from territories outside of the United States which are not remittable to Company in the United States in U.S. dollars by reason of currency or other restrictions shall be reflected on statements rendered hereunder for informational purposes only, and Company shall, at the request and expense of participant (subject to any and all limitations, restrictions, laws, rules, and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, such part thereof, if any, as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute remittance to Participant, and Company shall have no further responsibility therefor Company makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country. Costs incurred in a territory during a period when all receipts are blocked shall be charged only against blocked receipts from such territory. Costs incurred in a territory during a period when part of the receipts is blocked and part is remittable to the United States shall be charged proportionately against the blocked and dollar receipts from said territory. However, if costs charged against blocked receipts, in either of the foregoing instances, have not been recovered therefrom within twelve (12) months after such costs were incurred, the deficit shall be computed in dollars at the official rate of exchange in effect at the end of such twelve (12) month period and recovered by Company from dollar receipts, irrespective of the source.

9.      Earnings Statements: Company shall render to Participant periodic statements showing, in summary form, the appropriate calculations pursuant to this Exhibit. Such statements may be on a billings or collections basis, as Company may from time to time elect. Statements shall be rendered quarterly during the twenty-four (24) month period following the initial

release of the Picture, semi-annually during the next thirty-six (36) months and annually thereafter; provided, that no statement need by rendered for any period in which no receipts are received or charges incurred. Statements rendered by Company may be changed from time to time to give effect to year-end adjustments made by Company's Accounting Department or public accountants, or to items overlooked, to correct errors, to reflect any indebtedness which may become uncollectable, or for any other purposes. Should Company make any overpayment to Participant hereunder for any reason, Company shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Company to Participant or for Participant's account, or may demand repayment from Participant in which event Participant shall repay the same when demand is made. The right of Participant to receive, and the obligation of Company to account for, any share of the gross receipts of the Picture shall terminate if the first earnings statement issued after the Picture has been made available for exhibition on syndicated television in the United States shows a deficit under Paragraph 3 hereof which would require in excess of Five Hundred Thousand Dollars ($500,000) in gross receipts to reach net profits hereunder. Any U.S. dollars due and payable to Participant by Company pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring the deduction or withholding of payments for income or other taxes payable by or assessable against Participant. Company shall have the right to make such deductions and withholdings, and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations shall constitute payment hereunder to Participant, and Company shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have (and which it desires to make and prosecute) with respect to the same directly with the governmental agency having jurisdiction in the premises.

10.    Accounting Records and Audit Rights: Company shall keep at its main offices in the United States books of account relating to the distribution of the Picture (which books of account are hereinafter referred to as "records"), which shall be kept on the same basis, in the same manner, at the same place and for the same periods as such records are customarily kept by Company. Participant may, at its own expense, but not more than once annually, audit the applicable records at the aforesaid office in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant (subject to Company's reasonable approval) during reasonable business hours and shall not continue for more than thirty (30) consecutive days. Any such audit shall be conducted in such manner as not to interfere with Company's normal business activities. In this regard, Company shall have the right to fix the date for the commencement of any such audit so as to coordinate said date with the commencement dates of any other audits with respect to the Picture to be conducted by third-party participants. Participant shall not have the right to examine or inquire into any matters or items which are embraced by or contained in any such statement after the expiration of twelve (12) months from and after the date of mailing of such statement, and such statement shall be final and conclusive upon Participant upon the expiration of such twelve (12) month period notwithstanding that the matters or items embraced by or contained therein may later be contained or referred to in a cumulative statement pertaining to more than one accounting period. Such cumulative statement shall not be subject to audit by Participant to the extent the material contained therein was first reflected on a statement submitted more than twelve (12) months prior to the date of mailing of such cumulative statement. Participant shall be forever barred from maintaining or instituting any action or proceeding based upon, or in anywise relating to, any transactions had by Company, or its licensees, in connection with the Picture which are embraced by or reflected on any statement rendered hereunder, or the accuracy of any item appearing therein, unless written objection thereto shall have been delivered by Participant to Company within twelve (12) months after the date of mailing of the

statement on which such transaction or item was first reflected and unless such action or proceeding is commenced within six (6) months after delivery of such written objection. Participant's right to examine Company's records is limited to the Picture, and under no circumstances shall Participant have the right to examine records relating to Company's business generally or any other motion picture for the purpose of comparison or otherwise; provided, however, that in the event that Company includes in, or deducts from, the gross receipts any sums expended or received in connection with any sums expended or received in connection with any of the transactions referred to in the first sentence of Paragraph 7 of this Exhibit, Participant shall have the right to examine Company's records with respect to the other motion picture(s) which are part of the group of motion pictures which are the subject of such transaction(s), but only insofar as such records relate to such particular transaction or transactions.

