DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com (Lead Counsel)
ASHLEY PEARSON (S.B. #281223)
apearson@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Defendants
Warner Bros. Entertainment Inc.,
Katja Motion Picture Corp., and
New Line Productions, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TERRY T. GERRITSEN, an individual,

Plaintiff,

v.

WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; KATJA MOTION PICTURE CORP., a California corporation; and NEW LINE PRODUCTIONS, INC., a California corporation,

Defendants.

Case No. CV14-3305-MMM (CWx)

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

DECLARATION OF ASHLEY PEARSON; NOTICE OF LODGING OF BOOK AND DVD; AND PROPOSED ORDER FILED CONCURRENTLY HEREWITH

The Hon. Margaret M. Morrow

**Hearing Date:** Sept. 15, 2014
**Hearing Time:** 10:00 a.m.
**Courtroom:** 780

TO PLAINTIFF AND HER COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 15, 2014, at 10:00 a.m., or as soon thereafter as the matter may be heard by the above-entitled Court, located in Courtroom 780 at 255 East Temple Street, Los Angeles, California 90012, defendants Warner Bros. Entertainment Inc., Katja Motion Picture Corp., and New Line Productions, Inc. (collectively, "defendants") will and hereby do move to dismiss plaintiff's complaint, filed on April 29, 2014. Defendants bring this motion pursuant to Rule 12 of the Federal Rules of Civil Procedure.

This motion is made following the conference of counsel pursuant to Central District Local Rule 7-3. *See* Decl. of Ashley Pearson ("PD") ¶¶ 2-4 & Ex. F. This motion to dismiss is based on the ground that plaintiff Terry "Tess" Gerritsen has not, and cannot, properly allege a breach of contract claim against any of the defendants—as she is not in privity with defendant Warner Bros., and neither defendants Katja nor New Line breached their respective 1999 agreements with her. Plaintiffs' alter-ego, agency, and contract-assignment theories for holding Warner Bros. liable are each without basis as well, and come up well short of the pleading standards required in cases like *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 681 (2009), and *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1114 (C.D. Cal. 2003). Ms. Gerritsen has declined to amend her pleadings to address these obvious deficiencies (nor do any facts exist that would support them), and, thus, this case should be dismissed with prejudice.

This motion is based on this notice of motion and motion, the following memorandum of points and authorities, the concurrently filed Declaration of Ashley Pearson, the pleadings on file in this matter, the reply memorandum that defendants intend to file, and any further argument that the Court might allow.

Dated: June 20, 2014

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Matthew T. Kline

# TABLE OF CONTENTS

**Page**


I. Introduction .......... 1

II. Factual Background .......... 2

A. The Two Works At Issue .......... 2

B. The Relevant Contracts And Claims For Relief In This Case .......... 4

III. Ms. Gerritsen's Complaint Should Be Dismissed With Prejudice Because She Cannot Assert A Contract Claim Against Any Of The Defendants .......... 6

A. Warner Bros. Breached Neither Contact; It Was Party To Neither .......... 6

B. Katja And New Line Did Not Breach Either Contract Because They Did Not "Produce" Or "Release" The Movie *Gravity* .......... 7

C. Ms. Gerritsen's Assignment, Alter-Ego, And Agency Theories Are All Without Basis And Cannot Be Used To Blur Distinct Parties .......... 7

D. Ms. Gerritsen's Accounting Claim Should Be Dismissed As Well .......... 12

IV. Conclusion .......... 12

# TABLE OF AUTHORITIES

Page

**CASES**

*Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887 (1971) ..... 6

*Alcay v. City of Visalia*, 2013 U.S. Dist. LEXIS 90160 (E.D. Cal. June 26, 2013) ..... 8, 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..... *passim*

*Bank of the Sierra v. Kallis*, 2006 U.S. Dist. LEXIS 88234 (E.D. Cal. Dec. 6, 2006) ..... 6

*Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010) ..... 1, 12

*Bergman v. Fidelity Nat'l Financial, Inc.*, 2012 U.S. Dist. LEXIS 136711 (C.D. Cal. Sept. 24, 2012) ..... 12

*Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399 (N.D. Cal. 2009) ..... 2, 11

*Cal. v. NRG Energy Inc.*, 391 F.3d 1011 (9th Cir. 2004), *rev'd on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007) ..... 11

*Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677 (9th Cir. 2009) ..... 1-2

*Dolter v. Keene's Transfer, Inc.*, 2008 U.S. Dist. LEXIS 59436 (N.D. Ill. Aug. 5, 2008) ..... 11

