1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KULIK GOTTESMAN & SIEGEL, LLP
  Glen L. Kulik, Esq. (SBN 082170)
  Natalie N. Wright, Esq. (SBN 273381)
15303 Ventura Boulevard, Suite 1400
Sherman Oaks CA  91403
Tel:   (310) 557-9200; (818) 817-3600
Fax:  (310) 557-0224
gkulik@kgslaw.com; nwright@kgslaw.com

Attorneys for Plaintiff
Terry T. Gerritsen

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY T. GERRITSEN, an individual,<br><br>             Plaintiff,<br><br>      v.<br><br>WARNER BROS. ENTERTAINMENT, INC., A Delaware corporation; KATJA MOTION PICTURE CORP., a California Corporation; and NEW LINE PRODUCTIONS, INC., a  California corporation,<br><br>             Defendants. | Case No. CV14-3305-MMM (CWx)<br><br>[Hon. Margaret M. Morrow]<br><br>**OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:     September 29, 2014<br>Time:    10:00 a.m.<br>Room:   780 |

{00248858;2}

Gerritsen v. Warner Bros., et al.
Case No. CV 14-3305-MMM(CWx)

OPPOSITION TO MOTION TO DISMISS
COMPLAINT

# TABLE OF CONTENTS

Page

1.  INTRODUCTION................................................................................ 1

2.  SUMMARY OF ALLEGATIONS IN THE COMPLAINT........................... 4

3.  THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE
    MERGER OF WB AND NEW LINE, THE IMPACT ON
    KATJA, AND OTHER SALIENT FACTS WHICH ARE A
    MATTER OF PUBLIC RECORD.................................................. 7

4.  GERRITSEN'S CLAIMS ARE SUPPORTED BY
    COGNIZABLE LEGAL THEORIES AND ADEQUATELY
    DETAILED FACTUAL ALLEGATIONS...................................... 11

    A.   Successor-In-Interest Liability, *i.e.*, Assignment Theory,
         Is Adequately Pleaded........................................................ 11

         (i)    Gerritsen Alleges Facts Sufficient to Satisfy the
                First Prong of the Successor Liability Test ............... 13

         (ii)   Gerritsen Alleges Facts Sufficient to Satisfy the
                Second Prong of the Successor Liability Test........... 14

         (iii)  Gerritsen Alleges Facts Sufficient to Satisfy the
                Third and Fourth Prongs of the Successor Liability
                Test............................................................................. 15

    B.   Alter Ego Liability Is Adequately Pleaded ......................... 16

         (i)    Gerritsen Alleges Sufficient Facts to Establish
                Potential "Unity Of Interest and Ownership"........... 17

         (ii)   Gerritsen Alleges Sufficient Facts to Establish that
                Inequity Would Result from Treating Defendants as
                Separate Entities ..................................................... 19

         (iii)  Exhibit B to the Pearson Declaration is Not
                Judicially Noticeable, But Even If It Were, It
                Bolsters the Theory That  New Line and Katja Are
                Mere Alter Egos of WB ........................................... 20

    C.   Agency Liability Theory Is Adequately Pleaded................. 21

{00248858;2}                                                 i

Gerritsen v. Warner Bros., et al.                    OPPOSITION TO MOTION TO DISMISS
Case No. CV 14-3305-MMM(CWx)                         COMPLAINT

5.    FORMAL DISCOVERY IS NECESSARY AND
      WARRANTED. ........................................................................................... 22

6.    CONCLUSION. ............................................................................................ 23

Gerritsen v. Warner Bros., et al.                    OPPOSITION TO MOTION TO DISMISS
Case No. CV 14-3305-MMM(CWx)                         COMPLAINT

1

<u>TABLE OF AUTHORITIES</u>

2
<u>Page</u>

3

<u>Cases</u>

4

*Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc*.,

5
     583 F.2d 426 (9th Cir. 1978) ............................................................................ 4

6

*Ashcroft v. Iqbal*,

7
     556 U.S. 662 (2009)................................................................................... 19, 22

8

*Associated Vendors, Inc. v. Oakland Meat Co.*,

9
     210 Cal.App.2d 825 (1962) .............................................................................. 19

10

*CenterPoint Energy, Inc. v. Sup. Ct*.,

11
     157 Cal. App.4th 1101 (2007) .......................................................................... 11

12

*Garlock Sealing Technologies LLC v. NAK Sealing Technologies Corp*.,

13
     148 Cal.App.4th 937 (2007) ............................................................................ 22

14

*In re Currency Conversion Fee Antitrust Litigation*,
     265 F.Supp.2d 385 (S.D.N.Y. 2003) ............................................................... 16

15

*Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc*.,

16
     116 Cal.App.3d 111 (1981) ............................................................................. 17

17

*Kendall v. Visa U.S.A., Inc*.,

18
     518 F.3d 1042 (9th Cir. 2008) .................................................................... 16, 18

19

*Marr v. Postal Union Life Ins. Co*.,

20
     40 Cal.App. 673 (1940) ................................................................................... 17

21

*Neilson v. Union Bank of California, N.A.*,

22
     290 F.Supp.2d 1101 (C.D. Cal. 2003) ................................................. 16, 17, 20

23

*No Cost Conf., Inc. v. Windstream Communs., Inc.*,
     940 F.Supp.2d 1299 (S.D. Cal. 2013)...................................................... passim

24

*Palomares v. Bear Stearns Residential Mortg. Corp.*,

25
     2008 WL 686683 (S.D.Cal. Mar.13, 2008) ..................................................... 22

26

*SEC v. Hickey*,

27
     322 F.3d 1123 (9th Cir. 2003) ......................................................................... 17

28

*Sonora Diamond Corp. v. Superior Court,*
    83 Cal.App.4th 523 (Cal.Ct.App.2000) ............................................................ 22

*Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.,*
    972 F. Supp. 1275 (C.D. Cal. 1997) ................................................................ 19

*United States v. Standard Beauty Supply Stores, Inc.,*
    5611 F.2d 774 (9th Cir. 1977) ........................................................................ 19

*Wady v. Provident Life and Accident Ins. Co. of America,*
    216 F.Supp.2d 1060 (C.D. Cal. 2002) .............................................................. 17

*Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.,*
    2008 WL 2693741 *4, 2008 U.S. Dist.
    LEXIS 111530 (E.D. Cal. July 1, 2008) .......................................................... 12

*Zorich v. Long Beach Fire Dep't & Ambulance Serv., Inc.,*
    118 F.3d 682 (9th Cir. 1997) ........................................................................... 12