11.    Holding of Funds: Company shall not be considered a trustee, pledgeholder, fiduciary or agent of Participant by reason of anything done or any money collected by it, and shall not be obligated to segregate receipts of the Picture from its other funds.

12.    Ownership: Participant shall not have any lien or other rights in or to the gross receipts of the Picture, it being understood that the references herein thereto are intended solely for the purpose of determining the time, manner and amount of payments, if any, due to Participant hereunder.

13.    Sales Policies: Company shall have complete authority to license, market and exploit the Picture and all rights therein, or to refrain from so doing, in accordance with such sales methods, policies and terms as it may, in its reasonable business judgment, exercised in good faith, determine. Company shall not be required to itself exercise any of its rights but may license, sub-license or assign any or all thereof, as it may elect, to any licensee, sub-licensee, subdistributor or assignee (including, without limitation, any of the corporations comprising Company or any of Company's or their subsidiaries or affiliates). Company may modify, amend, cancel, adjust and alter all agreements, exhibition licenses, rental terms, sales methods and policies relating to the distribution, exhibition and exploitation of the Picture and any other of its rights as it may deem advisable; adjust, increase or decrease the amount of any allowance to any exhibitor or licensee for advertising and exploitation whether or not included in any theretofore existing agreement or license; license the distribution and exhibition of the Picture (or other rights) upon percentage rental or flat rentals, or both, and jointly with other motion pictures or separately, as it shall deem desirable. Company shall have the right, in its sole discretion, to license the Picture for television or other types of exhibition at any time, and to cause or permit any such television or other exhibition to be on a sponsorship, sustained or other basis. Company may, but shall not be required to, release, reissue or re-release the Picture in any part of the Territory as may be consistent with the business policies of Company, and Company in its sole discretion may determine for any reason, and in respect of any part of the Territory, when, where and whether the Picture should be released, re-released or reissued and the duration of any such release, re-release or reissue. If the number of motion pictures which may be distributed by Company in any country or territory shall be limited by government, industry or self-limitation, the selection of motion pictures to be distributed by Company therein shall be by Company in its sole discretion. Participant shall be bound by the terms, provisions and conditions of any agreements heretofore or hereafter made by Company (or its subsidiaries) pursuant to any resolution of the Motion Picture Export Association (or similar organization) or made by Company alone with any government or governmental agency made by Company alone with any government or governmental agency relating to any particular country or territory. Nothing contained in this Paragraph 13 shall be deemed to, nor shall it, limit or restrict Company's rights under Paragraph 15 hereof.

14.    Licenses to Controlled Facilities; No Warranties: If Company licenses the exhibition of the Picture to any theatre or television station or other facility owned or controlled by Company or in which Company has an interest, directly or indirectly, Company shall do so upon terms consistent with those upon which Company licenses the exhibition of the Picture to facilities in which it does not have an interest. Company has not made any express or implied representation, warranty, guarantee or agreement (i) as to the amount of gross receipts which will be derived from the distribution of the Picture, or (ii) that there will be any sums payable to Participant hereunder, or (iii) that the Picture will be favorably received by exhibitors or by the public, or will be distributed or that any such distribution will be continuous, or (iv) that it now has or will have or control any theatres or facilities in the United States or elsewhere, or (v) that any licensee will make payment of any sums payable pursuant to any agreement between such licensee and Company, Company's obligation hereunder being limited to accounting only for such sums as may be actually received by Company from such licensee. In no event shall Participant make any claim that Company has failed to realize receipts or revenues which should or could have been realized in connection with the Picture or any of Company's rights therein.