*Funky Films Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006) ..... 1

*Gold Glove Prods. v. Handfield*, C.D. Cal. Case No. 13-CV-7247, Docket No. 218 (Feb. 24, 2014) ..... 1

*Haskell v. Time, Inc.*, 857 F. Supp. 1392 (E.D. Cal. 1994) ..... 11

*Henried v. Four Star Television*, 266 Cal. App. 2d 435 (1968) ..... 12

*Hill v. Opus Corp.*, 841 F. Supp. 2d 1070 (C.D. Cal. 2011) ..... 6, 8

*Imageline, Inc. v. CafePress.com, Inc.*,
2011 U.S. Dist. LEXIS 3982 (C.D. Cal. Apr. 6, 2011) ..... 11

*In re Cal. Title Ins. Antitrust Litig.*,
2009 U.S. Dist. LEXIS 43323 (N.D. Cal. May 21, 2009) ..... 11

*In re Turbodyne Techs, Inc. Secs. Litig.*,
2000 U.S. Dist. LEXIS 23020 (C.D. Cal. Mar. 15, 2000) ..... 8

*Kendall v. Visa U.S.A.*,
518 F.3d 1042 (9th Cir. 2008) ..... 9

*Kightlinger v. White*,
2009 Cal. Unpub. LEXIS 9345 (Nov. 23, 2009) ..... 12

*Kimball v. Flagstar Bank F.S.B.*,
881 F. Supp. 2d 1209 (S.D. Cal. 2012) ..... 12

*Laird v. Capital Cities/ABC, Inc.*,
68 Cal. App. 4th 727 (1998) ..... 10

*M.O.D. of the Islamic Republic of Iran v. Gould, Inc.*,
969 F.2d 764 (9th Cir. 1992) ..... 11

*Mindlab Media, LLC v. LWRC Int'l LLC*,
2012 U.S. Dist. LEXIS 14769 (C.D. Cal. Feb. 6, 2012) ..... 11

*Neilson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..... *passim*

*Neu v. Terminex Int'l et. al*,
2008 U.S. Dist. Lexis 32844 (N.D. Cal. Apr. 8, 2008) ..... 11

*No Cost Conf., Inc. v. Windstream Communs., Inc.*,
940 F. Supp. 2d 1285 (S.D. Cal. 2013) ..... 2, 7, 8

*Norins Realty Co. v. Consol. Abstract & Title Guar. Co.*,
80 Cal. App. 2d 879 (1947) ..... 10-11

*Pac. Coast Shipyards Pension Fund v. Nautical Eng'g, Inc.*,
2014 U.S. Dist. LEXIS 4020 (N.D. Cal. Jan. 13, 2014) ..... 10

*Sandoval v. Ali*,
2014 U.S. Dist. LEXIS 42630 (N.D. Cal. Mar. 28, 2014) ..... 2, 9

*Shroyer v. New Cingular Wireless Servs., Inc.*,
622 F.3d 1035 (9th Cir. 2010) ..... 6

*Signature Mgmt. Team, LLC v. Automattic, Inc.*,
941 F. Supp. 2d 1145 (N.D. Cal. 2013) ..... 4

*Solid Host, NL v. Namecheap, Inc.*,
652 F. Supp. 2d 1092 (C.D. Cal. 2009) ..... 8

*Sonora Diamond v. Super. Ct.*,
83 Cal. App. 4th 523 (2000) .......... 9

*Sutton v. Walt Disney Prods.*,
118 Cal. App. 2d 598 (1953) .......... 12

*U.S. v. Bestfoods*,
524 U.S. 51 (1998) .......... 9

*Wady v. Provident Life & Accident Ins. Co. of Am.*,
216 F. Supp. 2d 1060 (C.D. Cal. 2002) .......... 9, 11, 12

*Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*,
2008 U.S. Dist. LEXIS 111530 (E.D. Cal. July 1, 2008) .......... 8

**OTHER AUTHORITIES**

FED. R. CIV. P. 12(b)(6) .......... 6

FED. R. EVID. 801(d)(2) .......... 4

FED. R. EVID. 201(b) .......... 4

## I. Introduction

It is an unfortunate reality that many successful motion pictures spur lawsuits by misdirected plaintiffs claiming to be the movies' true creators. This case, which concerns the Academy Award winning motion picture *Gravity*, is no exception. Plaintiff Tess Gerritsen (a successful novelist, who has a television show on the air with Warner Bros. as well) alleges that the movie *Gravity*, released by Warner Bros. in 2013 (the "Movie"), is based on her 1999 novel *Gravity* (the "Book") and that she is owed a share of the Movie's profits and credit as its creator.