<u>Statutes</u>

Cal. Civ.Code § 2295 ........................................................................................ 21


<u>Rules</u>

Fed. R. Civ. P. Rule 8(a)(2) of the ...................................................................... 4

# 1.  <u>INTRODUCTION</u>.

Defendant Warner Bros. Entertainment ("WB") believes it can produce a motion picture ("Picture") based on the novel *Gravity* ("Book"), while avoiding any obligation to author Terry T. Gerritsen ("Gerritsen"), by arguing she was only entitled to payment and credit if the Picture was produced by one of WB's wholly owned, fully controlled, alter ego subsidiaries with which Gerritsen had a contract ("Contract").  In other words, defendants contend they effectively circumvented the Contract by having WB produce the Picture.  Defendant Katja Motion Picture Corp. ("Katja") owns the motion picture rights in the Book, and Katja is not about to make a claim against WB.  So, defendants reason, Gerritsen is left without any remedy and the Complaint must be dismissed.

Defendants believe they pulled off the perfect crime, but they are mistaken. If they were correct, motion picture studios would have a license to steal.  After all, studios can (and often do) form subsidiaries to acquire rights to literary material. If they want to avoid their obligations to the author—obligations to which they agreed when the rights were purchased—all they have to do is have the parent company produce the film rather than the subsidiary.  The latter will, of course, not object, and if the author complains, the studio's response will be that she no longer owns any rights in her material and her contract is with the subsidiary. This argument flies in the face of industry practice and commercial reality.

As discussed below, defendant New Line Productions, Inc. ("New Line") has been owned by Time Warner since 1996.  Until 2008, it was an independent motion picture studio that, as alleged, used its wholly owned subsidiary Katja to acquire literary material and develop screenplays.  If New Line liked the screenplay, Katja would assign the rights to New Line or an affiliate who would produce the movie. In 2008, in response to New Line's staggering financial losses, Time Warner dismantled New Line and Katja and merged the remnants into WB.

{00248858;2}                                1

Gerritsen v. Warner Bros., et al.                OPPOSITION TO MOTION TO DISMISS
Case No. CV 14-3305-MMM(CWx)                     COMPLAINT

It will require substantial discovery to fully unravel the complicated web which defendants have created to shield themselves from creditors of New Line and Katja, but Gerritsen has adequately alleged three theories on which defendants, including WB, may be liable for the consideration specified in the Contract. Gerritsen alleges that in 2008, when WB absorbed New Line and Katja, WB acquired all of their assets and liabilities including the Contract.  Under paragraph 11 of the Contract, that makes WB obligated to perform the duties owed to Gerritsen by New Line and Katja.  Gerritsen also alleges that New Line and Katja are shell companies fully controlled by WB through which WB conducts business, and as such they are the alter egos of WB.  Finally, Gerritsen also alleges that New Line and Katja are mere agents of WB.  The present motion is an attempt to stop Gerritsen from conducting discovery on these three theories, any of which, if proven, would establish their liability under the Contract. [1]

In support of their motion, defendants seek to selectively introduce evidence they want the court to see while preventing the disclosure of anything else.  They cunningly tell the court it "may, but need not," take judicial notice of their documents, hoping the court's view of the case will be colored by their inadmissible evidence.  The pending motion must be decided solely on the allegations in the Complaint and information which is *properly* subject to judicial notice.   The evidence defendants present is not subject to judicial notice and should not be considered at the pleading stage. It is argumentative, incomplete, and conclusory

---

[1] Defendants do not recite the actual grounds for their motion until the third paragraph of their introduction.  The first paragraph contains the standard studio bluster that anyone who dares to sue them is misguided and uninformed.  In the second paragraph they point out that this is not a copyright claim because defendants own the copyright which they acquired when they bought the motion picture rights to the Book.  It is not until the third paragraph that they state the grounds for the motion:  that the Picture was produced by WB, not by New Line or Katja, thus the payment and credit terms in the Contract were not triggered.

rather than factual in nature.  Further, if the court is inclined to take judicial notice of that material, Gerritsen should be entitled to the same consideration and the court should take judicial notice of those items she is lodging with this opposition.

In purported support of their motion, defendants submit an Assignment Agreement dated January 1, 2010 between New Line and WB.  They argue: "The actual 'Assignment Agreement' between New Line and Warner Bros. . . . makes clear that Warner Bros was *not* assigned any rights or liabilities with respect to her Book." (Motion, p. 8, n. 4.)  First, the document in question is not subject to judicial notice, but even if it were, defendants' characterization of it is egregiously false. The document is an assignment of rights in material New Line will acquire in and subsequent to 2010.  It does not address intellectual property rights owned by New Line prior to 2010, or, more specifically, rights that New Line owned in 2008 at the time it was acquired by WB, including New Line's rights in the Book.  There is not even an inference about rights that New Line owned before 2010.  That subject would be covered by the transaction documents in 2008 which defendants do not want plaintiff or this court to see.

While the Assignment Agreement does not support defendants' position, it has the unintended result of supporting Gerritsen's allegation that New Line is the alter ego of WB.  The Assignment Agreement defines the term "Content" as all intellectual property rights acquired by New Line on or after January 1, 2010. (Declaration of Ashley Pearson ("Pearson Decl."), Ex. B, ¶ 1.2.)  It goes on to say that all Content will automatically and irrevocably be deemed assigned and transferred to WB now and in the future.  (*Id.,* ¶ 2.1.) There is a boilerplate recital that the assignment is for adequate consideration, but it identifies no such consideration and says WB will own the rights but assumes no duties.  (*Id.,* ¶ 2.2.) Given the nature of the intellectual property in question, the value of the rights assigned could, over time, be worth billions of dollars.  In any bona fide agreement of that magnitude the specific consideration would have been specified.  Instead, the

Assignment Agreement merely says that anything acquired by New Line in or after 2010, in perpetuity, is actually owned by WB. This is clear evidence of the alter ego relationship that exists today.

This is only the pleading stage. The Complaint provides fair notice to defendants of the nature of the allegations against them as required by Rule 8(a)(2) of the Federal Rules of Civil Procedure. As shown below, the allegations of alter ego, agency, and assignment are supported by sufficient factual assertions and discovery should proceed. Other facts are within defendants' sole and exclusive control and there is no way to access them without formal discovery. Defendants may raise these arguments again at the summary judgment stage after both sides have been afforded a fair opportunity to take discovery and present to the court a full recitation of the evidence.