15.    Sale of Picture: Company shall have the right, at any time, to sell, transfer, assign or hypothecate all of its right, title and interest, in and to the Picture and the negative and copyright thereof; provided that any such sale, transfer, assignment or hypothecation shall be subject to Participant's rights hereunder. Upon the purchaser, transferee or assignee assuming performance of Company's obligations hereunder in place and stead of Company, Company shall, provided that such purchaser, transferee or assignee is at the time of its assuming performance a financially responsible party, be released and discharged of and from any further liability or obligation hereunder and none of the monies or other consideration received by, or paid or payable to, Company shall constitute gross receipts hereunder, and Participant shall have no rights in respect of any thereof.

16.    Assignments, Etc.: Participant shall not have the right, prior to the completion and delivery of the Picture, to sell, assign, transfer or hypothecate (all hereinafter referred to as "assign") all or any part of Participant's right to receive the monies payable to Participant hereunder. Thereafter, Participant may assign Participant's said right, provided, however, that (i) Company shall not be required to accept or honor any assignment or assignments which would result in requiring Company to make payments to an aggregate of more than two (2) parties unless a single party is designated to receive and disburse all monies payable to Participant and to the parties entitled to share therein; and (ii) in no event shall any party other than Participant have the right to audit Company's records by reason of such assignment. Any such assignment shall at all times be subject to all pertinent laws and governmental regulations and to all of the rights of Company hereunder. In the event that Participant (or any transferee) shall propose to assign all or part of the monies payable to Participant (or any transferee) hereunder, other than by way of bona fide gift, bequest or devise, dissolution of Participant (if a corporation) or corporate merger or acquisition of all of Participant's assets (if Participant has substantial assets other than the Picture), Company shall have the right of first refusal to acquire the same, which right Company may exercise within ten (10) days after receipt of written notice from Participant (or any transferee) specifying the terms and conditions upon which Participant (or any transferee) proposes to make such assignment. Should Company fail to exercise said right of first refusal as aforesaid, then Participant (or any transferee) shall not assign monies or any part thereof to any third party upon terms and conditions more favorable to such third party than those set forth in said written notice without again giving Company the opportunity to exercise said right of first refusal in accordance with the foregoing procedure.

*****

## EXHIBIT "DNP-1"

### VIDEO DEVICES

Provided that Company is vested with the right to manufacture and distribute the Picture on video cassettes, video tapes, video discs and similar compact audio-visual devices ("Video Devices") intended to be sold or leased to the public as a device intended primarily for "home use" (as such term is commonly understood in the motion picture industry), and that Participant or any third party affiliated with or subsidiary to Participant or of which Participant has beneficial or constructive control shall not be entitled, separate and apart or independently from this Exhibit, to any portion of the royalties or revenues derived from any Video Device manufacturing and distribution rights in the Picture, the gross receipts of the Picture shall include a royalty on "Video Gross Receipts" (as defined below) in accordance with the applicable percentages set forth below.

    1.    With respect Video Devices manufactured and sold in the United States, the gross receipts of the Picture shall include:

    (a)    Twenty percent (20%) of Video Gross Receipts from the exploitation of the Picture on videocassettes with a suggested retail price of more than $29.95;

    (b)    Ten percent (10%) of Video Gross Receipts from the exploitation of the Picture on videocassettes with a suggested retail price of $29.95 or less;

    (c)    The royalty rate on any laserdisc, or any Video Devices other then videocassettes (new technologies included), will be three-fourths (3/4) of the otherwise applicable royalty rate;

    (d)    No royalty shall be included in the gross receipts of the Picture for Video Devices where the Video Gross Receipts derived exceed Company's manufacturing costs by $1.00 or less (i.e., remainders);

    (f)    With respect to Video Devices distributed for ultimate distribution by mail order, "club" sales or similar plans, through key-outlet marketing, subdistributors, or as part of a premium promotion whereby items are distributed as an inducement to the purchase of such Video Devices, the royalty rate will be fifty percent (50%) of the otherwise applicable rate.

    (g)    The royalty rate on any Video Device sold for distribution through military exchange channels will be one-half (1/2) of the other applicable royalty rate.

    (h)    With respect to Video Devices not consisting entirely of the entire Picture as released theatrically to the general public, the amount to be included in the gross receipts of the Picture shall be prorated by multiplying such amount by a fraction the numerator of which is the running time of all scenes or "highlights" from the Picture included on such Video Device, and the denominator of which is the total running time of such Video Device; provided, however, that no amount shall be included in the gross receipts of the picture in respect of Video Devices which include scenes or "highlights" from the Picture for promotional or advertising purposes.