Ms. Gerritsen brings this lawsuit *in contract* because a copyright suit would be frivolous. She assigned any motion picture copyrights in the Book to defendant Katja in 1999; and, more importantly, the Movie and Book are drastically different works that could not possibly be the subject of a copyright infringement action. *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010); *Funky Films Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006); *Gold Glove Prods. LLC v. Handfield*, C.D. Cal. Case No. 13-CV-7247, Docket No. 218 (Feb. 24, 2014).

Ms. Gerritsen's breach-of-contract claims fare no better and can and should be dismissed. She alleges that Katja and defendant New Line breached two 1999 contracts with her, in which Katja promised to pay her money and give her screen and advertising credits *if* Katja "produce[d] or release[d]" a motion picture "based on" her Book. Compl. Ex. 1 ¶¶ 2A, 2B, 15. The fundamental defect with this contract theory is that Katja neither "produced" nor "released" the Movie—and nor did New Line. By her own admission, Warner Bros. produced and released the Movie, Compl. ¶¶ 10, 22, and Warner Bros. is *not a party* to either 1999 agreement.

Because her direct liability claims are without merit, Ms. Gerritsen asserts in the alternative that Warner Bros. assumed New Line's obligations under the 1999 agreements, or that New Line and Katja are its "alter egos" or "agents." But these claims are unsupported by any specific facts, and such conclusory allegations run afoul of Rule 8 and successor, alter-ego, and agency law. *E.g., Doe I v. Wal-Mart*

*Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1112 (C.D. Cal. 2003); *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 414 (N.D. Cal. 2009); *Sandoval v. Ali*, 2014 U.S. Dist. LEXIS 42630, at *16-18 (N.D. Cal. Mar. 28, 2014); *No Cost Conf., Inc. v. Windstream Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1299 (S.D. Cal. 2013). Ms. Gerritsen did not amend her complaint to address these shortcomings, and she cannot do so, because no facts exist to support her theories. Her complaint should be dismissed with prejudice.

## II. Factual Background

### A. The Two Works At Issue.

*1. The Book*. On its cover and inside flap, *Gravity* is described as "A Novel of Medical Suspense" and a "nail-biting tale of genetic misadventure."[1] The Book features a multitude of characters (NASA, military, and White House staff; medical doctors; astronauts and their families; space engineers; scientists; and creators of an exploratory space shuttle). *E.g.*, Book at 3, 5, 13, 17-18, 31-32, 43, 62-65, 75, 81-83, 144-45, 153, 197-99, 205-06. The two main characters are physicians Emma Watson and her husband Jack McCallum, who are on the verge of divorce. *Id*. at 21. Watson is an accomplished astronaut who has previously spent time on the International Space Station ("ISS"); McCallum is a former astronaut who never made it to space and is now an E.R. doctor in Houston. *Id*. at 24, 31, 61, 68-69.

The "genetic misadventure" around which the Book twists concerns marine microorganisms called "archaea," which, as the result of a secret government-funded experiment on the ISS, mutated into alien life-forms called "chimera" that infect and gruesomely kill the astronauts on board. Each person infected by the chimera falls ill with demonic red eyes, seizures, and vomiting, and his or her body eventually swells and explodes, revealing greenish globs that are chimera eggs. The White House and the U.S. Army cover up the deaths, falsely blaming them on

[1] Defendants lodge herewith copies of the Book and Movie. The plots of each work are summarized in detail in Appendix 1 to the Pearson Declaration.

bio-terrorists, and keep NASA in the dark about the archaea experiment. *Id*. at 3-10, 109-15, 139-43, 177-79, 196-202, 252-54, 328-31, 335-43.

After many of her crewmates die, Dr. Watson becomes infected. Knowing she will die, she sends the last uninfected crew member home in an emergency vehicle—only to have the U.S. government nefariously shoot him down. *Id*. at 302-08, 312-16. Meanwhile on Earth, Dr. McCallum discovers the chimera is an alien life-form and invents a cure for it. *Id*. at 325-43. He uses an experimental space craft to launch a secret mission to the ISS, where he saves Watson with his antidote and emergency brain surgery. *Id*. at 344-49, 359-71. The reconciled couple returns home, but Watson fears that the chimera was only one attempt by aliens to colonize Earth, and there will be others. *Id*. at 372-80.

*2. The Movie*. There are no aliens, government conspiracy theories, gory medical scenes, or tales of lovers reconciling in *Gravity* the Movie. The Movie is a visual masterpiece that combines stunning vistas of astronauts working in the micro-gravity of space, with a spare story grounded in the realism of their work.