2.   **SUMMARY OF ALLEGATIONS IN THE COMPLAINT.**

Defendants argue that the Complaint contains only conclusions and no factual allegations. That is not the case.

Gerritsen was a medical doctor who became a best-selling novelist. (Complaint, ¶ 9.) On March 18, 1999, Katja, New Line and Gerritsen entered into the Contract under which Katja paid $1,000,000 to purchase the motion picture rights to the Book. (*Id.*, ¶¶ 12-13 and Ex. 1.)[2] Katja also agreed that if a Picture was produced "based on" the Book, it would pay Gerritsen a production bonus of $500,000 plus 2.5% of 100% of the Defined Net Proceeds of the Picture, and Gerritsen would be afforded credit as specified in the Contract. (*Id.*, ¶ 14 and Ex. 1.) The precise wording of the credit depended on whether the Picture used Gerritsen's title *Gravity* or some other title. New Line was also a party to the Contract,

---

[2]   In deciding a motion under Rule 12(b)(6), documents attached to the complaint are considered because they are deemed part of the pleadings. *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429-30 (9th Cir. 1978).

guaranteeing the "full and faithful performance" by Katja of all duties under the Contract.  (*Id*., ¶ 15 and Ex. 1, pp. 16-17.)

At the time the Contract was signed, Katja was a wholly-owned subsidiary of New Line.  (*Id*., ¶ 16.)  Gerritsen has alleged that Katja was "a shell entity completely dominated, directed, and controlled by New Line." (*Id*.)  She has further alleged that Katja was merely used by New Line "as part of its overall business strategy to acquire literary material and develop the material into a viable motion picture screenplay ready for production, at which point the rights would be assigned to New Line or another entity controlled by New Line which would produce and distribute the actual film." (*Id*.)  Thus, "it was understood and intended at the time the Contract was signed that when the Picture was produced Katja would transfer its rights to New Line or to another entity controlled by New Line which would produce the Picture." (*Id*.)  This anticipation of assignment was memorialized in paragraph 11 of the Contract:

> "11.  **ASSIGNMENT**: Owner agrees that Company may assign this Agreement, in whole or in part, at any time to any person, corporation, or other entity, provided that unless this assignment is to a so-called major or mini-major production company or distributor or similarly financially responsible party or purchaser of substantially all of Company's stocks or assets which assumes in writing all of Company's obligations, Company shall remain secondarily liable for all obligations to Owner hereunder." (*Id.*, Ex. 1, p. 11.)

The actual "assignment" stated that Gerritsen "sells and assigns to Katja Motion Picture Corp., its successors and assigns, all right, title and interest in the original literary material. . . ." (*Id.*, Ex. 1, p. 13.)  The property assigned was deemed

to include "all contents" and "all past, present and future adaptations and versions," and the "title, characters, and theme."  (*Id.*)

In paragraph 12 of the Contract, the parties agreed that all notices to be provided to Katja must be addressed to "Katja Motion Picture Corp., c/o New Line Productions, Inc., 888 Seventh Avenue, New York, New York 10106."  Under paragraph 12, the notices were to be delivered to Judd Funk, who was Executive Vice President of Business and Legal Affairs for New Line.  (*Id.*)

At about the same time that they purchased the Book, New Line and Katja entered into an agreement with a production company, Artists Production Group ("APG").   APG attached director Alfonso Cuarón ("Cuarón") to oversee development of the Book into the Picture (*Id.*, ¶ 17.)  Gerritsen was not aware until recently of Cuarón's attachment to the Book.   (*Id.*)  To assist in the development process, Gerritsen wrote and delivered additional material that constituted an additional version of a portion of the Book.  The additional material included scenes of satellite debris colliding with the International Space Station ("ISS"), the destruction of the ISS, and the surviving female medical doctor/astronaut left drifting in her space suit, alone and untethered, seeking the means to return to earth.  (*Id.*, ¶ 18.)  Under the Contract, this additional material from Gerritsen was a "future adaptation and version" that was deemed to be part of what Katja acquired.  (*Id.*)

After formal development of Gerritsen's project by Katja and New Line ended in 2002, Cuarón wrote a screenplay entitled *Gravity* based on the Book.  (*Id.*, ¶ 19.)

The Complaint alleges that in 2008, WB "acquired control of New Line and Katja by means of a corporate transaction."  Gerritsen could not be specific as to the nature of the transaction because some media reported that New Line was "merged into" WB, others reported that New Line became a "unit" of WB, while still others reported that New Line had been "folded into" or "absorbed by" WB.  For example, the <u>Los Angeles Times</u> reported that New Line had been "folded into Warner Bros."

1   at which point Warner Bros. fired "most of New Line's 500 employees in a get-

2   tough cost-cutting measure designed to impress restive Time Warner stockholders."

3       On or about December 17, 2009, Cuarón and his son granted all rights in their

4   *Gravity* project to WB.  (*Id.*, ¶ 21.)  In 2011, WB commenced production of the

5   Picture.  (*Id.*, ¶ 22.)  Cuarón directed the Picture and together with his son was

6   accorded writing credit by WB. (*Id.*)  Gerritsen has alleged that "Katja should have

7   objected to the production by WB of a film based on a literary property technically

8   owned by Katja, but did not, because Katja is controlled by WB and WB is

9   effectively the owner of the motion picture rights to the Book." (*Id.* at ¶ 22.)

10      Gerritsen has further alleged that starting in 2008 and continuing to the

11  present "New Line and Katja have been and continue to be shell corporations wholly

12  owned by WB and mere conduits through which WB conducts business."  (*Id.*, ¶ 6.)

13  It is specifically alleged that "to the extent New Line and Katja continue to transact

14  any business at all, it is at the sole direction and for the sole benefit of WB."  (*Id.*)

15  Throughout this period, "WB exercised complete management, control, ownership,

16  and domination over New Line and Katja."  (*Id.*)  These allegations are followed by

17  the recitation that "there has been and is today such a unity of interest and ownership

18  between New Line and Katja, on the one hand, and their parent WB on the other,

19  that the separate personalities of New Line and Katja no longer exist and if their acts

20  are not treated as the acts of WB an inequitable result will follow." (*Id.*)

21  **3.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE**

22  **MERGER OF WB AND NEW LINE, THE IMPACT ON KATJA, AND**

23  **OTHER SALIENT FACTS WHICH ARE A MATTER OF PUBLIC**

24  **RECORD.**

25      The contact person for New Line and Katja, as listed in the California

26  Secretary of State's Business Entities Registry, is a paralegal employed by WB,

27  Jillaine Costelloe, whose office is located on the WB studio lot at 4000 Warner

28  Boulevard, Burbank, California 91522.  (Plaintiff's Request for Judicial Notice

("RJN"), ¶ 1.)  The three companies share offices at the same business address.  (*Id.*, ¶ 2.)  Although there is at least a potential conflict of interest, the same law firm is representing all three companies in this lawsuit.  (*Id.*, ¶ 3.)