    2.    As to Video Devices sold outside the United States, the amount included in the gross receipts of the Picture shall be one-half (1/2) of the amount referred to in Paragraph 1 above. The aforesaid amount shall be computed in the national currency of the country to which the wholesale price so elected applies and shall be paid at the same rate of exchange as

the rate at which Company is paid; provided, however, that such amounts on such Video Devices shall not be included in the gross receipts of the Picture until payment therefor has actually been received by Company in the United States.

3. "Video Gross Receipts" means 100% of all monies actually received by or credited to the account of Company from the exploitation of the Picture on Video Devices, subject to the following exclusions and deductions:

(a)     Exclusions from Video Gross Receipts: Video Gross Receipts shall be determined after all refunds, credits, discounts, rebates, allowances and adjustments granted to subdistributors, wholesalers, retailers and other purchasers and licensees. In addition, the following shall be excluded from Video Gross Receipts:

(i)     Any monies derived by any local subdistributor, wholesaler or retailer from the sale of Video Devices, or by any local sales or promotional organization for services rendered on their behalf, whether or not such subdistributor, wholesaler, retailer or sales or promotional organization is owned operated or managed or controlled by Company; provided however, in the event Video Devices are sold or leased to any such owned, operated or managed subdistributor, wholesaler or retailer, Company agrees that the terms of such sale or lease shall be substantially the same as the terms of sale or lease of Video Devices to unrelated entities, in accordance with industry standards.

(ii)     Any sums due, but not paid, to Company.

(iii)     The salvage value of any videotape, cassettes or other materials purchased by or manufactured by Company and not sold as Video Devices.

(b)     Deductions from Video Gross Receipts: Video Gross Receipts shall be reduced by:

(i)     Any sums paid to or retained by any servicing entity.

(ii)     Any outside costs actually incurred in connection with the collection of monies included in Video Gross Receipts, including outside attorneys' and outside auditors' fees and costs, and any and all loss, damage or liability actually suffered or actually incurred by Company in the collection of such monies, whether by litigation or otherwise, in the computation of Video Gross Receipts hereunder.

(iii)     Any and all sums paid or accrued on account of sales, use, value added, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authorities, assessed upon the Video Devices, or upon the use or distribution of Video Devices or upon the revenues derived therefrom or any part thereof or upon the remittance of such revenues or any part thereof, and any and all sums paid or accrued on account of freight, shipping, handling or insurance in connection with the sale of Video Devices , duties, customs and imports, costs of acquiring permits, quotas and any similar authority to secure the entry, licensing, sale exhibition, performance, or other use of Video Devices in any country or part thereof regardless of whether such payments or accruals are assessed against Video Devices or the proceeds thereof or against a group of motion pictures or programs in which the Video Devices or proceeds thereof may be included. In no event shall the deductible amount any such tax (however denominated) imposed upon Company be decreased (nor the Gross Receipts increased) because of the manner in which such taxes are elected to be treated by Company in filing net income, corporate franchise, excess profits or similar tax returns. Notwithstanding the foregoing, Company's own income taxes and franchise taxes based on Company's net income and any income taxes paid to any country or

territory by Company based on the net earnings of Company in such country or territory (to the extent computed and assessed solely by the reason of voluntary retention in such country or territory by Company of any portion of Gross Receipts) shall not be deductible in computing Gross Receipts hereunder. Notwithstanding to the contrary contained herein, Participant shall have no right to inspect or copy any income or franchise tax return of Company or any of its subsidiaries or affiliates or to require Company or any of its subsidiaries or affiliates to produce any such tax return or any information contained herein.

(iv)  Company shall have the right to deduct and to reserve for returns and credits of any nature, including, without limitation, those on account of one hundred percent (100%) or a lesser return privilege, defective merchandise, exchange privilege, promotional credits, errors in billing, unusual overstock, bad debts and errors in shipping.

(v)  Any additional costs (which are not included in the costs of production of the Picture) incurred in connection with the reproduction of the Picture for the purpose of enabling the issuance of Video Devices therefrom.

4.  Royalties shall not be payable on Video Devices furnished without charge for promotional purposes or as a sales inducement or otherwise to distributors, subdistributors, dealers, reviewers and others. All royalty-free Video Devices distributed for promotional purposes shall be stamped or marked with a legend to the effect that such Video Devices are for promotional purposes only and are "not for sale."