The Movie opens with U.S. astronauts Matt Kowalski, Shariff Dasari, and Ryan Stone (who works as an engineer in a hospital) spacewalking outside a Space Shuttle, installing optics in the Hubble telescope. Stone is a rookie, dislikes outer space, and she mumbles to herself as she works. Kowalski—a highly experienced astronaut on his last mission—lightens her mood. Movie at 3:00-8:26. Suddenly, Mission Control orders the team to abort its mission because the Russians fired a missile at one of their own spy satellites, causing a cloud of debris to hurdle toward the Shuttle. Before the team can escape the debris' path, it severely damages the Shuttle, kills Dasari and the crew on board the Shuttle, and untethers Stone, who drifts into space, low on oxygen, scared, and alone. *Id*. at 9:56-16:23.

Kowalski and Stone lose all contact with NASA, but Kowalski saves Stone. They use his jet-pack to travel to the ISS (many kilometers away) to use one of its escape pods to return to Earth. Stone reveals that her daughter died in a schoolyard

accident. When they reach the ISS, Stone and Kowalski see it was damaged and the two become untethered. Stone grabs on to Kowalski to save him, but, realizing he is dragging her away, Kowalski lets go, knowing he will float into space and die. While drifting away, he talks Stone through a plan to get home. *Id*. at 16:30-36:40.

The last half of the movie involves Stone, on her own, going from the ISS (and its damaged escape pod) to a Chinese space station and its operative pod, and finally to Earth. Stone overcomes her inexperience and many mechanical failures, and chooses not to accept death, but to live for her daughter. Stone has a brief radio discussion with a man in Greenland, but is otherwise unable to contact anyone on Earth. When Stone loses hope, Kowalski appears in a dream and motivates her to live. Stone eventually makes it to Earth, where she lands in a verdant green lake region. After almost drowning—her final challenge—she crawls onto land (reborn) and shakily stands alone facing Earth's natural beauty. *Id*. at 36:40-1:23:50.

*Gravity* the Movie is rich with visual metaphor, including this final scene—or as one of other examples, a scene in which Stone rests in the fetal position rotating in micro-gravity, when she finds oxygen on the ISS. *Id*. at 39:17-40:00.[2]

**B. The Relevant Contracts And Claims For Relief In This Case.**

*1*. In 1999, Ms. Gerritsen entered into a "Purchase Agreement" with Katja concerning the Book, as well as a "Guaranty" with its affiliate New Line. Compl. Ex. 1. Gerritsen does *not* allege that Warner Bros. was a party to either 1999 contract. Nor can she: Warner Bros. signed neither agreement; and, as she admits, New Line was not a subsidiary of Warner Bros. until after 2008. Compl. ¶ 20.

---

[2] It is unsurprising that when Ms. Gerritsen saw the Movie, she told her fans: "Yea, 'Gravity' is a great film, *but it's* <u>*not*</u> *based on my book*," and "I've been peeved that my book GRAVITY *was never made into a film …. How I wished that Cuaron had told my story instead*, but the movie he did make was a masterpiece of suspense!" PD Exs. D, E (emphases added). If it wishes, the Court can (but need not) take notice of these admissions, FED. R. EVID. 801(d)(2), 201(b)—the latter of which is publicly available on Gerritsen's blog, and the former of which comes from comments she made at a public book signing, *e.g.*, *Signature Mgmt. Team, LLC v. Automattic*, *Inc.*, 941 F. Supp. 2d 1145, 1147-48 (N.D. Cal. 2013).

The 1999 Purchase Agreement assigns Ms. Gerritsen's "motion picture" and other copyrights in the Book to Katja. *Id.* Ex. 1 at 13 ¶ 3. In return, she received an up-front payment of $1 million, and Katja promised to pay her a production bonus of $500,000 and 2.5% of "Defined Net Proceeds" if Katja "produce[d] and release[d] a live action theatrical motion picture based on the Property." Compl. Ex. 1 at 12-13 ¶¶ 2A-B. Katja also promised to give Ms. Gerritsen "Based on the book…" screen and advertising credits if it released such a motion picture. *Id.* at 21 ¶ 15. As part of the 1999 Purchase Agreement, New Line executed a "Continuing Guaranty" with Gerritsen, in which New Line promised Katja's "full and faithful performance" of its obligations under the 1999 Purchase Agreement. *Id.* at 27-28.

*2.* After execution of these 1999 agreements, Katja and New Line sought to develop the Book into a motion picture. Compl. ¶ 17. Ms. Gerritsen contends that "[t]o assist in the development," she "wrote and delivered additional material that constituted a modified version of a portion of the Book." *Id.* ¶ 18. Tellingly, she does not allege that she provided these notes to defendants or that they saw them. She does include one cursory "information and belief" allegation that the director of *Gravity* the Movie, Cuarón, was "attached" to develop the Book into a movie, but she pleads almost no specifics concerning his access, if any, to her Book or how he, in fact, based the Movie on her Book or notes. *Id.* ¶ 17.