If one tries to access a website for New Line or Katja, one is transferred automatically to the WB website.  The web URL for Katja is publicly listed as www.newline.com (RJN, ¶ 4.)  If one enters that URL into the address-bar of a web browser, however, the URL redirects automatically to the WB website, www.warnerbros.com. (*Id.*, ¶ 5.) Thus, Katja and New Line do not even have a website separate from WB and the three companies appear to casual internet user and the general public as one unified business entity.

New Line was founded in 1967 by Robert Shaye ("Shaye"). (RJN, ¶ 6.) Michael Lynne ("Lynne") later became Chief Operating Officer.  (*Id.*, ¶ 7.)  New Line started as a low-budget film distribution company but soon became a high profile motion picture studio. (*Id.*, ¶ 8.) On January 28, 1994, it was purchased by Turner Broadcasting System, which was acquired by Time Warner in 1996. (*Id.*, ¶ 9.) From 1996 to the present, New Line, and its wholly owned subsidiary Katja, have been part of Time Warner. (*Id.*, ¶ 10.)

New Line operated as a separate studio until February 28, 2008, when Time Warner CEO Jeffrey Bewkes announced that New Line would shut down as a separately operated motion picture studio and would be merged into another of Time Warner's divisions, WB. (RJN, ¶ 11.) The Los Angeles Times reported:  "Roll the credits on New Line Cinema . . . . The company will lay off hundreds of its employees between its Los Angeles and New York facilities and be merged into its corporate sibling Warner Bros." (*Id.*, Ex. 19.)  At that time, Forbes reported:

It's the end of an era at New Line Cinema.  Founder, Co-Chairman and Co-Chief Executive Robert Shaye and Co-Chairman and Co-Chief Executive Michael Lynne are leaving the studio as part of a restructuring that will merge

New Line into fellow Time Warner subsidiary Warner
Bros. Entertainment.  The decision to merge the two film
divisions did not come as a surprise.  Time Warner Chief
Executive Jeff Bewkes said during a February 6
conference call that 'There is an obvious question about
whether it still makes sense for us to have two completely
separate studio infrastructures at Warner and New Line. . .
.'  New Line . . . has been part of Time Warner since 1996
when the media conglomerate acquired the studio's then-
parent Turner Broadcasting System. . . . The decision to
fold New Line into Warner Bros. is the latest move in
Bewkes' restructuring of Time Warner."  (RJN, Ex. 16.)

The merger was discussed in Time Warner's 2008 Shareholders Report (RJN,
Ex. 1) and in its corporate 10K for 2008 (*id.*, Ex. 2) and is mentioned on WB's
official website (*id.*, Exs. 4, 5, 6.)  USA Today announced at the time:  Time Warner
merges its Warner Bros., New Line Units."  (*Id.*, Ex. 20.)  The Huffington Post
wrote, "Warner Bros. Absorbs New Line Cinema." (*Id.*, Ex. 21.) Reuters announced
that Time Warner "will consolidate its New Line Cinema film studio under Warner
Bros. Entertainment. New Line's Co-Chairmen and Co-CEOs Robert Shaye and
Michael Lynne have elected to leave the studio, which will become a unit of Warner
Bros." (*Id.*, Ex. 18.)  At the time, Shaye and Lynne wrote a farewell letter to all
New Line employees which was widely reprinted in the media.

"This afternoon, Time Warner is announcing that New Line
will become a unit of Warner Bros.  This is, of course, a
very difficult and emotional time for all of us who have
worked at New Line.  While there is not much we can say
that can lessen the impact of this announcement, we did
want you to know about the decision before you read about

1    it in the press. . . . Time Warner hopes that by operating
2    New Line as a unit of Warner Bros. it will allow New Line
3    to focus on the creative side of movie making, while
4    reducing costs and taking advantage of Warner Bros.'
5    distribution systems. . . . For our part, we will be stepping
6    down as Co-Chairmen and Co-CEOs of New Line. This was
7    a painful decision . . . but we will be leaving the company
8    with enormous pride. . . . We thank all of you who have
9    worked so hard to make New Line such a success."  (RJN,
10   Exs. 13, 14, 15, 17, 21.)

11      Time Warner lowered the boom on New Line employees on April 14, 2008.
12   (RJN, ¶ 12) It was announced that 450—all but a handful —of New Line's
13   employees were being fired "in a highly anticipated move following an earlier
14   decision to fold the movie studio under the wing of Warner Bros. Entertainment. . . .
15   The decision in February to fold the studio under Warner ended New Line's 40 years
16   as an independent studio." (*Id.*, ¶ 12 and Ex. 24.)  The merger integrated New Line's
17   production, marketing, and distribution roles with Warner Bros., and transformed
18   New Line's identity from that of a studio to a production and development company
19   controlled by WB. (RJN, Exs. 38.)

20      As for Katja, it is not clear what role it was assigned after the merger of New
21   Line and WB.  According to the California Secretary of State and other sources,
22   Katja is an active corporation located at 4000 Warner Boulevard in Burbank, which
23   is the same address as New Line and WB.  (RJN, ¶ 2.)  Katja's President is Edward
24   Romano, who is or was the President of New Line Home Entertainment, Inc.,
25   Treasurer of Warner Bros. Home Entertainment, Inc., Treasurer of Warner Bros.
26   International Television Distribution, Inc., and affiliated with several dozen other
27   companies in the Time Warner family. (*Id.*, ¶ 13.) New Line's President and Chief
28

Gerritsen v. Warner Bros., et al.                    OPPOSITION TO MOTION TO DISMISS
Case No. CV 14-3305-MMM(CWx)                         COMPLAINT

1    Operating Officer, Toby Emmerich, reports directly to WB's Chairman and Chief

2    Executive Officer, Kevin Tsujihara. (*Id.*, ¶ 15.)

3        As noted above, after formal development by Katja and New Line of the Book

4    ceased, Cuarón wrote a screenplay entitled *Gravity*.  He assigned his rights in the

5    screenplay to WB in 2009. (Complaint, ¶ 21.) The Picture was produced by WB in

6    2012 and released to the public in 2013.  (RJN, ¶ 14.)