*****

## EXHIBIT "DNP-2"

## SOUNDTRACK ROYALTIES

Provided that Company is vested with record manufacturing rights in and to the music contained in the soundtrack of the Picture, and that Participant or any third party affiliated with or subsidiary to Participant or of which Participant has beneficial or constructive control shall not be entitled, separate and apart or independently from this Exhibit, to any portion of the royalties or revenues derived from any record manufacturing rights in any such music:

    A.    If Company (as opposed to a third party assignee, designee or licensee) shall use the soundtrack of the Picture for the purpose of manufacturing, distributing, selling and advertising commercial phonograph records (hereinafter "soundtrack records") of the music, musical compositions, sound effects and/or dialogue used in the soundtrack of the Picture, the gross receipts of the Picture shall include a royalty determined as follows:

    1.    An amount equivalent to seven and one-half percent (7-1/2%) of the suggested list price (excluding Federal Excise Taxes, or the equivalent thereof, local taxes, if any, and standard container charges) of ninety percent (90%) of soundtrack records manufactured and sold in the United States. As to soundtrack records not consisting entirely of music, musical compositions, sound effects and/or dialogue from the soundtrack of the Picture, the royalties to be included in the gross receipts of the Picture shall be prorated by multiplying such royalty by a fraction, the numerator of which is the number of "bands" of such record of music, musical composition, sound effects and/or dialogue from the soundtrack of the Picture, and the denominator of which is the total number of "bands" of such record. A "band" from the sound track of the Picture shall include music and musical compositions taken from the actual sound track of the Picture as well as rerecordings of portions of, or all of, such music or musical compositions by the same artist originally performing on the actual soundtrack.

    2.    As to soundtrack records sold outside the United States, the royalty included in the gross receipts of the Picture shall be one-half (1/2) of the royalty referred to in Paragraph 1 above and shall be calculated, at Company's election, upon the suggested retail list price of such soundtrack records in the country of manufacture, the United States, England, or the country of sale. The amounts of such royalties shall be computed in the national currency of the country to which the list price so elected applies and shall be paid at the same rate of exchange as the rate at which New York is paid; provided, however, that royalties on such records shall not be included in the gross receipts of the Picture until payment therefor has actually been received by New York in the United States.

    3.    In respect of phonograph records sold through any so-called "record clubs" or similar sales plans and devices, the royalty shall be one-half (1/2) of that referred to in Paragraphs 1 and 2 of this Exhibit "DNP-2", depending upon where such phonograph records are sold; provided, however, that there shall be no royalty with respect to phonograph records given to members of such record clubs as "bonus" or "free" phonograph records as a result of joining the club and/or purchasing a required number of phonograph records. No royalty shall be computed with respect to soundtrack records given away or furnished on a "no charge" basis to disc jockeys, radio stations, dealers or others.

    4.    In computing the number of soundtrack records manufactured and sold hereunder, Company shall have the right to deduct the returns and credits of any nature, including, without limitation, those on account of one hundred percent (100%) or a lesser return privilege, defective merchandise, exchange privilege, promotional credits, errors in billing, unusual overstock and errors in shipping.

Screenplay Option-Purchase  07/31/97
Gravity/Gerr04EE.002/5.13.99

5. From the royalties computed as set forth above, there shall first be deducted the aggregate of the following costs and expenses, and only the balance of royalties remaining after such deductions shall have been made shall be included in the gross receipts of the Picture:

(a) Any amounts and royalties which shall be payable to the person(s) whose performance(s) is/are contained on the soundtrack record in accordance with the agreement(s) which may have been entered into with any such person(s);

(b) All costs, expenses and fees with respect to the soundtrack record incurred by Company, or any company comprising Company or its or their subsidiaries, divisions or affiliates, under agreement(s) with the American Federation of Television and Radio Artists of the United States and Canada or any other guild or union wherever located and whether now or hereafter in existence. Said costs shall include, but not be limited to, reusage or re-recording fees, and where there is no appropriate union scale reuse fee, actual recording costs; and

(c) Any additional costs (which are not included in the cost of production of the Picture) incurred in connection with the recording or rerecording of the soundtrack for the purpose of enabling the issuance of rerecordings therefrom.