*3. Gravity* the Movie was released in October 2013 and won seven Academy Awards. *Id.* ¶ 22. Ms. Gerritsen waited until April 2014 to file this case, and in her first two Claims for Relief she alleges that (1) Katja and Warner Bros. breached the 1999 Purchase Agreement by producing a film "based on" her Book without paying or crediting her; and (2) New Line and Warner Bros. breached the 1999 Guaranty by failing to ensure that Katja performed. *Id.* ¶¶ 23-31. She asserts a Third Claim for an accounting based her contract claims. *Id.* ¶¶ 33-38. She seeks damages in excess of $10 million, including "damages [allegedly] resulting from deprivation of [her] contractually-mandated [screen and advertising] credit[s]." *Id.* at 10.

### III. Ms. Gerritsen's Complaint Should Be Dismissed With Prejudice Because She Cannot Assert A Contract Claim Against Any Of The Defendants.

Dismissal under Rule 12 is proper because Ms. Gerritsen has not pled and cannot plead facts sufficient "to support a cognizable legal theory" of breach of contract. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). California law governs, *see* Compl. Ex. 1 at 23 ¶ 24, and the elements of a breach claim are: (1) a valid contract between her and each defendant; (2) her performance; (3) the defendant's breach; and (4) damages to her. *See Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971).[3]

In evaluating this motion, the Court must accept the factual allegations in the complaint as true, but it need not accept legal conclusions, even if cast in the form of facts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679, 681 (2009). On the motion, the Court may consider exhibits alleged or incorporated by reference in the complaint when their authenticity is not challenged. *See, e.g.*, *Neilson*, 290 F. Supp. 2d at 1112; *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1079 (C.D. Cal. 2011).

#### A. Warner Bros. Breached Neither Contact; It Was Party To Neither.

Warner Bros. never entered into a contract with Ms. Gerritsen regarding her Book. As she acknowledges, it was *Katja*, and not Warner Bros. that executed the 1999 Purchase Agreement. Compl. ¶¶ 13-14. And while she alleges that "WB [Warner Bros.] and New Line guaranteed 'full and faithful performance'" of the Purchase Agreement, *id.* ¶ 28, the Guaranty does not include Warner Bros. as a party. It says that the "Guarantor guarantees full and faithful performance" of Katja's obligations, Compl. Ex. 1 at 27 ¶ 1, and states that the "Guarantor" is the "undersigned," or *New Line*—the only party that signed the Guaranty. The first element of a breach of contract claim is a contract between plaintiff and defendant. *See Acoustics*, 14 Cal. App. 3d at 913. Ms. Gerritsen has not pled and cannot plead that element as to Warner Bros.

---

[3] The elements of her breach-of-guaranty claims are the same. *See Bank of the Sierra v. Kallis*, 2006 U.S. Dist. LEXIS 88234, at *24 (E.D. Cal. Dec. 6, 2006).

**B. Katja And New Line Did Not Breach Either Contract Because They Did Not "Produce" Or "Release" The Movie *Gravity*.**

For any payment or credit obligations to Ms. Gerritsen to be breached (*i.e.*, the second element of her contract claims), Katja needed to "produce[]" or "release[]" a motion picture "based on" her Book. Compl. Ex. 1 at 12-13 ¶¶ 2A-B, 21 ¶ 15. Neither Katja nor New Line ever released such a motion picture. As Ms. Gerritsen concedes, it is "*WB* [Warner Bros.] that is engaged in the business of developing, producing, distributing, and marketing motion pictures *including the 2013 motion picture* entitled *Gravity*," Compl. ¶ 10 (emphases added), and "[i]n or about 2011, *WB* commenced production of the [Movie]," *id*. ¶ 22 (emphasis added).

Nor can New Line be held liable. The Guaranty states that "*[New Line] shall have no obligation* to [Gerritsen] with respect to any compensation *unless and until* such compensation shall have accrued and been payable to [her] in accordance with the provisions of the [Purchase Agreement] and *[Katja] shall have failed to pay….*" *Id*. Ex. 1 at 17 ¶ 5 (emphases added). Since Katja never "produce[d]" or "release[d]" the Movie, *id*. at 13 ¶ 2B, New Line cannot be in breach.