7    **4.**    **GERRITSEN'S CLAIMS ARE SUPPORTED BY COGNIZABLE**

8          **LEGAL THEORIES AND ADEQUATELY DETAILED FACTUAL**

9          **ALLEGATIONS**.[3]

10        **A.**    **Successor-In-Interest Liability, *i.e.*, Assignment Theory, Is**

11              **Adequately Pleaded**

12        Under California law, "a successor company has liability for a predecessor's

13    actions if: (1) the successor expressly or impliedly agrees to assume the subject

14    liabilities; (2) the transaction amounts to a consolidation or merger of the successor

15    and the predecessor; (3) the successor is a mere continuation of the predecessor; **_or_**

16    (4) the transfer of assets to the successor is for the fraudulent purpose of escaping

17    liability for the predecessor's debts." *No Cost,* 940 F.Supp.2d at 1299 (*citing*

18    *CenterPoint Energy, Inc. v. Sup. Ct.*, 157 Cal. App.4th 1101, 1120 (2007)) (emphasis

19    ───────────────────

20    [3] This is not a copyright case as defendants acknowledge.  They make it clear in their
     Notice of Motion, on page 1 of their brief, and in Footnote 7 on page 12, that the
21    *sole* basis for the present motion is that there is no privity of contract between WB
     and Gerritsen. Thus, it is curious that the try to submit a declaration to which they
22    attach selective documents that are both irrelevant to that issue and at best
     misleading and incomplete.  For example, they lodge a copy of the Book, a DVD of
23    the Picture, and a purported list of dissimilarities they prepared themselves. They
     have not considered any similarities in their analysis, or provided this court with a
24    copy of the additional material Gerritsen wrote as alleged in paragraph 18 of the
     Complaint and discussed above on page 6, lines 8-19, which is substantially similar
25    to the Picture.  As will be shown at the appropriate time in this litigation, a film is
     "based on" a book when it is "inspired by" or "based on a material element of" the
26    book.  This is a far different analysis than the substantial similarity test employed in
27    copyright cases.

28

added.)   Pleading any one of the foregoing elements is sufficient to state a claim based on successor liability.  *Zorich v. Long Beach Fire Dep't & Ambulance Serv., Inc.*, 118 F.3d 682, 684 (9th Cir. 1997).

Defendants contend, based on the holding in *No Cost*, 940 F.Supp.2d 1285, that Gerritsen's allegations are too conclusory to satisfy the first prong of the successor liability test.[4]   (Motion, p. 7:23-24.) Notably, defendants do not dispute that the allegations in the Complaint satisfy the second, third, and fourth prongs of the test.  Further, defendants overlook the ultimate outcome of *No Cost* wherein it was held that the plaintiff successfully stated a claim based on successor liability by adequately alleging a "consolidation or merger" had occurred.

*No Cost* is very similar to this case: the plaintiff had contracted with a company that was subsequently acquired by another corporation.  *No Cost*, 940 F. Supp.2d at 1292.  After the acquisition, plaintiff's contract was breached.  *Id.* at 1293-94.  Plaintiff sued both the parent and the subsidiary for breach and, as in this case, the parent corporation tried to escape liability by arguing the subsidiary was a distinct legal entity and plaintiff neither had, nor could support a claim that the subsidiary's contractual obligations to plaintiff had been assigned to the parent during the acquisition. *Id.* at 1297-98.

The *No Cost* plaintiff was not privy to the corporate transaction documents and thus it was unable to "plead the existence of a contract and its terms" or the particular "facts and circumstances giving rise to the assignment."  Therefore the *No Cost* plaintiff could not "establish successor-in-interest liability under the 'assumption of liabilities' prong of the success [sic] liability test" (the first prong).

---

[4] To satisfy the first prong of the successor liability test, a plaintiff "must not only plead the existence of an assumption of liability, but either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied)." *No Cost*, 940 F. Supp.2d at 1300 (quoting *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, 2008 WL 2693741 *4, 2008 U.S. Dist. LEXIS 111530 *12-13 (E.D. Cal. July 1, 2008).

*Id.* at 1299.  Instead, the court found that the plaintiff established potential successor liability by sufficiently alleging that the two defendants "consolidated or merged," thereby satisfying the *second-prong* of the test. *Id.* at 1300.  The plaintiff alleged that on a specific date, the defendant had formally announced the merger on its weblog and that after the merger, the defendant "set about on a course of actions aimed at causing PAETEC's customers . . . to believe that PAETEC was now a part of Windstream Communications," including by using new letterhead, sending invoices confirming the merger, and issuing shares of the new company to its shareholders. *Id.*  The corporate 8-K also confirmed the merger.  *Id.*  These allegations were held to fulfill the pleading requirements for successor liability.  *Id.*

### (i) Gerritsen Alleges Facts Sufficient to Satisfy the First Prong of the Successor Liability Test

Like the *No Cost* plaintiff, Gerritsen was not a party to the transaction in which New Line/Katja were merged into and absorbed by WB.  At this stage, her knowledge of what transpired is limited to publicly available information.  However, unlike the *No Cost* plaintiff, Gerritsen alleges factual circumstances giving rise to an implied assumption of liability. *No Cost*, 940 F. Supp.2d at 1300.

It is alleged that at the time the Contract was signed it was understood and intended that the rights and liabilities outlined in the Contract should pass to whatever company eventually produced the film. (Complaint, ¶ 16.)  It was further understood that, in any event, Katja was not going to produce the film. Instead, either New Line or one of New Line's affiliate companies would produce and distribute the actual film. (*Id.*) Katja was merely "a shell entity . . . controlled by New Line" through which New Line regularly acquired literary material. (*Id.*)  New Line and Katja were folded into WB in 2008. (*Id.*, ¶ 20; RJN, ¶ 11.) "[B]y virtue of the transaction the rights and duties of Katja and New Line under the Contract and Guaranty were . . . assigned to WB so that as of 2008 WB owned and still owns today the motion picture rights to the Book." (Complaint, ¶ 20.)

Thus, Gerritsen alleges that the Contract was intended to be assigned from Katja to a New Line affiliate who would produce the film; and she alleges that when New Line and Katja merged with WB, WB produced a film based on the Book. While the terms of the assignment are not *expressly* alleged, the test for successor liability is nevertheless satisfied because Gerritsen alleges an implied assignment to WB of rights and obligations under the Contract.