B. If a third-party assignee, designee or licensee (as opposed to Company) shall use the soundtrack of the Picture for the purpose of manufacturing, distributing, selling and advertising soundtrack records, Company shall include in the gross receipts of the Picture (in lieu of the royalty provided in Section A) a royalty equivalent to that earned from the actual sale of such soundtrack records and actually received by Company from any such assignee, designee or licensee with respect thereto, less an administration fee in an amount equal to fifteen percent (15%) of one hundred percent (100%) of all such sums, and thereafter, less any costs, amounts or royalties which may be payable in respect of any of the items set forth in Section A, Paragraph 5 of this Exhibit "DNP-2".

*****

## EXHIBIT "DNP-3"

### MUSIC PUBLISHING RIGHTS

Provided that Company is vested with music publishing rights in and to the music contained in the soundtrack of the Picture and the full publisher's share thereof, and that Participant or any third party affiliated with or subsidiary to Participant or of which Participant has beneficial or constructive control shall not be entitled, separate and apart or independently from this Exhibit, to any portion of the royalties or revenues derived from any music publishing rights in any such music, Company shall require the music publisher to which it may grant publishing rights (which may be an affiliated or related company) to pay to Company, with respect to music and lyrics written specifically for and synchronized in the Picture as released, and the gross receipts of the Picture shall include, the following royalty:

A. An amount equal to twenty percent (20%) of the "Publisher's Share" of mechanical reproduction and performing fees received by the publisher in the United States;

B. Two cents ($.02) per copy in respect of printed piano or piano-vocal copies sold and paid for and not returned in the United States and the Dominion of Canada;

C. Two cents ($.02) per copy in respect of orchestration, choral editions and other printed arrangements which are sold and paid for and not returned in the United States and the Dominion of Canada; and

D. An amount equal to twenty percent (20%) of the "Publisher's Share" of any or all receipts of the publisher in the United States from any other source not herein specifically provided for.

The "Publisher's Share" shall be deemed to mean:

1. With respect to mechanical reproduction fees, the amount actually collected by the publisher less collection fees and any and all royalties paid to authors, composers or any other third parties; and

2. With respect to performing fees, the amounts actually collected by the publisher from any performing rights society (it being understood that authors and composers are generally paid separately and directly by such performing rights societies) less any portion of such royalties payable to others and any reasonable cost and expense in administering the collection of such fees.

*****

## EXHIBIT "DNP-4"

### MERCHANDISING/~~NOVELIZATION PUBLICATION~~ ROYALTIES

Provided that Company is vested with merchandising rights in and to the Picture, and that Participant or any third party affiliated with or subsidiary to Participant or of which Participant has beneficial or constructive control shall not be entitled, separate or apart or independently from this Exhibit, to any portion of the royalties or revenues derived from any such merchandising rights, there shall be included in the gross receipts of the Picture:

A.     If Company (as opposed to a third party assignee, designee or licensee) shall exercise merchandising rights in the Picture, an amount equivalent to fifty percent (50%) of all license fees (in excess of all royalties and participations) earned from the actual sale of merchandising items and actually received by Company directly as a result of the exercise by Company itself of such merchandising rights.

B.     If a third-party assignee, designee or licensee (as opposed to Company) shall exercise such merchandising rights, Company shall include in the gross receipts of the Picture (in lieu of the amount provided in Section A), at its election, an amount equivalent to either:

1.     Eighty-five percent (85%) of the net sums (in excess of all royalties and participations) earned and actually received from such third-party assignee, designee or licensee; or

2.     Fifty percent (50%) of the net sums (in excess of all royalties and participations) derived by such third-party assignee, designee or licensee from the exercise of such merchandising rights.

~~Provided that Company is vested with novelization publication rights with respect to the~~ Picture, and that Participant or any third party affiliated with or subsidiary to Participant or of which Participant has beneficial or constructive control shall not be entitled, separate or apart or independently from this Exhibit, to any portion of the royalties or revenues derived from such novelization publication rights, there shall be included in the gross receipts of the Picture, at Company's election, an amount equivalent to either:

1.     The net sums earned and actually received by Company from independent third-party publishers from the publication of novelizations of the screenplay of the Picture (in excess of all royalties and participations to the writers of such novelizations); or

2.     Five percent (5%) of the net sums derived by the publisher of such novelizations from the publication thereof (in excess of all royalties and participations to ~~writers of such novelizations~~).

\*\*\*\*\*