**C. Ms. Gerritsen's Assignment, Alter-Ego, And Agency Theories Are All Without Basis And Cannot Be Used To Blur Distinct Parties.**

*1. Assignment.* Ms. Gerritsen alleges she is "informed and believes" that "by virtue of" a 2008 "corporate transaction" among Warner Bros., New Line, and Katja, "the rights and duties of Katja and New Line under [her 1999 agreements] were *transferred and assigned* to WB so that as of 2008 WB owned and still owns today the motion picture rights to the Book." Compl. ¶ 20 (emphasis added).

Such conclusory allegations regarding the legal effect of a transaction fail to state a claim. *See, e.g.*, *No Cost*, 940 F. Supp. 2d 1285. In *No Cost*, plaintiff alleged that, "as a result of the [corporate] merger, [defendant] assumed all right[s] and responsibilities" with regard to plaintiff's contract. *Id*. at 1299. The court held that this allegation was "conclusory" and "insufficient" because it did not plead "the existence of a contract [and] its terms which establish the obligation [in]

issue." *Id*. As *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, held in similar circumstances: "With regard to assumption of duties, plaintiffs must allege more than a terse allegation (*e.g*, [that a party] 'specifically assumed the duties and obligations of [another party]…') to support a finding that there was an express or implied assumption of liability. They *must allege facts*." 2008 U.S. Dist. LEXIS 111530, at *11-12 (E.D. Cal. July 1, 2008) (emphases added).

Ms. Gerritsen's "assignment" theory alleges no specific facts, and instead argues only a legal conclusion—*i.e.*, that a transfer or assignment occurred. Compl. ¶ 20. Indeed, she admits she has not pointed to and cannot point to a specific contract assigning Warner Bros. the rights and duties under her 1999 agreements. She admits, "[t]his is not a situation where, for example, the pleading refers to a specific contract"—she only assumes such an assignment exists. PD Ex. G at 61.[4]

*2. Alter Ego.* Gerritsen also makes the conclusory claim that defendants are all alter egos, Compl. ¶ 6, but it is a bedrock rule of law that "a parent corporation

---

[4] The actual "Assignment Agreement" between New Line and Warner Bros.—which defendants provided Gerritsen weeks ago, *see* PD ¶ 4 & Ex. B—makes clear that Warner Bros. was *not* assigned any rights or liabilities with respect to her Book. It states that the only "Content," "IP Rights," or "Content Agreements" that Warner Bros. acquired from New Line were those "acquired by [New Line] *on or after*" January 1, *2010*, PD Ex. B ¶¶ 1.1, 1.2, 1.3, 2.1 (emphasis added)—*i.e.*, a decade *after* Ms. Gerritsen's 1999 agreements were made.

The Court may (but need not) take notice of this Agreement—either on judicial-notice grounds, *e.g.*, *Neilson*, 290 F. Supp. at 1114, or because the complaint incorporates it by general reference, *e.g.*, *Hill*, 841 F. Supp. 2d at 1079; *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1118 n.59 (C.D. Cal. 2009). While Gerritsen disputes defendants' reading of the Agreement's plain terms, see PD Ex. G at 61, she does not (and cannot) challenge its authenticity, *cf.*, *e.g.*, *In re Turbodyne Techs, Inc. Secs. Litig.*, 2000 U.S. Dist. LEXIS 23020, at *29 (C.D. Cal. Mar. 15, 2000) (applying incorporation-by-reference doctrine where even though "defendants challenge[d] the truth of the allegations set forth in [the] documents, they [did] not appear to challenge their authenticity").

Moreover, while Gerritsen speculates that another assignment agreement might exist, PD Ex. G at 61, she has not properly pled the facts establishing its existence, *see No Cost*, 940 F. Supp. 2d at 1297-99, nor pled its existence in a way that would entitle her to discovery, *see Alcay v. City of Visalia*, 2013 U.S. Dist. LEXIS 90160, at *12 (E.D. Cal. June 26, 2013). As *Iqbal* confirmed, a plaintiff cannot fail to state a claim properly, then fish in discovery for facts to fix it. *See id.*; *infra* at 12.

… is not liable for the acts of its subsidiaries," *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998); *Sonora Diamond v. Super. Ct.*, 83 Cal. App. 4th 523, 538 (2000). When ruling on motions to dismiss—especially post-*Iqbal*—courts have repeatedly held that "[c]onclusory allegations of 'alter ego' status are insufficient." *Neilson*, 290 F. Supp. 2d at 1116. "[P]laintiff must allege *specifically* both of the elements of alter ego liability [*i.e.*, a unity of interest among the companies; and a fraud or injustice that would result in recognizing their separateness], *as well as facts supporting each*" prong—not merely a listing of legal elements. *Id*. (emphases added).