### (ii)   Gerritsen Alleges Facts Sufficient to Satisfy the Second Prong of the Successor Liability Test

By judicial notice, in paragraph 20 of the Complaint, Gerritsen sufficientlty alleges the occurrence of a "*consolidation or merger*" sufficient to satisfy the second prong of the successor liability test.  She alleges: "In or about 2008, WB acquired control of New Line and Katja by means of a corporate transaction. . . ." (Complaint, ¶ 20.)  It is further alleged that "in and subsequent to 2008, New Line and Katja have been and continue to be shell corporations wholly owned by WB and mere conduits through which WB conducts business." (*Id.*, ¶ 6.)

The consolidation of the three defendant companies was a highly publicized affair, as evidenced by press releases, the letter from Shaye and Lynne, as well as news commentary, all of which is still accessible online. (*See*, *e.g.* RJN, Exs.13-21.) For example, Time Warner, Inc.'s official press release on February 28, 2008 stated:

> "Time Warner Inc. announced today the consolidation of its filmed entertainment businesses Warner Bros Entertainment and New Line Cinema.  The combination brings together New Line's 40-year legacy as the world's most successful and innovative independent film studio with Warner Bros.' creative leadership and unparalleled scale and reach in global distribution and marketing.  As part of the consolidation, New Line will be operated as a unit of Warner Bros." (RJN, Ex.13, p. 6.)

A similar statement is found in Time Warner's 2008 corporate disclosures—"To increase operational efficiencies and maximize performance within the Filmed Entertainment segment, the Company reorganized the New Line business in 2008 to be operated as a unit of Warner Bros"—and  on WB's official website: "New Line Cinema, part of Warner Bros. Entertainment since 2008, coordinates its development, production, marketing, distribution and business affairs activities with Warner Bros. Pictures to maximize film performance and operating efficiencies." (RJN, Ex. 4.)

In sum, the allegations, combined with judicially noticeable facts on defendants' official website, official press releases and corporate disclosures, satisfy the "consolidation or merger" prong of the successor liability test. *No Cost*, 940 F. Supp.2d at 1300.

### (iii)   Gerritsen Alleges Facts Sufficient to Satisfy the Third and Fourth Prongs of the Successor Liability Test

Gerritsen also satisfies the third prong of the test by alleging facts to establish that WB "*is a mere continuation*" of New Line and Katja.  In addition to the allegations quoted above, Gerritsen alleges that "to the extent New Line and Katja continue to transact any business at all, it is at the sole discretion and for the sole benefit of WB." (*Id.*, ¶ 6.)  Their mutual parent company, Time Warner, described the merger of the companies in its 2008 10-K as "the reorganization of the New Line business under Warner Bros. (RJN, Ex. 2, p. 12.)  Jeff Bewkes, the Chairman and CEO of Time Warner, stated in the 2008 message to shareholders: "We've streamlined our operations in the past year. We combined the operations of our New Line and Warner Bros. film studios, lunched the most extensive reorganization in Time Inc.'s history, and trimmed over 15% of corporate expenses[.]"  (RJN, Ex. 1)

Finally, Gerritsen satisfies the fourth prong of the test by setting forth facts to establish that the New Line/Katja/WB consolidation involved the "*transfer of assets for the fraudulent purpose of escaping liability*." WB's defense to this lawsuit is

founded on the notion that it can circumvent the Contract by producing the Film using Katja's motion picture rights, knowing that Katja will not make a claim against it.  The Complaint makes clear that "Katja should have objected to the production by WB of a film based on a literary property technically owned by Katja, but did not, because Katja is controlled by WB and WB is effectively the owner of the motion picture rights to the Book."  (*Id.*, ¶ 22.)  Having alleged these facts Gerritsen is thus able to conclude that "the separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB, an inequitable result will follow."  (*Id.*, ¶ 6.)  One could not devise a better example than this of a fraudulent transfer of assets to avoid liability.

## B.    Alter Ego Liability Is Adequately Pleaded

In California,[5] two elements must be alleged to establish alter ego liability: (1) A unity of interest and ownership between the corporation and its equitable owner such that the separate personalities of the corporation and the shareholder do not in reality exist; and (2) that there will be an inequitable result if the acts in question are treated as those of the corporation alone." *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003).

Defendants cite cases wherein claims of alter ego liability were dismissed because the plaintiffs either failed to plead both elements of the doctrine (*e.g., No Cost*, 940 F.Supp at 1298), or they merely recited the elements without substantiating them with factual allegations (*Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1117 (C.D. Cal. 2003); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008)).  Defendants fail to make their case that the Complaint in this case is similarly deficient.  First, it cannot be said that Gerritsen

---

[5]    The Ninth Circuit applies the law of the forum state in evaluating alter ego liability claims.  *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).

failed to plead the elements of alter ego.  Both the "unity of interest" element and the "inequitable result" elements are specifically alleged:

> "[T]here has been and is today such a **unity of interest** and ownership between New Line and Katja, on the one hand, and their parent WB on the other, that the separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB an **inequitable result** will follow."  (Complaint, ¶ 6.) (Emphasis added.)

Further, as discussed below, the elements are substantiated by factual allegations about the circumstances that give rise to the alter ego theory and the relationships between the corporate defendants and their principals and/or agents.

### (i)   Gerritsen Alleges Sufficient Facts To Establish Potential "Unity Of Interest And Ownership"

Detailed facts are alleged about the unity of interest of the three defendants. Unity of interest and ownership may be shown with evidence that a company is a mere conduit for, or is financially dependent on another corporation, *Neilson*, 290 F.Supp.2d 1101, 1116; *Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.*, 116 Cal.App.3d 111, 119, 172 Cal.Rptr.74 (1981); or where the two companies commingle funds, that one controls the finances of the other, that the companies share officers or directors, or that the separateness of the companies has ceased.  *Neilson*, 290 F.Supp.2d 1101, 1116; *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F.Supp.2d 1060 (C.D. Cal. 2002).  "[U]se of common offices by two corporations is regarded as indicating, or at least supporting, a conclusion that one is the alter ego of the other." *Marr v. Postal Union Life Ins. Co.*, 40 Cal.App. 673, 684 (1940).