Relying on exactly the sort of conclusory allegations that these cases forbid, Ms. Gerritsen asserts that Warner Bros., Katja, and New Line are all alter-egos of one another. Compl. ¶ 6. Intoning a few of the elements of an alter-ego claim, she alleges that since 2008 (a) a "unity of interest" existed among defendants; (b) New Line and Katja are "shells" or "conduits through which WB conducts business"; (c) "[t]o the extent New Line and Katja continue to transact any business at all, it is at the sole direction and for the sole benefit of WB"; (d) "WB exercised complete management, control, ownership, and domination over New Line"; and (e) to treat these companies as separate legal entities would lead to an "inequitable result." *Id*.

But each of these "ultimate facts" or "legal conclusions" is unsupported by the "evidentiary" allegations required to sustain such a claim. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) (case dismissed with prejudice where plaintiffs failed to plead necessary evidentiary facts). And time and again, courts have dismissed alter-ego claims premised on such conclusory pleadings.[5]

---

[5] *E.g.*, *Neilson*, 290 F. Supp. 2d at 1118 (dismissing alter-ego claim not based on specific facts of, *inter alia*, inadequate capitalization or draining corporate assets); *Sandoval*, 2014 U.S. Dist. LEXIS 42630, at *16-18 (holding "too conclusory to survive a motion to dismiss" "'information and belief'" allegations that owners "are the alter egos of the corporate defendants … and that the corporate [d]efendants are underfunded, are not stand alone corporations, have common management and pay practices, share labor and materials, including a distribution and billing system, and operate a common marketing system"); *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1067 (C.D. Cal. 2002) (rejecting alter-ego pleadings where complaint failed to plead facts showing, *e.g.*, "that [parent corporation] treats

The alter-ego legal conclusions that Gerritsen alleges are also infirm. That Warner Bros. is now a grandparent company of its fellow defendants, *cf*. Compl. ¶ 20, does not make it liable for them, *see Neilson*, 290 F. Supp. 2d at 1116 ("the mere fact that it owns the stock of the subsidiary will not suffice to prove that the two entities are alter egos"). Moreover, Gerritsen's "control" allegation—aimed at New Line—is "not enough" to state a claim, *Pac. Coast Shipyards Pension Fund v. Nautical Eng'g, Inc.*, 2014 U.S. Dist. LEXIS 4020, at *13 (N.D. Cal. Jan. 13, 2014) (granting motion to dismiss), as she fails to plead the required "specific manipulative conduct," *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 742 (1998) (affirming grant of summary judgment), *overruled on other grounds by Reid v. Google*, 50 Cal. 4th 512 (2010). Indeed, her control and domination theory makes little sense, as New Line and Katja signed the operative contracts more than *10 years before* she says that Warner Bros. came to dominate them.

"[B]ad faith conduct" is also required to meet the "inequitable result" part of the alter-ego test. *Neilson*, 290 F. Supp. 2d at 1117. Ms. Gerritsen's one-sentence claim that "if [New Line and Katja's] acts are not treated as the acts of WB an inequitable result will follow," Compl. ¶ 6, is exactly the sort of *ipse dixit* that courts regularly reject on motions to dismiss, *e.g.*, *Neilson*, 290 F. Supp. 2d at 1117.

The reason that Ms. Gerritsen fails to plead facts supporting the unity-of-interest and bad-faith prongs of the alter-ego test is that no such facts exist. Indeed, the Assignment Agreement that Gerritsen adverts to in her complaint—between Warner Bros. and New Line—is a prime example of this. When New Line became an indirect subsidiary of Warner Bros., New Line *kept all of the IP rights and contracts* it acquired prior to 2010. PD Ex. B ¶¶ 1.1, 1.2, 1.3, 2.1. A company that holds such valuable rights is the exact opposite of an empty shell. *E.g.*, *Norins Realty Co. v. Consol. Abstract & Title Guar. Co.*, 80 Cal. App. 2d 879, 883 (1947)

---

the assets of [its subsidiary] as its own, that it commingles funds…, that it controls the finances of [the subsidiary], that it shares officers or directors with [the subsidiary], [or that the subsidiary] is undercapitalized").

(rejecting alter-ego claim as a matter of law; subsidiary "not alleged to be insolvent and no facts are alleged from which it can be inferred that it will be unable to respond to any judgment"); *accord M.O.D. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992); *Wady*, 216 F. Supp. 2d at 1070; *Haskell v. Time, Inc*., 857 F. Supp. 1392, 1403 (E.D. Cal. 1994).