The Complaint alleges that at the time the Contract was signed, Katja was a wholly-owned subsidiary of and was completely dominated, directed, and controlled by New Line.  (Complaint, ¶ 16.)  In 2008, WB acquired control of New Line and

Katja through a corporate transaction, (*id.*, ¶ 20), following which, "New Line and Katja have been and continue to be shell corporations wholly owned by WB and mere conduits through which WB conducts business." (*Id.*, ¶ 6.)  "To the extent New Line and Katja continue to transact any business at all, it is at the sole direction and for the sole benefit of WB." (*Id.*)   WB exercises complete management, control, ownership, and domination over New Line and Katja. (*Id.*, ¶ 20.)  New Line, Katja, and WB share a single website and business address.  (*See* RJN, ¶¶ 2, 4, 5.)  They are represented by the same agent for service of process and the same legal counsel. (*Id.*, ¶¶ 1, 3.)  In 2008 following the corporate consolidation of WB, New Line, and Katja, Time Warner, Inc., parent company for WB, New Line, and Katja executed an involuntary termination of 450 of New Line's employees as part of "the most extensive reorganization in Time Inc.'s history."  (RJN, ¶ 12, Ex. 1.)  The official website for WB states that New Line is "part of Warner Bros. Entertainment since 2008," and "coordinates its development, production, marketing, distribution and business affairs activities with Warner Bros."  (RJN, Ex. 5.)

In *Kendall*, the case cited by defendants, a group of merchants sued credit card companies and banks, alleging they had conspired to set the amounts of transaction fees charged to payment cards in retail transactions in violation of the Sherman Antitrust Act.  *Kendall*, 518 F.3d 1042.  The allegations in the complaint were insufficient to establish potential alter ego liability against the banks because the plaintiffs did not "allege any facts to support their theory that the Banks conspired or agreed with each other or with the Consortium to restrain trade. . . . [T]he complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048.

In contrast to *Kendall*, the Complaint in this case sets forth a detailed account of how the three corporate defendants are unified by their mutual connections to the Contract, the Book, and the Picture.  Originally, Katja and New Line sought to develop the Book into a film, as provided in the Contract, and Cuarón was attached

to help develop the Book into a screenplay.  (*Id.*, ¶ 17.)  In 2009, following the merger of New Line and WB, Cuarón assigned his rights in a screenplay entitled *Gravity* to WB, and in 2011, WB commenced production of the Picture with Cuarón as its director.  (*Id.*, ¶¶ 19, 21, 22.)  Because Katja and WB are joined by a unity of ownership it would have been against Katja's interests to object to WB's production of the Picture. (*See id.*, ¶ 22.)

The pleading standards set forth in Rule 8 of the Federal Rules of Civil Procedure and the *Iqbal* line of cases are concerned above all else with putting the defendant on notice of the nature of the claims against it. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The Complaint more than meets that requirement.

### (ii)  Gerritsen Alleges Sufficient Facts to Establish that Inequity Would Result from Treating Defendants as Separate Entities

To satisfy the "inequitable result" prong of the alter ego test, a plaintiff must show that a defendant's conduct amounted to bad faith." *United States v. Standard Beauty Supply Stores, Inc.*, 5611 F.2d 774, 777-78 (9th Cir. 1977).  Under California law, the alter ego doctrine "does not depend on the presence of actual fraud," although "it is designed to prevent what would be fraud or injustice, if accomplished." *Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.*, 972 F. Supp. 1275, 1290 (C.D. Cal. 1997), *citing Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838 (1962).

In *Neilson*, a group of investors sued various banking institutions and their corporate affiliates for the alleged involvement by the banks in a Ponzi scheme to defraud investors.  One of the defendant corporations moved to dismiss the complaint arguing that the plaintiffs failed to establish potential liability under alter ego theory.  The court agreed, holding that the "inequitable result" element of alter ego was inadequately pleaded where the only allegation to that effect was that the defendant corporation was "a mere instrumentality" of its parent company and thus "an inequitable result would occur" if the defendant was not included in the

litigation.  *Neilson*, 518 F.3d at 1117.  In their opposition to the motion to dismiss, the plaintiffs cited several cases in which the corporate veil was pierced due to inadequate initial capitalization, or the draining of corporate assets, but the plaintiffs had failed to allege that either of those practices had occurred.  *Id.* at 1117-18.

As detailed in section A(ii), *supra*, Gerritsen's allegations of "inequitable result" are far more than legal conclusions.  WB thinks that it can bypass the Contract because it knows Katja will not make a claim against it for essentially stealing Katja's motion picture rights. The Complaint alleges that while "Katja should have objected to the production by WB of a film based on a literary property technically owned by Katja," it "did not, because Katja is controlled by WB" and ostensibly the two companies share common interests.  (*Id.*, ¶ 22.)  Thus, Gerritsen alleges, "the separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB, an inequitable result will follow."  (*Id.*, ¶ 6.)

If the Court validates the argument advanced by defendants, they would be able to continue to act in concert to avoid liability to third parties merely by pretending to be distinct legal entities all the while benefitting from the free exchange of assets among themselves.

### (iii)   Exhibit B to the Pearson Declaration is Not Judicially Noticeable, But Even If It Were, It Bolsters the Theory That New Line and Katja Are Mere Alter Egos of WB

Defendants submit with their motion a purported Assignment Agreement dated January 1, 2010 ("Exhibit B"), which is clearly inadmissible. They contend the court should take notice of Exhibit B because it was "incorporated by reference" into the Complaint.  (Pearson Decl., Ex. B; Motion, p. 8, note 4.)

Ms. Pearson's testimony about Exhibit B lacks any foundation.  Her testimony is limited to a statement that her "clients provided a copy of . . . [it] to Plaintiff." (Pearson Decl., ¶ 4)  She has no basis for knowing whether the document is accurate or complete, or whether it has any relevance to this lawsuit.  Defendants falsely state

{00248858;2}                                          20

Gerritsen v. Warner Bros., et al.                          OPPOSITION TO MOTION TO DISMISS
Case No. CV 14-3305-MMM(CWx)                               COMPLAINT

that "Plaintiff and her counsel have not disputed the authenticity" of Exhibit B and that Exhibit B "was incorporated by reference into" the Complaint." (Pearson Decl., ¶ 4; Motion, p. 8, note 4).  To the contrary, Gerritsen's attorney expressly objected to Exhibit B and the suggestion that the document was referenced in the Complaint, and he refused to stipulate to its authenticity. (*See* Pearson Decl., Ex. G, p. 2.)