*3. Agency.* Ms. Gerritsen's final theory to escape the privity rules—*i.e.*, agency—is equally without basis. She says that she "is informed and believes … that in and subsequent to 2008 each defendant was acting as the agent of each other defendant, and, in committing the acts and omissions described [in her complaint], was acting within the course and scope of such agency…." Compl. ¶ 5. Again, such legal conclusions defy *Iqbal* and are regularly rejected by the courts at the motion to dismiss stage. Corporate "[i]ndependence is to be presumed," *Cal. v. NRG Energy Inc.*, 391 F.3d 1011, 1024 (9th Cir. 2004), *rev'd on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007), and a plaintiff must "plead specific facts" demonstrating agency to get past a Rule 12 motion.[6]

*4. Discovery and Whether to Permit Amendment.* In the meet-and-confer process, Ms. Gerritsen said she had pled enough in her complaint to survive *Iqbal*, declined to amend her complaint to address the caselaw above, and said she hoped

[6] *Biggins*, 266 F.R.D. at 414 (N.D. Cal. 2009) (rejecting such allegations as "nothing more than bare legal conclusions"); *accord, e.g.*, *Imageline, Inc. v. CafePress.com, Inc.*, 2011 U.S. Dist. LEXIS 3982, at *12-13 (C.D. Cal. Apr. 6, 2011) (allegations that defendant was an "agent … of the remaining defendants and … act[ed] within the course and scope, and purpose of said agency" were "nothing more than legal conclusions of the type prohibited by *Iqbal*"); *Mindlab Media, LLC v. LWRC Int'l, LLC*, 2012 U.S. Dist. LEXIS 14769, at *10-12 (C.D. Cal. Feb. 6, 2012) ("information and belief" allegation that defendants were agents of one another were "legal conclusions"; granting motion to dismiss); *In re Cal. Title Ins. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 43323, at *29 (N.D. Cal. May 21, 2009) (rejecting agency allegations as no "more than bare legal conclusions, which the Court need not accept as true"); *Dolter v. Keene's Transfer, Inc.*, 2008 U.S. Dist. LEXIS 59436, at *7-8 (N.D. Ill. Aug. 5, 2008) (rejecting agency allegations because they included only "labels and conclusions"); *Neu v. Terminix Int'l, Inc.*, 2008 U.S. Dist. LEXIS 32844, *18-19 (N.D. Cal. Apr. 8, 2008) (dismissing claims against parent company based on conclusory allegations of control).

to take discovery to prove her various vicarious-liability theories. But under *Iqbal* and its progeny, conclusory, speculative allegations in a complaint do not entitle a plaintiff to discovery. To the contrary, "Rule 8—as interpreted by *Iqbal*…—dictates that the doors to discovery must remain closed to [plaintiff] until she can plead sufficient facts…." *Bergman v. Fid. Nat'l Fin., Inc.*, 2012 U.S. Dist. LEXIS 136711, at *10 (C.D. Cal. Sept. 24, 2012); *Iqbal*, 556 U.S. at 678-79 (Rule 8's notice pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"); *Alcay*, 2013 U.S. Dist. LEXIS 90160, at *12 ("[Plaintiff] either possess[es] enough facts to plausibly allege a [] claim, or [s]he does not. If [s]he does not, … discovery will not go forward.").

Ms. Gerritsen has pled no facts—nor has she identified any further facts she could plead—to support her infirm theories of liability. Thus, her complaint should be dismissed, with prejudice.

### D. Ms. Gerritsen's Accounting Claim Should Be Dismissed As Well.

Ms. Gerritsen's Third Claim—for an accounting—is premised on the two contract claims refuted above. This dependent claim should likewise be dismissed. *See Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1225 (S.D. Cal. 2012).

## IV. Conclusion

Defendants' motion to dismiss should be granted.[7]

Dated: June 20, 2014

Respectfully submitted,
O'MELVENY & MYERS LLP
By: /s/ Matthew T. Kline

OMM_US:72337044

[7] If need be, defendants will assert numerous other defenses, including the separate, independent grounds that *Gravity* the Book and Movie are such dissimilar works that no reasonable jury could conclude the Movie was "based on" her Book, and that the creators of the Movie never had the requisite access to the Book for liability to obtain. *See, e.g.*, *Sutton v. Walt Disney Prods.*, 118 Cal. App. 2d 598, 603 (1953); *Henried v. Four Star Television*, 266 Cal. App. 2d 435, 436-37 (1968); *Kightlinger v. White*, 2009 Cal. App. Unpub. LEXIS 9345, at *10-18 (Nov. 23, 2009); *Benay*, 607 F.3d at 630; D. NIMMER, NIMMER ON COPYRIGHT § 19D.08[B] (2013). This, of course, is only a partial listing of defenses.