Nevertheless, Exhibit B to the Pearson Declaration has the unintended effect of supporting plaintiff's allegation that New Line is the alter ego of WB.  As discussed on page 5 above, it provides that all "Content" will automatically and irrevocably be deemed assigned and transferred to WB now and in the future.  (*Id.,* ¶ 2.1.)  The agreement identifies no consideration, and yet it provides that WB will own the rights in New Line's "Content" without assuming any duties.  (*Id.,* ¶ 2.2.) Given the nature of the intellectual property rights transferred, this agreement could be worth billions of dollars to WB.  This clearly evidences the alter ego relationship that now exists between New Line and WB.

## C.   <u>Agency Liability Theory Is Adequately Pleaded</u>

Gerritsen alleges in paragraph 5 of the Complaint, "In and subsequent to 2008 each defendant was acting as the agent of each other defendant, and, in committing the acts and omissions described below, was acting within the course and scope of such agency with the knowledge, consent and ratification of each other defendant." Defendants attack this allegation on the basis that it is nothing more than a "bare legal conclusion." (Motion, p. 11.)   If this allegation were standing alone and unsupported by any other indications of agency then perhaps it would be vulnerable to a Rule 12(b)(6) motion.  But it is not.  The allegations set forth in the Complaint and discussed hereinabove apply equally to substantiate a theory of agency.

An agent is defined as "one who represents another, called the principal, in dealings with third persons." Cal. Civ.Code § 2295. The essential elements of an agency relationship are: (1) that the agent or apparent agent holds power to alter legal relations between [the] principal and third persons and between [the] principal

and himself; (2) that the agent is a fiduciary with respect to matters within [the] scope of [the] agency; and (3) that the principal has right to control [the] conduct of [the] agent with respect to matters entrusted to him." *Palomares v. Bear Sterns Residential Mortg. Corp.,* No. CV 07–1899 WQH (BLM), 2008 WL 686683, at *4 (S.D.Cal. Mar.13, 2008) (citing *Garlock Sealing Technologies LLC v. NAK Sealing Technologies Corp.,* 148 Cal.App.4th 937, 965, 56 Cal.Rptr.3d 177 (2007)). To plead an agency relationship, plaintiff must allege facts demonstrating the principal's control over its agent. *See Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 541, 99 Cal.Rptr.2d 824 (Cal.Ct.App.2000) (explaining that degree of control can be enough "to reasonably deem" one party the agent of another "under traditional agency principles"). In fact, "[c]ontrol is the key characteristic." *Id.*

In the Complaint, Gerritsen alleges the formation of the Contract with New Line and Katja in 1999.  (Complaint, ¶¶ 13-17.)  Gerritsen alleges details of the relationship of New Line and Katja prior to the merger with WB, *i.e.*, that Katja was wholly owned by and completely dominated and controlled by New Line, and was regularly complicit in New Line's business strategy. (*Id.*, ¶ 16.)  It is alleged that in 2008 WB "acquired control of New Line and Katja by means of a corporate transaction" after which WB commenced to exercise complete management and control over New Line and Katja. (*Id.*, ¶ 6.)  Gerritsen alleges that to the extent New Line and Katja continue to transact business at all it is at the sole direction and for the sole benefit of WB. (*Id.*)  These allegations establish that "agency" is a viable theory under which defendants may be jointly liable under Gerritsen's claims.

## 5.   <u>FORMAL DISCOVERY IS NECESSARY AND WARRANTED.</u>

Defendants argue (Motion, p. 11-12) that Gerritsen should not be permitted to take discovery to prove her various vicarious liability claims because, under *Iqbal* and its progeny, "the doors to discovery must remain closed to [plaintiff] until she can plead sufficient facts . . . ."  *Iqbal*, 556 U.S. at 678-79.   Naturally, this is

1    defendant's position because the facts are within their sole and exclusive control and

2    there is no way to access them without formal discovery.

3         Exhibit B to the Motion is a red herring.  It has nothing to do with the case as

4    explained above.  There is not even an inference in the document about rights that

5    New Line owned before 2010.  Without a doubt there are other documents bearing

6    on the corporate transaction alleged in paragraph 20 of the Complaint.  Defendants

7    seek to conceal those documents by advancing the severely flawed argument that: **if**

8    New Line assigned to WB intellectual property rights it acquired after 2010, **then**

9    "New Line *kept all of the IP rights and contracts* it acquired prior to 2010."

10   (Motion, p. 10:23-24, citing Pearson Decl., Ex. B.) (Emphasis in original).  This is

11   an egregious non sequitur which the Court should disregard.

12        In sum, neither Rule 201 of the Federal Rules of Evidence nor the

13   incorporation by reference doctrine allows the defendant to pull a random document

14   from its files and argue on a Rule 12(b)(6) motion that this is the only document that

15   the Court should evaluate in deciding the case.  There are surely other documents

16   related to the transaction in 2008 which reflect the creation and structure of the

17   WB/New Line/Katja relationship and the attendant transfer of rights in the Book.

18   Gerritsen has alleged enough facts in her Complaint to open the door to discovery.

19   **6.    CONCLUSION.**

20        Assuming for the sake of argument at the pleading stage that the Picture was

21   based on the Book as expressly alleged, defendants contend they still owe no credit

22   or compensation to Gerritsen because her Contract was with New Line and Katja

23   while the Picture was produced by WB.  If that were true, it would afford motion

24   picture studios a license to steal.  This is an unconscionable attempt to manufacture a

25   Catch-22 situation designed to intentionally prevent Gerritsen from enforcing her

26   rights under a valid contract.

27        The requirements of Rule 8 have been met.  Gerritsen has stated her claims

28   with many factual allegations that satisfy every test of pleading sufficiency.

Defendants pretend to have wholly separate corporate identities but public records contradict their position. They attempt to introduce extrinsic evidence which is not only impermissible at this stage, but their purported evidence is irrelevant to the only issue raised by their motion which is the lack of privity between WB and Gerritsen. Their "evidence" is argumentative and conclusory rather than factual in nature. It is incomplete and in some cases misrepresented. For example, the Assignment Agreement does not say what defendants assert, and other documents contain statements by Gerritsen taken out of context which ignore other public statements she has made and statements from fans who after seeing the Picture thought it was based on the Book. The circumstances surrounding the development, production and release of the Picture are suspicious and Gerritsen is entitled to take discovery in an attempt to prove her case.

Dated: September 8, 2014          KULIK GOTTESMAN & SIEGEL LLP


                                  By:   /s/ *Glen L. Kulik*
                                        Glen L. Kulik
                                        Attorneys for Plaintiff