UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TERRY T. GERRITSEN, an individual,

Plaintiff,

vs.

WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; KATJA MOTION PICTURE CORP., a California corporation; and NEW LINE PRODUCTIONS, INC., a California corporation,

Defendants.

CASE NO. CV 14-03305 MMM (CWx)

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

On April 29, 2014, Terry T. Gerritsen filed this action against Katja Motion Picture Corporation ("Katja"), New Line Productions, Inc. ("New Line"), and Warner Bros. Entertainment, Inc. ("WB") (collectively, "defendants").[1] On June 20, 2014, defendants filed a motion to dismiss Gerritsen's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Gerritsen opposes the motion,[3]

[1]Complaint, Docket No. 1 (Apr. 29, 2014).

[2]Notice of Motion and Motion to Dismiss Case ("Motion"), Docket No. 8 (June 20, 2014).

[3]Opposition to Motion to Dismiss ("Opposition"), Docket No. 13 (Sept. 8, 2014).

and objects to a declaration submitted by defense counsel and the exhibits attached thereto.[4] Defendants filed a response to Gerritsen's objection on September 15, 2014.[5] On September 8, 2014, Gerritsen filed two separate requests for judicial notice, which in combination seek to have the court judicially notice 48 exhibits.[6] Defendants opposed the requests on September 15, 2014.[7]

On September 26, 2014, the court took defendants' motion to dismiss under submission pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15.[8] For the reasons that follow, the court grants the motion.

## I. FACTUAL BACKGROUND

Gerritsen is an international best-selling, award-winning author whose novels have frequently appeared on the New York Times Best Seller list.[9] WB is in the business of developing, producing, distributing, and marketing motion pictures, including the 2013 film *Gravity* (the "Film").[10] In 1999, Gerritsen completed a novel titled *Gravity* (the "Book"), which was published by Simon and Schuster in September of that year.[11] Gerritsen alleges that the Book, set in orbital space, features a female

---

[4]Objection in Opposition to Declaration of Ashley Pearson and Attached Exhibits ("Opposition to Pearson Decl."), Docket No. 15 (Sept. 8, 2014).

[5]Response to Plaintiff's Objections to Declaration of Ashley Pearson and Attached Exhibits ("Response Supporting Pearson Decl."), Docket No. 19 (Sept. 15, 2014).

[6]Request for Judicial Notice in Support of Opposition ("RJN"), Docket No. 14 (Sept. 8, 2014); Additional Request for Judicial Notice in Support of Opposition ("Second RJN"), Docket No. 16 (Sept. 8, 2014).

[7]Defendants' Opposition to Plaintiff's Request for Judicial Notice ("RJN Opposition"), Docket No. 18 (Sept. 15, 2014); Defendants' Opposition to Plaintiff's Additional Request for Judicial Notice ("Second RJN Opposition"), Docket No. 20 (Sept. 15, 2014).

[8]See (In Chambers) Order Taking Hearing on Defendants' Motion to Dismiss Off Calendar, Docket No. 22 (Sept. 26, 2014).

[9]Complaint, ¶ 9.

[10]*Id.*, ¶ 10.

[11]*Id.*, ¶ 12.

doctor/astronaut who is stranded alone aboard a space station after a series of disasters kill the rest of the crew; the book details her struggle to survive.[12]  Gerritsen asserts she did extensive research prior to and while writing the Book to ensure that her depiction of NASA technology was realistic.[13]  Based on a manuscript it saw before the Book was published, Katja entered into a written contract (the "contract") with Gerritsen on March 18, 1999, to purchase motion picture rights to the Book, as well as "any and all versions thereof."[14]  The contract provided that Katja would pay Gerritsen $1,000,000 in exchange for these rights. It further provided that, if a motion picture based on the Book were produced, Katja would pay Gerritsen (1) a $500,000 production bonus and (2) contingent compensation in the amount of 2.5% of the defined net proceeds of the motion picture.  It also agreed to give her (3) onscreen credit and credit in paid advertisements that read "Based on the book by Terri Gerritsen."[15] New Line executed and delivered a continuing guaranty, guaranteeing "full and faithful performance" by Katja of its obligations under the contract.[16]  Gerritsen alleges on information and belief that, at the time the contract was signed, Katja was a wholly-owned subsidiary of New Line, and was a shell entity that was completely dominated and controlled by New Line.[17]  She asserts that Katja regularly used New Line to acquire literary material it could use to produce viable motion picture screenplays.[18]  She contends, on information and belief, that after a screenplay was written and produced, Katja assigned rights in the work to New Line or another entity controlled by New Line; this entity ultimately produced and distributed the film.[19]  For this reason, she alleges, the parties understood and intended at the time

---

[12]*Id.*

[13]*Id.*

[14]*Id.*, ¶ 13; Exh. 1; *Gravity* Purchase Agreement.

[15]*Id.*, ¶¶ 14, 24.

[16]*Id.*, ¶ 15.

[17]*Id.*, ¶ 16.

[18]*Id.*

[19]*Id.*

of contracting that, if a motion picture were to be produced based on the Book, Katja would assign its rights to New Line or an entity controlled by New Line.[20]

Following its acquisition of the motion picture rights to the Book, Katja sought to develop a film with New Line and Artists Production Group ("APG").[21] Gerritsen asserts that while a screenplay is being written, a director is often "attached" to the project to supervise screenplay creation; this individual has access to the literary work upon which the screenplay is to be based.[22] She contends, on information and belief, that writer and director Alfonso Cuarón was attached to the project of writing a screenplay based on the Book.[23] Gerritsen was purportedly not told that Katja had attached Cuarón to the project.[24] To assist with the writing of the screenplay, Gerritsen wrote additional scenes in which satellite debris collided with the International Space Station, leaving the female doctor/astronaut drifting in a space suit searching for ways to return to Earth.[25] Under terms of the contract, Katja owned this additional written work.[26]

Gerritsen alleges on information and belief that, sometime after 2002, Cuarón and his son Jonas Cuarón, wrote a screenplay titled *Gravity* (the "Cuarón Gravity Project"), which featured the same characters and storyline as the Book and Gerritsen's additions thereto.[27] In 2008, WB acquired control of New Line and Katja.[28] Gerritsen asserts on information and belief that, by virtue of the WB-New

---

[20]*Id.*

[21]*Id.*, ¶ 17.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.*, ¶ 18.

[26]*Id.*

[27]*Id.*, ¶ 19.

[28]*Id.*, ¶ 20.

Line transaction, WB assumed Katja's and New Line's rights and duties under the contract.[29]

On December 17, 2009, the Cuaróns granted all rights in the Cuarón Gravity Project to WB.[30] In or about 2011, WB began production of the Film, with Cuarón as its director.[31]  The Film includes scenes of satellite debris colliding with the International Space Station; as a result, a female astronaut is set adrift in space, and desperately seeks a way to return to Earth.[32]  The screenplay credit for the Film states that it was "written by Alfonso Cuarón and Jonas Cuarón."[33]  Gerritsen alleges that, by including such a credit, WB represented to the public that the Film was based on the Cuaróns' original work.[34]  The Film was released in the United States on October 4, 2013, and to date has reported box office gross revenue of more than $700,000,000.[35]  The Film won seven Oscars.[36]

Gerritsen alleges that Katja should have objected to WB's production of the Film because it was based on a literary property owned by Katja.[37]  Katja purportedly did not object, however, because it is controlled by WB and WB thus effectively owned the motion picture rights to the Book.[38]  More specifically, she alleges, on information and belief, that subsequent to 2008, New Line and Katja became shell corporations wholly owned by WB, and mere conduits through which WB conducts business.[39] She asserts that to the extent Katja and New Line transact any business at all, it is at the sole discretion

---

[29]*Id.*, ¶ 20.

[30]*Id.*, ¶ 21.

[31]*Id.*, ¶ 22.

[32]*Id.*

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]*Id.*, ¶ 6.

and for the sole benefit of WB.[40] Gerritsen contends that WB manages, controls, and dominates New Line and Katja, and that there is a complete unity of interest among them. She asserts that an inequitable result will follow if Katja and New Line are not treated as WB's alter egos.[41]

Gerritsen pleads claims for breach of written contract against Katja and WB, and breach of guaranty against New Line and WB. She seeks an accounting from all defendants.[42]

## II. DISCUSSION

### A. Exhibits Submitted With Defendants' Motion to Dismiss and Gerritsen's Requests for Judicial Notice

#### 1. Legal Standard for Judicial Notice

In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings. . . . A court may, however, consider certain materials – documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice – without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Branch v. Tunnell* 14 F.3d 449, 453 (9th Cir. 1994) (noting that a court may consider a document whose contents are alleged in a complaint, so long as no party disputes its authenticity), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119

---

[40] *Id.*

[41] *Id.*

[42] *Id.*, ¶¶ 23-38.

(9th Cir. 2002).

Thus, in ruling on a motion to dismiss, the court can consider material that is subject to judicial notice under Rule 201 of the Federal Rules of Evidence. FED.R.EVID. 201. Under Rule 201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." FED.R.EVID. 201.

**2. Exhibits Submitted with Defendants' Motion to Dismiss**

In support of their motion to dismiss, defendants proffer the declaration of their attorney, Ashley Pearson.[43] Pearson's declaration attaches the following exhibits: (1) a copy of the outside and inside front cover, first page, and outside back cover of the Book (Exhibit A); (2) a copy of an "Assignment Agreement," dated January 1, 2010 (Exhibit B); (3) a copy of the outer packaging of the Film (Exhibit C); (4) a printout of a blog entry dated October 7, 2013, from a website titled "The Official Blog of Bestselling Author Tess Gerritsen" (Exhibit D); (5) a printout of an article titled "Pull of 'Gravity' Doesn't Extend to Gerritsen Novel," dated October 8, 2013, and published on the website Banner Graphic (Exhibit E); (6) an email and meet-and-confer letter sent to Gerritsen's counsel pursuant to Local Rule 7-3 (Exhibit F); (7) emails exchanged by the parties regarding the authenticity of the Assignment Agreement (Exhibit G); and (8) a chart comparing the Book and the Film ("Appendix 1").[44]

Citing *Ritchie*, 342 F.3d at 909, Gerritsen objects that the declaration and exhibits "are not admissible and may not be considered . . . in support of or in opposition to a motion to dismiss under Rule 12(b)(6)."[45] Defendants counter that consideration of the declaration is appropriate because declarations of this type are regularly submitted to document prefiling conferences and introduce

---

[43]Declaration of Ashley Pearson in Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("Pearson Decl."), Docket No. 8-1 (June 20, 2014).

[44]Pearson Decl., ¶¶ 2-10.

[45]Opposition to Pearson Decl. at 2.

relevant materials.[46]

In deciding a motion to dismiss, the court can consider only the pleadings and documents that are incorporated by reference therein or are properly the subject of judicial notice.[47] See *Id.* at 907-08. Declarations can be used to bring materials that are properly considered to the attention of the court. See *In re Silicon Graphics, Inc. Securities Litigation*, 970 F.Supp. 746, 758-59 (N.D. Cal. 1997) (denying plaintiffs' motion to strike a declaration submitted in support of a motion to dismiss because it referenced materials that were incorporated by reference in plaintiffs' complaint). Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss, however, if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice. See *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, 880 F.Supp.2d 1045, 1060 (N.D. Cal. 2012) ("Defendants move to strike the Declaration of Stuart Harden, which Plaintiffs submitted in support of their Opposition to Defendants' Motion to Dismiss. As Plaintiffs themselves acknowledge . . . a court cannot consider evidence outside the pleadings without converting the motion to dismiss into one for summary judgment. . . . There are only a few limited exceptions to this rule. . . . The Harden Declaration falls into none of these categories and thus cannot be considered by the Court for purposes of ruling on the pending motions to dismiss. Accordingly, Defendants' motion to strike the Harden Declaration is GRANTED").[48] The court must, however, consider each

---

[46]Response Supporting Pearson Decl. at 1.

[47]Defendants are correct that parties frequently submit additional materials to document compliance with the prefiling conference requirement of Local Rule 7-3. Generally, however, the court considers such matters only when there is a dispute concerning compliance. Here, as noted *infra*, there is no such dispute.

[48]See also *Vassel v. Carson Helicopters, Inc.*, No. 2:13-CV-02520-KJM-CMK, 2014 WL 1912056, *3-4 (E.D. Cal. May 13, 2014) ("In support of plaintiff's oppositions to Phillips' and Carson's motions to dismiss, plaintiff includes the declaration of one of his attorneys, Troy Douglas Mudford, and attaches . . . exhibits. . . . Plaintiff also includes his own declaration summarizing his responsibilities with regard to the helicopter involved in the crash. Plaintiff did not file a request for judicial notice, nor did he set forth any legal argument supporting the court's ability to consider these matters. Phillips opposes consideration of the declarations and exhibits, arguing it is improper extrinsic evidence in deciding a 12(b)(6) motion and the documents 'contribute nothing to the analysis of the subject of duty or to the propriety of Plaintiff's emotional distress claims. . . . Here, plaintiff provides no argument or legal authority to show the facts contained in a press release and mere excerpts of public

exhibit to the declaration in turn to determine whether it is a proper subject of judicial notice or can be taken into account under the incorporation by reference doctrine in deciding defendants' motion to dismiss.[49]

**a. Appendix 1 – Comparison Chart of the Book and the Film**

Gerritsen objects to the court's consideration of Appendix 1 on the grounds that it is "irrelevant, unauthenticated, argumentative, and represents a one-sided characterization which is subject to

---

records are proper subjects of judicial notice. The court declines to consider the declarations of Mudford and plaintiff"); *Stanley v. Bobo Construction, Inc.*, No. 14–cv–00035 JAM–EFB, 2014 WL 1400957, *2 (E.D. Cal. Apr. 10, 2014) ("The City objects to the Declaration of John J. Rueda submitted by Plaintiff with his opposition to the City's motion to dismiss. Generally, courts may not consider materials beyond the pleadings in ruling on a [Rule] 12(b)(6) motion. There are two exceptions to this rule: First, a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss. Second, under Federal Rule of Evidence 201, 'a court may take judicial notice of matters of public record.' In this case, as part of his opposition, Plaintiff submitted a declaration by his counsel. This declaration was not attached to the complaint nor has Plaintiff requested judicial notice of it; therefore, this declaration is outside the pleadings. Accordingly, the Court sustains the City's objection and will not consider the declaration"); *In re Applied Micro Circuits Corp.*, No. 01-CV-0649 K (AJB), 2002 WL 34716875, *2-3 (S.D. Cal. Oct. 4, 2002) ("Plaintiff alleges that Defendants have submitted declarations . . . in their Rule 12(b)(6) motion to refute part of Plaintiff's claim. . . . Plaintiff contends that the declarations were not referenced in the amended complaint, nor were they attached to the complaint. In fact, Plaintiff avers that the declarations did not exist at the time the amended complaint was drafted and thus were not relied on by Plaintiff. . . . If the Court were to consider this extrinsic evidence, it would in fact convert this motion to dismiss into a motion for summary judgment, and the Court is not willing to do so. The declarations are obviously not referenced in, and therefore fall outside of, the amended complaint. Because the declarations are extrinsic materials to the Rule 12(b)(6) motion to dismiss, the Court GRANTS Plaintiff's motion to strike the declarations . . . in Defendants' Rule 12(b)(6) motion"); see also *Tolliver v. YRC Worldwide, Inc.*, No. 3:13-CV-3739-M-BK, 2014 WL 929029, *2 (N.D. Tex. Mar. 10, 2014) ("The Court cannot consider the declaration YRC Worldwide submitted with its Motion to Dismiss in support of its assertion that YRC Freight is Plaintiff's employer because it is not the type of evidence that a court can review in ruling on a Rule 12(b)(6) motion. In particular, the declaration was neither referred to in Plaintiff's complaint nor [is it] central to his claims").

[49]Gerritsen also objects to consideration of Pearson's declaration on the basis that she has no personal knowledge of the matters discussed in the declaration and cannot authenticate or lay foundation for the exhibits. (Opposition to Pearson Decl. at 2.) Pearson states in her declaration, however, that she has personal knowledge of the facts recited therein (Pearson Decl., ¶ 1), and the nature of the exhibits, as well as additional facts included in the declaration, indicate that she does. This objection is therefore overruled.

dispute."[50] Appendix 1 is a chart prepared by defense counsel Pearson and another lawyer that compares the sequence of events in the Book to that in the Film. Gerritsen disputes the accuracy of the chart because it "compares selective plot points from the Book and Film with the intent of distinguishing the two works."[51] Defendants contend the chart is relevant because it undermines Gerritsen's assertion that the Film is based on the Book, that Katja should therefore have objected when WB did not credit or pay Gerritsen in connection with its production of the Film, and that Katja's failure to do so, a result of the control WB purportedly exercised over it, shows that an inequitable result will follow if the defendants' corporate separateness is not disregarded. The fact that the chart might be relevant in assessing the ultimate validity of Gerritsen's claims does not mean that the court can consider it in deciding a motion to dismiss.[52] The only relevant question in deciding such a motion is whether plaintiff's allegations, *taken as true*, plausibly state a claim. Thus, the court declines to consider Appendix 1 in deciding the motion to dismiss. Cf. *Balanced Body University, LLC v. Zahourek Systems, Inc.*, No. CIV S-13-1606 LKK/EFB, 2014 WL 66722, *2 (E.D. Cal. Jan. 7, 2014) ("The court cannot take judicial notice of statements which paraphrase or summarize allegations, as such statements are arguably inaccurate, and therefore, 'subject to reasonable dispute,'" citing FED.R.EVID. 201(b)); *Garber v. Heilman*, No. CV 08-3585 DDP (RNB), 2009 WL 409957, *1 (C.D. Cal. Feb. 18, 2009) ("Plaintiff's request that the Court take judicial notice of his own list of encounters with the police . . . is denied because plaintiff's own characterization of the matters reflected in his chart does not qualify as a matter that is 'not subject to reasonable dispute,'" citing FED.R.EVID. 201(b)).

**b. Exhibits A & C– Photocopies of the Book's Covers and the Outer Packaging of the Film**

Defendants next proffer photocopies of the Book's front and back cover, as well as copies of the

---

[50]Opposition to Pearson Decl., ¶ 4.

[51]*Id.*

[52]Indeed, even at a later stage of the proceedings, it would likely be inappropriate for counsel themselves to serve as witnesses and offer evidence to be used in resolving Gerritsen's claims.

outer packaging of the Film.[53] Gerritsen objects to consideration of these exhibits on relevance grounds.[54] She asserts that the exhibits, which attempt to distinguish the Book and the Film, are not relevant because the only argument defendants advance in their motion to dismiss is that she has not plausibly pled a theory under which WB can be held vicariously liable for the acts of Katja and New Line.[55] Defendants respond that the exhibits are relevant; they contend the exhibits show that Gerritsen cannot plausibly plead the existence of vicarious liability because the allegedly bad faith acts that would make it inequitable to honor corporate separateness rest on the similarity of the Book and Film, and the exhibits show she cannot plausibly claim similarity.[56] Once again, defendants confuse Gerritsen's obligation to plead plausible claims with her ability to prove those claims. Accordingly, the court declines to consider Exhibits A and C.

**c. Exhibit B – The "Assignment Agreement"**

Defendants next request that the court consider a 2010 Assignment Agreement between New Line and WB. They contend the document is incorporated by reference in Gerritsen's complaint, which states, in relevant part:

> "In or about 2008, WB acquired control of New Line and Katja by means of a corporate transaction. Gerritsen is informed and believes, and on that basis alleges, that by virtue of the transaction *the rights and duties of Katja and New Line under the Contract and Guaranty were transferred and assigned to WB* so that as of 2008 WB owned and still owns today the motion picture rights to the Book."[57]

Gerritsen contends that the court should not consider Exhibit B because it is unauthenticated and

---

[53]Pearson Decl., Exhs. A, C.

[54]Opposition to Pearson Decl. at 3-4.

[55]*Id.* at 4.

[56]Response Supporting Pearson Decl. at 3-4.

[57]Complaint, ¶ 20.

its contents are subject to dispute.[58]   She references an email from her attorney, Glen Kulik, to defendants' attorney, Matthew Kline, in which Kulik objects to Exhibit B and refuses to stipulate to its authenticity.[59]   Defendants argue that Gerritsen's purported authenticity objections do not create a reasonable dispute because they are based on her speculation that other agreements *might exist* or that defendants misinterpret language in the agreement.[60]   The court cannot agree.   The incorporation by reference doctrine applies *only* when

a document is central to plaintiff's claim and no party questions its authenticity.   See *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (in ruling on a motion to dismiss, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion," citing *Branch*, 14 F.3d at 453–54); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n. 5 (9th Cir. 2003); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n. 3 (2d Cir. 2002)); see also *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007) ("Review is generally limited to the contents of the complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document," citing *Warren*, 328 F.3d at 1141 n. 5); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th

---

[58]Although Gerritsen contends the court should not take judicial notice of the agreement, the specific arguments she makes are relevant in assessing whether it is appropriate to consider the document under the incorporation by reference doctrine.   Gerritsen asserts, for example, that the agreement is not authentic; this is directly relevant to application of the incorporation by reference doctrine.   See *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (stating that it is proper to consider a document "where the complaint necessarily relies upon [it] or [its] contents . . . are alleged in a complaint, *the document's authenticity is not in question* and there are no disputed issues as to the document's relevance" (emphasis added)).   Gerritsen also objects to consideration of Exhibit B on the ground that Pearson is unable to authenticate the agreement based on personal knowledge.   (Opposition to Pearson Decl. at 4.)   The court agrees that Pearson has recited no facts in her declaration that indicate she was personally involved in the drafting or execution of the agreement.   As a result, she cannot personally authenticate it.   See *Orr v. Bank of America*, 285 F.3d 764, 777 (9th Cir. 2002) (excluding exhibits because they were attached to the declaration of a person other than the author or recipient of the document).

[59]Opposition to Pearson Decl. at 4; see Pearson Decl., Exh. G.

[60]Response Supporting Pearson Decl. at 4-5.

Cir. 2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them," citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998)); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 986 ("[The incorporation by reference doctrine] permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading,'" quoting *Branch*, 14 F.3d at 454). The doctrine is designed "to prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (internal quotation marks and citation omitted); see also *Ritchie*, 342 F.3d at 908 (explaining that the incorporation by reference doctrine "may apply, for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, or when a plaintiff's claim about stock fraud is based on the contents of SEC filings" (citations omitted)).

Gerritsen alleges, on information and belief, that WB acquired Katja and New Line in 2008, and that the rights of those companies under the contract and guaranty were transferred and assigned to WB at that time.[61] Because the Assignment Agreement on which defendants rely was signed two years later, in 2010, it is unclear that it is the agreement to which Gerritsen makes reference in the complaint.[62]

---

[61]Complaint, ¶ 20.

[62]The court notes, in this regard, that Gerritsen has had no opportunity to conduct discovery regarding the documents that govern WB's acquisition of Katja and New Line. In *Haskell v. Time, Inc.*, 857 F.Supp. 1392 (E.D. Cal. 1994), the court elected to consider exemplars of purportedly false advertising in deciding a motion to dismiss. It observed: "Plaintiff does not deny that the exemplars, or virtually identical other mailings, are in his possession, are central to his claim, and are referred to in detail in the complaint. Rather, he argues that the exemplars are not the exact or only mailings on which he bases his claims and that they were handpicked by the defendants to succeed on their motions to dismiss. He suggests that he may have exemplars in which the challenged statements appear in a more misleading context or that such examples may turn up through discovery. But plaintiff does not provide any basis in fact for these conclusory assertions. He certainly had exemplars either identical or very similar to the ones provided by defendants when drafting the complaints. He has been on notice for some time – at least since the first status conference – that defendants intended to make this motion to dismiss based on exemplars. And he has provided no competing examples in which the context of the alleged misrepresentations is different from the exemplars. His hope that discovery will somehow turn up favorable examples is not sufficient to deprive defendants of their opportunity to avoid the burdens of discovery through a motion to dismiss." *Id.* at 1397. In *Yumul v. Smart Balance, Inc.*, 733

Furthermore, nothing in the Ninth Circuit cases discussing the incorporation by reference doctrine suggests that a plaintiff must demonstrate that her unwillingness to stipulate to the authenticity of a document submitted by a defendant in support of a motion to dismiss is "reasonable." Indeed, the purpose of the incorporation by reference doctrine would not be served by considering the assignment agreement. There is no evidence that Gerritsen had access to the agreement(s) documenting the transaction in which WB acquired Katja and New Line at the time she filed her complaint, and elected not to attach them to make her complaint less vulnerable to a motion to dismiss. See *Foster v. Kosseff*, No. 11–CV–5069–TOR, 2013 WL 147822, *4 (E.D. Wash. Jan. 14, 2013) ("[C]onsidering the audit report at this juncture would not serve the underlying purpose of the incorporation by reference doctrine. Notably, this is not a case in which the plaintiff has attempted to survive a motion to dismiss 'by deliberately omitting documents upon which [her] claims are based.' To the contrary, Plaintiff did not have a copy of the audit report (and therefore lacked knowledge of its precise contents) when this lawsuit was filed," citing *Swartz*, 476 F.3d at 763). Given that Gerritsen pleads facts concerning WB's acquisition of Katja and New Line on information and belief, the logical inference is that she did not have access to the agreements documenting the acquisition transaction at the time she filed this lawsuit.

For all of these reasons, the court declines to consider Exhibit B under the incorporation by reference doctrine.

**d. Exhibit D – Blog Entry**

Exhibit D to Pearson's declaration is a printout of excerpts from Gerritsen's official blog

---

F.Supp.2d 1134 (C.D. Cal. 2010), the court noted that the *Haskell* plaintiff had notice that defendant intended to rely on the exemplars in a motion to dismiss, and had had an opportunity to conduct discovery, but failed to proffer evidence that showed the exemplars were not the entire universe of representations that had been made. *Id.* at 1139-40. It also noted that it was unclear whether *Haskell* survived subsequent Ninth Circuit decisions that narrowly define the incorporation by reference doctrine. *Id.* This reasoning reinforces the court's conclusion that it is inappropriate to consider the Assignment Agreement under the incorporation by reference doctrine at this point.

The court cautions, however, that as the case proceeds, and Gerritsen obtains discovery concerning the terms and conditions of the agreement(s) pursuant to which WB acquired Katja and New Line, she must be cognizant of Rule 11 of the Federal Rules of Civil Procedure, and not pursue theories of liability that are clearly foreclosed by the terms of the relevant agreements.

(http://www.tessgerritsen.com) as of October 7, 2013.[63] The blog entry states, in relevant part: "I've been peeved that my book GRAVITY was never made into a film (20th Century Fox owns the film rights). How I wished that Cuarón had told my story instead, but the movie he did make was a masterpiece of suspense. Go go go to see it!"[64] Defendants contend this blog entry refutes Gerritsen's allegations of fraud and inequity, and demonstrates that she cannot state a plausible claim.[65] While she does not challenge its authenticity, Gerritsen objects that the blog post is irrelevant.[66] Because, at this stage of the proceedings, the court can consider only documents that can be judicially noticed or that have been incorporated by reference in the complaint, the court cannot consider the blog post purportedly made by Gerritsen.

**e. Exhibit E – Internet Article**

Defendants next proffer an article about Gerritsen that was published on the "Banner Graphic" website on October 8, 2013.[67] In the article, Gerritsen is quoted as saying: "I've been receiving a number of emails from readers congratulating me on the new movie 'Gravity,' which they believe is based on my book with the same title . . . . Yea, 'Gravity' is a great film, but it's not based on my book."[68] Defendants ask that the court consider this article for the same reason they seek to have Exhibit D considered.[69] The document cannot be judicially noticed or considered under the incorporation by reference doctrine. Consequently the court declines to consider the exhibit.

**f. Exhibit F– Meet and Confer Letter**

Defendants also ask that the court consider correspondence their lawyers sent to Gerritsen's

---

[63]Pearson Decl., Exh. D.

[64]*Id.*

[65]Response Supporting Pearson Decl. at 5-6.

[66]Opposition to Pearson Decl. at 5.

[67]Pearson Decl., Exh. E.

[68]*Id.*

[69]Response Supporting Pearson Decl. at 6.

attorney, Glen L. Kulik, concerning a Local Rule 7-3 prefiling conference.[70] The exhibit includes a letter from WB's Vice President and Senior Litigation Counsel, Michelle Schultz, which was apparently attached to the meet-and-confer email.[71] Gerritsen objects to the court's consideration of these documents because they are irrelevant, unauthenticated, and represent a "one-sided characterization of facts subject to dispute."[72] Defendants assert that they have proffered the documents only to substantiate the statement in their notice of motion that the motion was filed following a conference under Local Rule 7-3.[73] Gerritsen does not assert that a prefiling conference did not occur or that defendants failed to comply with Local Rule 7-3. Consequently, the documents do not concern any controversy the court must resolve and are irrelevant. The court therefore declines to consider them.

**g. Exhibit G – Emails Between the Parties**

Finally, defendants seek to have the court consider Exhibit G as evidence that they satisfied the meet-and-confer requirements of the local rules.[74] Pearson states that the documents show defendants gave Gerritsen a copy of the 2010 Assignment Agreement on June 6, 2014, and that Gerritsen did not dispute the authenticity of the agreement or object to the court's consideration of it in deciding the motion to dismiss.[75] Gerritsen objects to consideration of the emails for the same reasons she objects to Exhibit F.[76] The court treats defendants' request for judicial notice of the email correspondence that comprises Exhibit G as a request that the court take notice of the parties' meet-and-confer efforts. Because there is no dispute that defendants satisfied Local Rule 7-3, the email communications are not relevant to decision of the motion. As they are not proper subjects of judicial notice and cannot be

---

[70]Pearson Decl., ¶ 2; Exh. F.

[71]*Id.*

[72]Opposition to Pearson Decl. at 6-7.

[73]Response Supporting Pearson Decl. at 6.

[74]Pearson Decl., ¶ 4; Exh. G; Reply Supporting Pearson Decl. at 6.

[75]Pearson Decl., ¶ 4.

[76]Opposition to Pearson Decl. at 7.

considered under the incorporation by reference doctrine, the court declines to consider them.[77]

**3. Gerritsen's First Request for Judicial Notice**

Gerritsen first requests that the court take judicial notice of forty-five exhibits that she asserts establish fifteen judicially noticeable facts.[78] The facts Gerritsen seeks to have the court judicially notice include: (1) the identity of the official contact person for New Line and Katja (referencing Exhibits 42 and 43); (2) the fact that defendants share offices at the same business address (referencing Exhibits 5, 31, 42, 43); (3) the fact that the same law firm represents defendants (referencing defendants' motion to dismiss in this action); (4) Katja's publicly listed web URL (referencing Exhibits 39 and 40); (5) the fact that Katja's publicly listed web URL automatically redirects to the WB website; (6) the date New Line was founded (referencing Exhibits 32, 33, 34, 36, 37, and 38); (7) the dates on which Michael Lynne joined New Line's Board of Directors and became its President and Chief Operating Officer (referencing Exhibits 8, 9, and 34); (8) the fact that New Line started as a film distribution company but later became a high profile motion picture studio (referencing Exhibits 8, 9, 12, 32, 33, 34, 36, 37, and 38); (9) the fact that New Line purchased a company that was later acquired by Time Warner ("TW") (referencing Exhibits 7, 8, 9, 12, 16, 32, 33, 34, 36, 37, and 38); (10) the fact that New Line and Katja have been part of WB since 1996 (referencing Exhibits 8, 9, 36, and 41); (11) the fact that New Line operated as a separate studio until February 28, 2008, when it announced it would shut down and merge with WB (referencing Exhibits 10-21, 23-28, 31, 33, 34, 36, and 38); (12) the fact that TW fired 450 New Line employees on April 18, 2008 (referencing Exhibits 22-26); (13) the fact that Katja's president, Edward Romano, holds positions in New Line, WB, and other TW companies (referencing Exhibit 41); (14) the fact that the Film was produced by WB in 2012 and released to the public in 2013 (referencing Exhibit 38); and (15) the fact that New Line's President and Chief Operating Officer reports directly to

---

[77]To the extent defendants seek to have the court consider the email exchange for the purpose of concluding that Gerritsen does not truly dispute the authenticity of the Assignment Agreement, the court declines to do so. In her opposition, Gerritsen disputes the authenticity of the document; the court must accept her representation that there is a dispute for purposes of applying the incorporation by reference doctrine, and cannot make a credibility finding concerning the matter at this stage.

[78]RJN at 1-2.

WB's Chairman and Chief Executive Officer (referencing Exhibits 29 and 30).[79]

**a. Information Made Known to the General Public Through Press Releases and News Reports**

Gerritsen first asks that the court take judicial notice of "information made known to the general public through news reports and press releases."[80] She does not identify the specific exhibits that she alleges can be judicially noticed on this basis. She does, however, identify the facts that purportedly fall into this category; those facts, in turn, reference exhibits that purportedly reflect them.[81] Most of the facts concern the corporate structure of Katja, New Line, and WB, as well as the purported merger of New Line and WB in 2008.[82]

While the facts Gerritsen wishes the court to notice concern a limited number of subjects, the sources from which the facts have been gleaned are varied. As an example, the sources of information Gerritsen cites to support the fact that "public records indicate that in January 28, 1994, New Line was purchased by Turner Broadcasting System, which was acquired by Time Warner in 1996," include the *Los Angeles Times* (Exh. 7), *Variety* magazine (Exh. 8), the *Wall Street Journal* (Exh. 12), Slideshare.net (Exh. 32), GoPetition.com (Exh. 33), and Wikipedia (Exh. 34).[83]

Gerritsen contends that courts in the Ninth Circuit routinely take judicial notice of press releases.[84] The cases in which courts take judicial notice of newspaper articles and press releases, however, are limited to a narrow set of circumstances not at issue here – e.g., in securities cases for the purpose of showing that particular information was available to the stock market. See *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir. 1999) ("When considering a motion for

---

[79]*Id.* at 1-3.

[80]RJN at 10.

[81]*Id.*

[82]RJN at 10-11.

[83]*Id.* at 3.

[84]*Id.* at 10.

judgment on the pleadings, this court may consider facts that 'are contained in materials of which the court may take judicial notice.' We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants"); see also *In re American Apparel, Inc. Shareholder Litigation*, 855 F.Supp.2d 1043, 1062 (C.D. Cal. 2012) ("Taking judicial notice of news reports and press releases is appropriate for show[ing] 'that the market was aware of the information contained in news articles'" (citations omitted)). This is because often, the accuracy of information in newspaper articles and press releases cannot be readily determined and/or can be reasonably questioned. FED.R.EVID. 201.

Some of the newspapers and press releases Gerritsen seeks to have judicially noticed appear on third party websites, such as Wikipedia, Answers.com, Deadline.com, and Slashfilm.com.[85] As a general matter, courts are hesitant to take notice of information found on third party websites and routinely deny requests for judicial notice, particularly when the credibility of the site's source information is called into question by another party. See, e.g., *In re Yagman*, 473 Fed. Appx. 800, 801 n. 1 (9th Cir. June 14, 2012) (Unpub. Disp.) (declining to take judicial notice of information contained in attorney's curriculum *vitae* and appearing on his Wikipedia page); *Altman v. HO Sports Co., Inc.*, 821 F.Supp.2d 1178, 1181 n. 2 (E.D. Cal. 2011) ("Altman objects to the request for judicial notice. Specifically, Altman objects to two articles from wikipedia on the basis that wikipedia is not an adequate source for purposes of judicial notice. Altman's objections will be sustained"); *Crispin v. Christian Audigier, Inc.*, 717 F.Supp.2d 965, 976 n. 19 (C.D. Cal. 2010) ("It is unfortunate that the parties were unable to provide more authoritative evidence. One court recently noted the danger of relying on Wikipedia: 'Wikipedia.com [is] a website that allows virtually anyone to upload an article into what is essentially a free, online encyclopedia. A review of the Wikipedia website reveals a pervasive and, for our purposes, disturbing series of disclaimers, among them, that: (i) any given Wikipedia article may be, at any given moment, in a bad state: for example it could be in the middle of a large edit or it could have been recently vandalized; (ii) Wikipedia articles are also subject to remarkable oversights and omissions; (iii) Wikipedia articles (or series of related articles) are liable to be incomplete in ways that

---

[85]RJN at 10-11.

would be less usual in a more tightly controlled reference work;' (iv) '[a]nother problem with a lot of content on Wikipedia is that many contributors do not cite their sources, something that makes it hard for the reader to judge the credibility of what is written; and (v) many articles commence their lives as partisan drafts' and may be caught up in a heavily unbalanced viewpoint.' *Campbell ex rel. Campbell v. Secretary of Health and Human Services*, 69 Fed.Cl. 775, 781 (2006)"); *Ruiz v. Gap, Inc.*, 540 F.Supp.2d 1121, 1124 (N.D. Cal. 2008) ("Gap's request for judicial notice is also DENIED. Federal Rule of Evidence 201 permits courts to take judicial notice of facts that are 'not subject to reasonable dispute.' Gap seeks judicial notice for two sets of materials: a study from an internet site on identity theft, and a list, also from an internet site, of data breach incidents reported in California in the last two years. Neither of these documents contain information which is 'generally known within the territorial jurisdiction of the trial court' or 'capable of accurate and ready determination.' In short, these materials are not remotely akin to the type of facts which may be appropriately judicially noticed").

Defendants object to the court taking judicial notice of information that appears on these third party websites; they argue the websites contain "unreliable, inaccurate information."[86] The court agrees with defendants that information appearing on the third party websites is not a proper subject of judicial notice because it is not capable of accurate and ready determination. Thus, for this additional reason, the court denies Gerritsen's request to take judicial notice of information contained in press releases and news articles that appear on third party websites.

Finally, and most fundamentally, to the extent the court *can* take judicial notice of press releases and news articles, it can do so only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (citing *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006)); ; *In re Disciplinary Proceedings of Yana*, No. 2012–SCC–0017–ADA, 2014 WL 309314 (N. M.I. Jan. 28, 2014) ("Newspaper articles generally, and statements during an interview specifically, are not always free of reasonable dispute. Ordinarily, then, we only take 'judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the

---

[86]Opposition to RJN at 1-3.

contents of those articles were in fact true,"'" quoting *Von Saher*); *United States v. Kane*, No. 2:13-cr-250-JAD-VCF, 2013 WL 5797619, *9 (D. Nev. Oct. 28, 2013) ("When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true" (citations omitted)); *Brodsky v. Yahoo! Inc.*, 630 F.Supp.2d 1104, 1111-12 (N.D. Cal. 2009) ("The Court also grants Defendants' request [for judicial notice] as to Exhibits 31 through 47, Yahoo! Press releases, news articles, analyst reports, and third party press releases to which the SAC refers, *but not for the truth of their contents*" (emphasis added)).

Gerritsen clearly seeks to have the court take judicial notice of the *truth* of the facts stated in the various press releases and news articles. This the court cannot do. Because it is irrelevant, for purposes of defendants' motion to dismiss, that the information in the press releases and news articles was publicly available, the court declines to take judicial notice of the newspaper articles and press releases Gerritsen cites.

**b. Information Published on Websites, and Especially on a Party's Website**

Gerritsen also requests that the court take judicial notice of information found on third party websites, including WB's website.[87] Gerritsen again fails to identify the exhibits that are the subject of this request; she identifies only the "judicially noticeable facts" to which the exhibits refer.[88] Defendants make the same objections to these exhibits that they raised concerning the third party websites that were the subject of Gerritsen's first request for judicial notice.[89] For the reasons earlier articulated, the court declines to take judicial notice of information found on third party websites. The court similarly declines to take judicial notice of information on WB's website. Although Gerritsen appears to argue that authenticity and accuracy concerns are not present with respect to information found on defendants' websites, the court cannot agree.

---

[87]RJN at 11.

[88]*Id.*

[89]Opposition to RJN at 2.

Federal courts considering the issue have expressed skepticism as to whether it is appropriate to take judicial notice of information or documents appearing on websites that are created and maintained by a party to the litigation. See, e.g., *Stewart v. Stoller*, No. 2:07-cv-552-DB-EJF, 2014 WL 1248072, *1-2 (D. Utah Mar. 25, 2014) ("The court has even greater concern because Ms. Stewart appears to have edited the proposed documents to include calculation of the damages to her; making a party to the suit the source of information of which that same party seeks the Court to take judicial notice. Courts express additional skepticism about taking judicial notice of party-created documents. The facts Ms. Stewart tenders do not meet the high standard required for judicial notice. The Court therefore denies Ms. Stewart's Motion"); *Koenig v. USA Hockey, Inc.*, No. 2:09-cv-1097, 2010 WL 4783042, *2 (S.D. Ohio June 14, 2010) ("One court has gone so far as to describe information available from private Internet websites as 'no[t] remotely akin to the type of facts which may be appropriately judicially noticed.' *Ruiz v. Gap, Inc.*, 540 F.Supp.2d 1121, 1124 (N.D. Cal. 2008). Similar concern has been expressed about information from a website that is created by one of the parties to the case," citing *Scanlon v. Texas A & M University*, 343 F.3d 533, 536 (5th Cir. 2003) (holding that the court should not take judicial notice of a 'defendant-created report' appearing on the Internet)).

Here, to the extent that Gerritsen asks the court to take judicial notice of information on WB's website, she fails to demonstrate that the information is capable of "accurate and ready determination" in the territorial jurisdiction of the court, such that it is a proper subject of judicial notice. Accordingly, the court declines to take judicial notice of information published on private websites, including information that appears on WB's website. See *Koenig*, 2010 WL 4783042 at *3 ("This Court concludes that federal courts should be very reluctant to take judicial notice of information or documents that appear exclusively on websites which have been created and are maintained by one of the parties to a case unless that party is a governmental body and the website is maintained not to further the business interests of the party but to provide a source of public information. The potential for fabrication or for inaccurate information is simply too great to be reconciled with the language of Rule 201 to the effect that judicial notice may be taken only if the information comes from 'sources whose accuracy cannot reasonably be questioned.' As the Advisory Committee notes to Rule 201 state, '[a] high degree of indisputability is an essential prerequisite for a court to take judicial notice of a particular

fact.' See *Holland v. United States*, [No. 06-2700-STA-tmp,] 2008 WL 2769367, *3 (W.D. Tenn. July 11, 2008). The documents tendered by USA Hockey simply do not meet this standard. Therefore, the Court will not only decline to take judicial notice of them, but will strike them from the motion to dismiss").[90]

**c. Information Provided in Corporate Disclosure Statements**

Gerritsen next asks that the court take judicial notice of exhibits consisting of, or referencing, information contained in the corporate disclosure statement and/or Form 10-K of Time Warner, Inc.[91] Defendants do not respond to this request; rather, they contend that "Ms. Gerritsen cannot amend her

---

[90]Other courts have viewed the matter differently and have taken judicial notice of information appearing on a party's website. See, e.g., *Jeandron v. Board of Regents of University System of Maryland*, 510 Fed. Appx. 223, 227 (4th Cir. Feb. 14, 2013) (Unpub. Disp.) ("A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination,'" citing FED.R.EVID. 201(b); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007)); *In re UBS Auction Rate Securities Litigation*, No. 08 Civ 2967 (LMM), 2010 WL 2541166, *15 (S.D.N.Y. June 10, 2010) ("[I]t is appropriate to take judicial notice of the contents of a party's website"); *Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F.Supp.2d 173, 179 n. 8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination," citing FED.R.EVID. 201(b); *Town of Southhold v. Town of East Hampton*, 406 F.Supp.2d 227, 232 n. 2 (E.D.N.Y. 2005); *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 406 F.Supp.2d 274, 277 (S.D.N.Y. 2005)); *Monsanto Co. v. Pacificorp*, No. CV 01-607 E LMB, 2006 WL 1128226, *8 n. 4 (D. Idaho Apr. 24, 2006) ("'[A] court may take judicial notice of information publicly announced on a party's website,'" citing *Doron Precision Systems*).

Some courts that have taken judicial notice of such websites, however, have done so only "for the *fact* of the website's publication, not for the *truth* of any matter asserted therein." *Braun v. United Recovery Systems, LP*, 14 F.Supp.3d 159, 169 (S.D.N.Y. 2014) (citing *In re UBS Auction Rate Securities Litig.*, 2010 WL 2541166 at *15); see *Kane*, 2013 WL 5797619 at *9 ("When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true," citing *Premier Growth Fund*, 435 F.3d at 401 n. 15; *Heliotrope Gen. Inc.*, 189 F.3d at 981 n. 118). As with Gerritsen's request that the court take judicial notice of press releases and news articles, it is clear that she seeks to have the court take judicial notice of information published on third party and WB's websites for the *truth* of the information published, not simply the *fact* of its publication. Even if the court were to take notice of the information, it would do so only for that purpose. As the fact that the information was publicly available on the sites is not relevant to decision of defendants' motion to dismiss, the court declines for this reason as well to take judicial notice of the information appearing on the various websites.

[91]RJN at 11.

complaint by attaching [corporate disclosure documents] to her brief in opposition to defendants' Motion to Dismiss."[92] Courts can consider securities offerings and corporate disclosure documents that are publicly available. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"); *Wynn v. Chanos*, ___ F.Supp.3d ___, 2014 WL 7186981, *5 (N.D. Cal. Dec. 16, 2014) ("SEC forms such as a Form 8-K or Form 10-K are matters of public record and may be subject to judicial notice. Accordingly, I take judicial notice of Wynn's Form 8-K from 2013, Wynn's Form 8-K from 2012, Wynn's Form 10-K from 2013, Wynn's Form 10-K from 2012, and Wynn's Form 10-K from 2011" (citation omitted)); *Oklahoma Firefighters Pension & Retirement System v. Ixia*, __ F.Supp.3d __, 2014 WL 4978568, *13 (C.D. Cal. Oct. 6, 2014) (taking judicial notice of Ixia's SEC filings); *Glenbrook Capital Ltd. Partnership v. Kuo*, 525 F.Supp.2d 1130, 1137 (N.D. Cal. 2007) ("The SEC Forms at issue here [Forms 8-K and 10-K] are publicly-available documents filed with the SEC. For these reasons, the Court takes judicial notice of these documents"); *Morgan v. AXT, Inc.*, Nos. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125, *7 (N.D. Cal. Sept. 23, 2005) ("The SEC Forms 4 at issue here are publicly-available documents filed with the SEC. Accordingly, the Court takes judicial notice of the documents attached as Exhibit L to the Banie Declaration").

It is only "appropriate[, however,] for the court to take judicial notice of the content of the SEC Forms [ ] and the fact that they were filed with the agency. *The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201*." *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) (emphasis added); see *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss . . . , a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of

---

[92] Opposition to RJN at 4.

determining what statements the document contain, not to prove the truth of the documents' contents," citing *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (holding that the district court properly refused to take judicial notice of a corporation's Form 10-K to determine a fact in dispute – the number of corporate employees)); *In re Foundry Networks, Inc.*, No, C 00-4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Defendants have filed a Request for Judicial Notice, wherein they seek judicial notice of (1) two Foundry press releases, (2) SEC Forms 4 filed by Foundry's officers, and (3) Foundry's SEC Forms 10-K and 10-Q filings. Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); see also *Del Puerto Water District v. United States Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

As discussed *infra*, Gerritsen relies on the information contained in the SEC documents as evidence that, *inter alia*, WB merged with New Line and/or that there is a unity of interest among the defendants. Stated differently, she relies on the *truth* of the contents of the SEC filings to prove the substance of her claims. It is inappropriate for the court to take judicial notice of the contents of the documents for this purpose. See *Patel*, 253 F.R.D. at 546. Accordingly, the court declines to take judicial notice of the content of WB's various SEC filings.[93]

---

[93]As noted, many of Gerritsen's requests ask that the court take judicial notice of the *truth* of the documents and sources identified. Defendants argue that, in seeking to have the court judicially notice "45 new exhibits and 15 new 'facts' attached to her opposition brief," she is attempting to utilize the documents to amend the complaint and defeat defendants' motion to dismiss. (Opposition to RJN at 1.) The court agrees. It appears that Gerritsen relies on the facts contained in the various documents that are the subject of her judicial notice request to supplement the allegations in her complaint. This is improper, and her request that the court judicially notice information contained in press releases and news articles, third party websites, and WB's SEC filings must be declined for this reason as well. See, e.g., *Ixia*, 2014 WL 4978568 at *14 ("The parties dispute whether the court may properly consider certain Forms 4 that the individual defendants filed with the SEC during the class period. Plaintiffs seek to have the court take judicial notice of the documents. Because the documents are SEC filings, they

**d. Information on Government Websites**

Gerritsen also seeks to have the court judicially notice the business entity profiles for Katja and New Line retrieved from the California Secretary of State's website.[94] Defendants do not oppose Gerritsen's request. Under Rule 201, the court can take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as websites run by governmental agencies. See *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08–CV–1166–IEG, 2009 WL 6597891, *1 (S.D. Cal. Dec. 23, 2009) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). See also *Daniels-Hall v. National Education Association*, 620 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson*, No. C 06–4670, 2008 WL 4183981, *5 (N.D. Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice"). The court will therefore take judicial notice of the business entity profiles on the California Secretary of State's website (Exhs. 42 and 43).

**e. Public Records**

Gerritsen seeks finally to have the court take judicial notice of defendants' motion to dismiss and

---

are proper subjects of judicial notice. Defendants contend, however, that the court should decline to take judicial notice of the documents because plaintiffs are attempting to use them to supplement allegations included in the complaint. Although plaintiffs assert that they relied on the documents in pleading certain of their allegations, they did not include other facts that are referenced in their opposition to the motion to dismiss. Plaintiffs cannot utilize the documents to amend the complaint and defeat defendants' motions to dismiss. Consequently, the court declines to take judicial notice of the individual defendants' Forms 4" (citation omitted)); *In re Turbodyne Technologies, Inc. Sec. Litig.*, No. CV 99-00697 MMM (BQRx), 2000 WL 33961193, *10 (C.D. Cal. Mar. 15, 2000) ("Plaintiffs' complaint alleges much of the information contained in Exhibit Q, including Turbodyne's stock price on certain days and the dates the stock's upward and downward price swings began. The complaint lacks any allegations regarding Turbodyne's daily trading volume, however, and plaintiffs clearly seek to have the court take judicial notice of Exhibit Q to cure this omission. In deciding a motion to dismiss, courts may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).' The effect of plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason" (internal citation omitted)).

[94] RJN at 12.

the fact that the same law firm – O'Melveny & Myers, LLP – represents Katja, New Line, and WB. It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence. *Molus v. Swan*, No. 05cv452-MMA (WMc), 2009 WL 160937, *2 (S.D. Cal. Jan. 22, 2009) ("Courts also may take judicial notice of their own records," citing *United States v. Author Services*, 804 F.2d 1520, 1523 (9th Cir. 1986)); see also *Vasserman v. Henry Mayo Newhall Memorial Hosp.*, _ F.Supp.3d _, 2014 WL 6896033, *5 (C.D. Cal. Dec. 5, 2014) (taking judicial notice of the operative complaint in the action before the court); *NovelPoster v. Javitch Canfield Group*, No. 13-CV-05186-WHO, 2014 WL 5594969, *4 n. 7 (N.D. Cal. Nov. 3, 2014) ("In conjunction with the motion, defendants requested judicial notice of various documents, including NovelPoster's *ex parte* application for a temporary restraining order in this case and this Court's subsequent order . . . . Defendants' request for judicial notice of the TRO application and order is GRANTED"); *In re Linda vVista Cinemas, L.L.C.*, 442 B.R. 724, 740 n. 7 (Bankr. D. Ariz. 2010) (stating that "[t]he court takes judicial notice of its own records," specifically, a declaration attached to the opposition to a motion for preliminary injunction, citing *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)). Accordingly, the court grants Gerritsen's request for judicial notice of the motion to dismiss "although [Gerritsen] [is] advised for future reference that [she] need not seek judicial notice of documents filed in the same case. An accurate citation will suffice." *NovelPoster*, 2014 WL 5594969 at *4 n. 7.

**3. Gerritsen's Second Request for Judicial Notice**

As noted, Gerritsen filed a second request for judicial notice that asks the court to take notice of three additional exhibits.[95] The request concerns a press release issued shortly after she filed this action and two 2010 blog posts.[96] Gerritsen's request is contingent on the court's willingness to take judicial notice of Exhibit D to the Pearson Declaration, however.[97] Because the court declines to take judicial notice of Exhibit D, it denies Gerritsen's second request for judicial notice of Exhibits 46-48.

---

[95] Second RJN at 1-2.

[96] *Id.*

[97] *Id.*

**B. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)**

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

**C. Gerritsen's Breach of Contract and Breach of Guaranty Claims**

**1. Legal Standard Governing Breach of Contract and Breach of Guaranty Claims**

To state a breach of contract claim, a party must allege: (1) the existence of a contract; (2) the party's performance under that contract or an excuse for nonperformance; (3) the defendant's breach;

and (4) resulting damages. *Alvarado v. Aurora Loan Services, LLC*, No. SACV 12-0524 DOC (JPRx), 2012 WL 4475330, * 4 (C.D. Cal. Sept. 20, 2012) (citing *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1489 (2006)). California courts apply the same legal standard to breach of guaranty claims. See *Harrison Ventures, LLC v. Alta Mira Treatment Center, LLC*, No. C 10-00188 RS, 2010 WL 1929566, *5 (N.D. Cal. May 12, 2010) ("With regard to the breach of guaranty claim against Cartwright, such a breach occurs when a debt falls due and remains unpaid. Here, absent a breach by defendants, no such unpaid debt arises. The breach of guaranty claim against Cartwright is therefore wholly dependent upon the viability of the FAC's breach of contract claims. As those claims have been dismissed with leave to amend, the same fate must befall the breach of guaranty claim," citing *California First Bank v. Braden*, 216 Cal.App.3d 672, 677 (1989)); *MRW, Inc. v. Big-O Tires, LLC*, No. CIV S-08-1732 LKK/DAD, 2009 WL 3368438, *9 (E.D. Cal. Oct. 16, 2009) ("An action for breach of guaranty is a species of claim for breach of contract"). As Gerritsen's breach of contract and breach of guaranty claims are governed by the same standard and the parties address the claims jointly in their briefs, the court considers the claims in tandem below.

**2. Whether Gerritsen Has Plausibly Alleged Claims for Breach of Contract and Breach of Guaranty**

In their motion to dismiss, defendants charge that Gerritsen has failed to state either a breach of contract or breach of guaranty claim because: (1) she cannot plead facts plausibly alleging that there was a contract between her and WB; and (2) she cannot plead facts plausibly alleging that there was a breach of contract because the contract and guaranty were agreements between Gerritsen and Katja and New Line, respectively, and WB, not Katja or New Line, produced and released the Film.[98]

Gerritsen alleges that she and Katja entered into a written purchase agreement ("the contract") on March 18, 1999, pursuant to which Katja purchased the motion picture rights to the Book and "any and all versions" of the Book for $1,000,000.[99] Under the contract, Gerritsen was entitled to the following if Katja produced a motion picture "based on" the Book: a production bonus of $500,000;

---

[98]Motion at 6-7.

[99]Complaint, ¶ 13.

contingent compensation based on the net proceeds of the motion picture; and source credit in the main titles of the motion picture and all advertisements.[100] The same day, New Line executed a guaranty ("the Guaranty"), in which it guaranteed the "full and faithful performance" of all of Katja's obligations under the Contract.[101] Gerritsen also pleads that WB developed, produced, distributed, and marketed the Film.[102]

Even when her allegations are construed in Gerritsen's favor, it is apparent that she cannot plausibly allege a claim under traditional contract law theories. Gerritsen pleads that she entered into contracts with Katja and New Line that entitled her to payment if Katja produced a motion picture based on her book; and that WB, not Katja, produced the Film that is allegedly "based on" the Book. No plausible inference arises from these allegations that WB was a party to the contracts or that Katja produced the Film. Thus, absent an alternative theory of liability, Gerritsen's claims must be dismissed.

**3. Whether Gerritsen Has Plausibly Alleged That WB Is Liable under the Contract and Guaranty**

Gerritsen argues that there are three bases on which she can state a claim for breach of contract and guaranty against WB: (1) a successor-in-interest theory; (2) an alter ego theory; and (3) an agency theory.

**a. Successor-in-Interest Liability**

**(1) Legal Standard Governing Successor-in-Interest Liability**

Gerritsen alleges that WB is the parent company of Katja and New Line.[103] Parent corporations can be liable for their own unlawful acts, the unlawful acts of subsidiary companies that act as their

---

[100] *Id.*, ¶ 14.

[101] *Id.*, ¶ 15.

[102] *Id.*, ¶¶ 10 ("WB is engaged in the business of developing, producing, distributing, and marketing motion pictures including the 2013 motion picture entitled *Gravity* (the 'Film')"); 22 ("In or about 2011, WB commenced production of the Film").

[103] Complaint, ¶ 6 ("Gerritsen is informed and believes, and on that basis alleges, that in and subsequent to 2008, New Line and Katja have been and continue to be shell corporations wholly owned by WB and mere conduits through which WB conducts business").

agents, and the unlawful acts of predecessor companies. See *United States v. Bestfoods*, 524 U.S. 51, 64-65 (1998); *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001); *Monaco v. Bear Stearns Cos.*, No. CV 09–05438–SJO (JCx), 2011 WL 4059801, *19 (C.D. Cal. Sept. 12, 2011).

Under California law, "a successor company has liability for a predecessor's actions if: (1) the successor expressly or impliedly agrees to assume the subject liabilities . . . [;] (2) the transaction amounts to a consolidation or merger of the successor and the predecessor[;] (3) the successor is a mere continuation of the predecessor[;] or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts." *No Cost Conference, Inc. v. Windstream Communications, Inc.*, 940 F.Supp.2d 1285, 1299 (S.D. Cal. 2013) (citing *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal.App.4th 1101, 1120 (2007)); see *City of Los Angeles v. Wells Fargo & Co.*, 22 F.Supp.2d 1047, 1062 (C.D. Cal. 2014).

**(2) Whether Gerritsen Has Adequately Alleged Successor-in-Interest Liability**

**(a) Assumption**

To allege successor-in-interest liability on the basis that the successor expressly or impliedly agrees to assume the liabilities of its predecessors, a plaintiff "must not only plead the existence of an assumption of liability but either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied)." *No Cost*, 940 F.Supp.2d at 1300 (citing *Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, No. CIV S-08-539 LKK/JFM, 2008 WL 2693741, *4 (E.D. Cal. July 1, 2008)). Defendants argue that Gerritsen merely alleges as a legal conclusion that WB assumed Katja's and New Line's obligations, and that she pleads no facts that plausibly support an inference that WB assumed the rights and duties of Katja and New Line under the Contract and the Guaranty.[104] They cite Gerritsen's allegation that "by virtue of the transaction [between defendants in 2008] the rights and duties of Katja and New Line under the Contract and Guaranty were . . . assigned to WB so that as of 2008 WB owned and still owns today the motion picture rights to the

[104]Motion at 7-8.

Book."[105] Defendants assert that under *No Cost* and *Winner*, this allegation cannot survive a motion to dismiss. See *No Cost*, 940 F.Supp.2d at 1299 (plaintiff's "conclusory" allegation that "as a result of the [corporate] merger, [defendant] assumed all right[s] and responsibilities" under plaintiff's contract was "insufficient" because plaintiff had to plead "the existence of a contract and . . . terms . . . establish[ing] the obligation in issue"); *Winner*, 2008 WL 2693741 at *4 ("With regard to assumption of duties, plaintiffs must allege more than a terse allegation (e.g., 'Zurich . . . specifically assumed the duties and obligations of Universal,' . . .) to support a finding that there was an express or implied assumption of liability. They must allege facts").

Gerritsen attempts to distinguish *No Cost* on the grounds that, although the *No Cost* plaintiff was not able to establish successor-in-interest liability under an assumption theory, it was able to do it on an alternative basis.[106] She also contends that, unlike *No Cost*, she "alleges factual circumstances giving rise to an implied assumption of liability."[107] Gerritsen references allegations that, at the time of contracting, the parties intended that rights and liabilities under the Contract would pass to the company that eventually produced the film, and that it was understood Katja would not produce the film.[108] Gerritsen asserts that these allegations, coupled with allegations that Katja was New Line's "shell entity,"and that "by virtue of the [WB-New Line] transaction the rights and duties of Katja and New Line under the Contract and Guaranty were assigned to WB" pleads sufficient facts to support her contention that WB impliedly assumed Katja's and New Line's liability under the Contract and Guaranty.[109]

The court disagrees. Gerritsen's allegations are largely conclusory. First, her allegation that Katja's and New Line's obligations were assigned to WB "by virtue of the transaction" is the very legal conclusion that numerous courts have found insufficient under Rule 8. See *No Cost*, 940 F.Supp.2d at

---

[105]Complaint, ¶ 20.

[106]Opposition at 12-13.

[107]*Id.* at 13.

[108]Complaint, ¶ 13.

[109]Opposition at 13.

1299; *Brockway v. JP Morgan Chase Bank*, No. 11CV2982 JM (BGS), 2012 WL 4894253, *3 (S.D. Cal. Oct. 15, 2012) ("The SAC simply alleges that Wells Fargo 'expressly or impliedly agreed to assume all of DREXEL's liabilities under the Deed of Trust. . . .  Such conclusory allegations do 'not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'  While an allegation that Defendants either 'expressly or implied agreed to assume all of DREXEL's liabilities' raises the possibility of an assumption of liabilities, it does not show that Plaintiff is entitled to relief under [Rule] 8(a)(2)"); *Pantoja v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 1177, 1192 (N.D. Cal.2009) (holding that a plaintiff who alleged that Bank of America "is responsible and liable for the actions of Countrywide" and who pled "no facts beyond the purchase of Countrywide by Bank of America" had failed to plead sufficient facts to support a claim against the bank); *Winner*, 2008 WL 2693741 at *4.

To the extent Gerritsen's other allegations plead some facts that might support a finding that WB assumed the other defendants' obligations under the Contract and Guaranty, they do not give rise to a plausible inference that it did so.  Gerritsen's allegations regarding the intent of the original contracting parties ,i.e., that she and Katja understood that Katja would not produce the film and that either New Line or a New Line affiliate would do so, does not speak to WB's intentions when it acquired Katja and New Line, nor does it provide a factual basis for Gerritsen's allegation that WB assumed all obligations under the Contract.  The facts Gerritsen seeks to have judicially noticed, which include reference to a common address or contact person,[110] do not alter this conclusion because, as noted, even had it taken judicial notice of them, the court could not consider the documents for their truth, i.e., that WB, Katja, and New Line have a common address.

Furthermore, even had Gerritsen alleged that the companies had a common address or contact person – which, as noted, she has not – the fact that the companies have related operations does not, in and of itself, support a plausible inference that WB assumed Katja's and New Line's obligations such that it can be held liable on the Contract and Guaranty.  See *Serna v. Bank of America, N.A.*, No. CV 11-10598 CAS (JEMx), 2012 WL 2030705, *4 (C.D. Cal. June 4, 2012) (allegations that Bank of America "expressly assumed [Countrywide's] liability by sending [plaintiffs] a letter stating that they

---

[110]See RJN, ¶¶1-2.

could make the trial plan payment" was insufficient to establish express or implied assumption); *Winner*, 2008 WL 2693741 at *4 ("Although plaintiffs argue that an implied assumption of liability may be inferred [from] Zurich's conduct, the mere allegation that Zurich communicated with plaintiffs regarding their claims and that it shared a common address with Universal is not enough from which to infer that Zurich agreed to assume Universal's liabilities"). The court thus concludes that Gerritsen has failed to sufficiently plead assumption under the successor-in-interest theory of liability.

Consequently, the court concludes that Gerritsen has not alleged plausibly that WB assumed Katja's and New Line's obligations under the Contract and Guaranty.

**(b) Consolidation or Merger**

Under California law, successor liability can be imposed on the basis of consolidation or merger, sometimes called the *de facto* merger exception.[111] Specifically, liability can attach "where one corporation takes all of another's assets *without providing any consideration* that could be made available to meet claims of the other creditors." *Franklin*, 87 Cal.App.4th at 626 (citing *Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (1977)). Gerritsen argues that she has sufficiently alleged the occurrence of a "consolidation or merger" such that WB can be held liable under the Contract and Guaranty.[112] She pleads that "WB acquired control of New Line and Katja by means of a corporate transaction" in 2008, and that, following the transaction, Katja and New Line "have been and continue to be shell corporations wholly owned by WB and mere conduits through which WB conducts business."[113]

Gerritsen's other allegations do not cure the problem. Nowhere in the complaint does Gerritsen allege any facts concerning the details of the corporate transaction or the consideration exchanged by defendants. Gerritsen's conclusory allegation that "New Line and Katja have been and continue to be

---

[111]See *Franklin v. USX Corp.*, 87 Cal.App.4th 615, 626-27 (2001) (referring to this theory as the "*de facto* merger exception").

[112]Opposition at 14.

[113]Complaint, ¶¶ 6, 20. Although, in her opposition, she references a number of press releases, articles, and news commentaries discussing the purported merger between WB and New Line that were subjects of her request for judicial notice, the court has, for reasons detailed earlier, declined to take judicial notice of the documents in ruling on defendants' motion to dismiss.

shell corporations wholly owned by WB and mere conduits through which WB conducts business" does not plead facts giving rise to a plausible inference that a consolidation or merger occurred in which WB acquired all of Katja's and New Line's assets but provided no consideration that could be made available to other creditors. In short, Gerritsen's allegations do not reflect a transaction "in the nature of a merger or consolidation for purposes of the aforesaid rule." See *Ray*, 19 Cal.3d at 29 ("There is no contention that this consideration was inadequate or that the cash and promissory note given to Alad I were not included in the assets available to meet claims of Alad I's creditors at the time of dissolution. Hence the acquisition of Alad I's assets was not in the nature of a merger or consolidation for purposes of the [successor liability] rule").[114]

**(c) Mere Continuation**

Gerritsen next argues that WB is liable as a successor-in-interest because it is a mere continuation of Katja and New Line.[115] California courts view the "mere continuation" basis for imposing successor liability as "merely a subset of the [consolidation or merger theory]." *Franklin*, 87 Cal.App.4th at 625. Therefore, "[t]o prevail on such a theory, plaintiff [must] demonstrate [that] '(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [and that] (2) one or more persons were officers, directors, or stockholders of both corporations.'" *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal.App.4th

---

[114]Gerritsen appears to rely on *No Cost* to support her contention that her complaint adequately pleads a consolidation or merger giving rise to successor-in-interest liability. (Opposition at 12-13, 15.) In *No Cost*, the court held that No Cost had satisfactorily alleged that Wind. Corp. and PAETEC had consolidated or merged for purposes of the successor-in-interest test. *No Cost*, 940 F.Supp.2d at 1300. There, No Cost alleged that Windstream Corporation produced a press release that officially announced a merger and that, following the merger, Windstream "set about on a course of actions aimed at causing PAETEC's customers . . . to believe that PAETEC was now part of Windstream Communications." *Id.* Among other things, Windstream sent No Cost a letter stating that Windstream Communications and PAETEC had combined and also sent invoices that confirmed the merging of the two companies. *Id.* Finally, PAETEC shareholders received 0.460 shares of Windstream stock for each PAETEC share owned at closing. *Id.* Based on these allegations, the court concluded that the complaint satisfactorily alleged successor liability due to a "consolidated or merger."

No Cost's allegations differ from Gerristen's in that they reference an exchange of shares as a result of the merger transaction. As noted, Gerritsen does not address in any way the consideration that defendants exchanged.

[115]Opposition at 15.

1101, 1120 (2007) (quoting *Ray*, 19 Cal.3d at 28); see also *Franklin*, 87 Cal.App.4th at 625 ("The crucial factor in determining whether a corporate acquisition constitutes either a *de facto* merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets"); *id.* at 627 ("[T]he common denominator, which must be present in order to avoid the general rule of successor non-liability, is the payment of inadequate consideration").

Gerritsen asserts that her allegations satisfy the "mere continuation" test because she pleads that "to the extent New Line and Katja continue to transact any business at all, it is at the sole discretion and for the sole benefit of WB."[116] Gerritsen also references TW's annual Form 10-K filing, which characterizes the merger as "the reorganization of the New Line Business under Warner Bros."[117] Although the Form 10-K can be judicially noticed, it cannot be considered for its truth and thus does nothing to cure the deficiencies in Gerritsen's allegations. As with the merger or consolidation inquiry, Gerritsen's allegations and judicially noticeable information do not reference, must less demonstrate, that "no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors." See *CenterPoint Energy*, 157 Cal.App.4th at 1120. There are no factual allegations that give rise to a plausible inference that Katja or New Line transferred its assets to WB or that it received inadequate consideration in exchange; indeed, there are no allegations supporting an inference that there was a *de facto* merger between the defendants. Accordingly, Gerritsen has not shown that WB could be held liable as Katja's successor in interest on the Contract or New Line's successor on the Guaranty. See *Franklin*, 87 Cal.App.4th at 627 (finding that a successor company was not liable for its predecessor's torts because adequate consideration had been paid for the predecessor's assets); see also *CenterPoint Energy, Inc.*, 157 Cal.App.4th at 1116 ("The factors generally considered for a de facto merger are not present. . . . CenterPoint did not take all of Former REI's assets without providing consideration. There is nothing to suggest that either CenterPoint or New REI are not sufficiently funded to meet the claims of creditors").

---

[116]*Id.*

[117]*Id.*, see RJN, Exh. 2.

**(d) Fraudulent Purpose**

Finally, Gerritsen argues that she has pled facts that support a plausible inference that the Katja/New Line/WB consolidation involved "the transfer of assets for the fraudulent purpose of escaping liability."[118] See *Ray*, 19 Cal.3d at 28. Gerritsen alleges that Katja should have objected to WB's production of the Film because it was based on a "literary property technically owned by Katja."[119] She further alleges that Katja's failure to object to WB's production was fraudulent because "Katja is controlled by WB and WB is effectively the owner of the motion picture rights to the Book."[120] Thus, Gerritsen asserts that the "separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB, an inequitable result will follow."[121] Defendants counter that Gerritsen's allegations are merely conclusory.[122] They also contend that the allegations are implausible based on the large number of dissimilarities between the Book and the Film.[123]

The court finds that Gerritsen's allegations are, once again, conclusory. While the court will assume for purposes of this motion that she plausibly pleads the Film was based on her Book, a "literary property" owned by Katja, in that she pleads purported similarities between the two works,[124] and alleges that she and Katja entered into the Contract,[125] she alleges no *facts* supporting her conclusion that "Katja is controlled by WB and WB is effectively the owner of the motion picture rights in the Book." Conclusory allegations of control do not give rise to a plausible inference that Katja "transferred" rights

---

[118]Opposition at 15-16.

[119]Complaint, ¶ 22.

[120]*Id.*

[121]*Id.*, ¶ 6.

[122]Reply at 11-12.

[123]*Id.* As noted, the court denied defendants' request to take judicial notice of the documents attached to the Pearson Declaration that list purported differences between the Book and the Film because such evidence is not properly considered at this state of the litigation. It therefore declines to consider this argument.

[124]Complaint, ¶¶ 12, 19, 21.

[125]*Id.*, ¶ 13.

to the Film to WB for a "fraudulent purpose." See *Iqbal*, 129 S.Ct. at 1949 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Because Gerritsen's fraudulent purpose theory is not supported by factual allegations, the court concludes that she has failed plausibly to plead successor-in-interest liability on this basis.

**(e) Conclusion Regarding Successor-in-Interest Liability**

Because Gerritsen has failed to plead plausibly that WB is Katja's and New Line's successor-in-interest with respect to the Contract and Guaranty on any of the four bases identified in *Ray*, this liability theory does not provide grounds for denying defendants' motion to dismiss.

**b. Alter Ego Liability**

**(1) Legal Standard Governing Alter Ego Liability**

"The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300 (1985).[126] The purpose of the doctrine is to bypass the corporate entity in order to avoid injustice. Its "essence . . . is that justice be done[,] . . . [and t]hus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." *Id.* at 301. See also *Roman Catholic Archbishop of San Francisco v. Superior Court*, 15 Cal.App.3d 405, 411 (1971) ("The terminology 'alter ego' or 'piercing the corporate veil' refers to situations where there has been an abuse of corporate privilege, because of which the equitable owner of a corporation will be held liable for the actions of the corporation," citing *Minton v. Cavaney*, 56 Cal.2d 576, 579 (1961)).

Before the doctrine can be invoked, two elements must be alleged: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate

---

[126]Whether to pierce the corporate veil is a question of state law. See, e.g., *Dusharm v. Elegant Custom Homes, Inc.*, 302 Fed. Appx. 571, 572 (9th Cir. Dec. 1, 2008) (Unpub. Disp.) (applying Arizona law); *Harwood v. Int'l Estate Planners*, 33 Fed. Appx. 903, 906 (9th Cir. Apr. 2, 2002) (Unpub. Disp.) (applying California law).

personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 526 (2000); see also *Mesler*, 39 Cal.3d at 300 ("There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow,'" quoting *Automotriz del Golfo de California S.A. De C.V. v. Resnick*, 47 Cal.2d 792, 796 (1957)). See also *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996); *Harwood*, 33 Fed. Appx. at 906.

Conclusory allegations of "alter ego" status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting both of the elements of alter ego liability. *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003) ("These purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard"); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F.Supp.2d 1060, 1067 (C.D. Cal. 2002) ("More pertinent for purposes of the current discussion, none [of the allegations] contains any reference to UnumProvident being the alter ego of Provident. None alleges that UnumProvident treats the assets of Provident as its own, that it commingles funds with Provident, that it controls the finances of Provident, that it shares officers or directors with Provident, that Provident is undercapitalized, or that the separateness of the subsidiary has ceased. Without such allegations, the issue is not adequately raised, and UnumProvident was not put on notice that this was a theory against which it should be prepared to defend"); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946 (AGS), 2002 WL 432390, *12 (S.D.N.Y. Mar. 20, 2002) ("[I]n order to overcome the presumption of separateness afforded to related corporations, [plaintiff] is required to plead more specific facts supporting its claims, not mere conclusory allegations"); *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 647 (C.D. Cal. 1983) ("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken. .

. . If plaintiffs wish to pursue such a theory of liability, they must allege the elements of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient").

A plaintiff may plead unity of interest by relying on a number of different factors. "Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Wady*, 216 F.Supp.2d at 1066 (quoting *Roman Catholic Archbishop*, 15 Cal.App.3d at 411). This list is non-exclusive, and California courts have relied on a host of other factors in finding alter ego liability as well. See *Zoran Corp v. Chen*, 185 Cal.App.4th 799, 811-12 (2010) (listing factors that include "the holding out by an individual that he is personally liable for the debts of the corporation . . . ; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . ; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; . . . the employment of the same employees and/or attorney . . . ; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . . ; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . . ; the use of the corporate entity to procure labor, services or merchandise for another person or entity . . . ; the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . . ; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; and the formation and use of a corporation to transfer to it the existing liability of another person or entity," quoting *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal.App.4th 223, 249–50 (1999) (in turn quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838–40 (1962)). "No single factor is determinative, and instead a court must examine all the

circumstances to determine whether to apply the doctrine." *VirtualMagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal.App.4th 228, 245 (2002).

**(2) Whether Gerritsen Has Adequately Alleged Alter Ego Liability**

**(a) Unity of Interest and Ownership**

As respects unity of interest and ownership, Gerritsen pleads:

> "[T]here has been and is today such a unity of interest and ownership between New Line and Katja, on the one hand, and their parent WB on the other, that the separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB an inequitable result will follow."[127]

The allegations that substantiate Gerritsen's recitation of this element of alter ego liability include: (1) that Katja was a wholly-owned subsidiary of, and was completely dominated, directed, and controlled by New Line; (2) that WB acquired New Line in a corporate transaction, after which New Line and Katja became "shell corporations wholly owned by WB and mere conduits through which WB conducts business"; (3) that to the extent New Line and Katja do any business, it is at the sole direction and for the sole benefit of WB; and (4) that WB exercises complete management, control, ownership, and domination over New Line and Katja.[128]

Each of the preceding allegations is a conclusory assertion that there is a unity of interest among the defendants; none pleads any specific facts demonstrating that this is so. Consequently, these allegations insufficiently plead the first element of an alter ego claim. See *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d at 426; *Wady*, 216 F.Supp.2d at 1067. Gerritsen alleges no facts showing that New Line and Katja are "shell corporations," nor does she plead facts showing that WB directs New Line's and Katja's business activities. Similarly, Gerritsen does she detail how it is that WB exercises complete management, control, ownership, and domination over New Line and Katja. Without a factual basis, her conclusory allegations are insufficient. See *Hokama*, 566 F.Supp. at 647

---

[127]Complaint, ¶ 6.

[128]*Id.*, ¶¶ 6, 16, 20.

("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken. . . . If plaintiffs wish to pursue such a theory of liability, they must allege the elements of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient").

In her opposition, Gerritsen references facts found in documents that are the subject of her requests for judicial notice – i.e., that defendants share a website and the same business address, as well as the same legal counsel and agent for service of process.[129] She also references documents concerning the involuntary termination of 450 New Line employees by WB following the consolidation and a statement on WB's website that New Line has been "part of Warner Bros. Entertainment since 2008" and "coordinates its development, production, marketing, distribution, and business affairs activities with Warner Bros."[130] As the court has noted in declining to take judicial notice of these documents, the facts and information in the documents and on the websites cannot be considered for their truth and thus cannot be used to establish unity of interest or to cure the deficiencies in Gerritsen's conclusory pleading of this element.

Importantly, there are no allegations that WB commingled funds with New Line and Katja, or that New Line and Katja were undercapitalized after acquired by WB. See *Matsunoki Group, Inc. v. Timberwork Oregon, Inc.*, No. C 08-04078 CW, 2009 WL 1033818, *4 (N.D. Cal. Apr. 16, 2009) (finding the evidence sufficient to support an alter ego claim where "[d]efendant Blondheim seems to enjoy significant if not complete control over decisions made on behalf of Timberwork. In addition to marketing, his duties include sales, and purchasing. Defendant Blondheim has never had more than two employees working for him. He admits to having final approval on every decision pertaining to the operation of Timberwork. . ."); *ADO Finance, AG v. McDonnell Douglas Corp.*, 931 F.Supp. 711, 717 (C.D. Cal. 1996) ("MDC presents substantial evidence that there is a unity of interest between ADO, Steinbrugger, and the Anstalts. During discovery, ADO has stated that AFI

---

[129]Opposition at 18.

[130]*Id.*

is the sole legal owner of ADO's shares, that Premanda is the sole beneficial owner of ADO's shares, and that both AFI and Premanda are 'solely owned' by Steinbrugger. . . . During his deposition, Willy Huber, ADO's Rule 30(b)(6) witness and managing director/sole employee since 1994, testified that ADO's affairs are managed and controlled by Steinbrugger in his capacity as the 'shareholders' representative'").

For all of these reasons, Gerritsen has not adequately pled unity of interest.

**(b) Inequitable Result**

Even had Gerritsen satisfactorily pled unity of interest, the court could not find that she has adequately alleged that an inequitable result will follow if the corporate separateness of the defendant entities is not disregarded. "[A] plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each." *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1116 (C.D. Cal. 2003). In addition to alleging facts that show a unity of interest, Gerritsen must also plead facts demonstrating that an inequitable result will follow if an alter ego finding is not made. See *Orloff v. Allman*, 819 F.2d 904, 908-09 (9th Cir. 1987) (discussing California's alter ego standard). The "inequitable result" prong of alter ego liability exists to address circumstances in which "adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *First Western Bank & Trust Co. v. Bookasta*, 267 Cal.App.2d 910, 914-15 (1968) (citations omitted). Bad faith is a critical factor in this analysis. See *Neilson*, 290 F.Supp.2d at 1117 ("California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding," citing *Mid-Century Ins. Co. v. Gardner*, 9 Cal.App.4th 1205, 1213 (1992) ("The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil" (internal citation and quotation marks omitted)).

Gerritsen cites the same allegations she offered to show that she had pled successor-in-interest liability because defendants engaged in corporate transactions for the fraudulent purpose of escaping

liability.[131] Just as they do not support a finding that Gerritsen has adequately alleged successor-in-interest liability, the allegations do not sufficiently plead inequitable result. Although Gerritsen asserts that "Katja is controlled by WB and WB is effectively the owner of . . . motion picture rights in the Book," and that "the separate personalities of New Line and Katja no longer exist and if their acts are not treated as the acts of WB, an inequitable result will follow," she pleads no facts that support these conclusions. As a consequence, they do not satisfy Rule 8. See *Iqbal*, 129 S.Ct. at 1949. Gerritsen's alter ego claim cannot be saved by the allegations that the Film was based on her Book, and that the Book was a "literary property" owned by Katja because these allegations cannot support a plausible inference of inequitable conduct. Thus, the court concludes that Gerritsen has failed to plead alter ego liability sufficiently.

**c. Agency Liability**

**(1) Legal Standard for Agency Liability**

Under California law, an agent is defined as "one who represents another, called the principal, in dealings with third persons." CAL. CIV. CODE § 2295. "In determining if an agent relationship exists, the court considers three essential characteristics: (1) an agent or apparent agent holds a power to alter the legal relationships between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal had the right to control the conduct of the agent with respect to matters entrusted to him." *Grober v. Mako Productions, Inc.*, No. CV 04-08604 SGL (OPx), 2008 WL 9027249, * 6 (C.D. Cal. Aug. 29, 2008) (citing *Garlock Sealing Techs., LLC v. Nak Sealing Techs. Corp.*, 148 Cal.App.4th 937, 945 (2007)); *Palomares v. Bear Sterns Residential Mortg. Corp.*, No. CV 07-1899 WQH (BLM), 2008 WL 686683, *4 (S.D. Cal. Mar. 13, 2008).

**(2) Whether Gerritsen Has Adequately Alleged Agency Liability**

Gerritsen asserts that her complaint alleges a plausible theory of agency liability under which defendants may be held jointly liable for breach of the Contract and Guaranty.[132] Her complaint pleads,

---

[131]Opposition at 20.

[132]Opposition at 22.

in relevant part:

> "In and subsequent to 2008, each defendant was acting as the agent of each other defendant, and, in committing the acts and omissions described below, was acting within the course and scope of such agency with the knowledge, consent, and ratification of each other defendant."[133]

Gerritsen concedes that this allegation, standing alone, does not suffice to allege agency liability plausibly.[134] She maintains, however, that other allegations support a finding that she has adequately pled this theory of liability. Many of the "factual allegations" Gerritsen references in her opposition, however, are the same allegations the court has found to be conclusory and lacking in factual basis. Gerritsen contends, for example, that allegations that Katja was "wholly owned by and completely dominated and controlled by New Line;" that Katja was regularly complicit in New Line's business strategy; that WB "acquired control of New Line and Katja" and exercises "complete management and control" over them; and that New Line and Katja transact business at the sole direction and for the sole benefit of WB are sufficient to withstand a Rule 12(b)(6) challenge.

As the court has noted, Gerritsen pleads no *facts* supporting the conclusions that Katja and New Line were "completely dominated and controlled" by WB, and that Katja was complicit in New Line's business strategy. Allegations reciting a legal standard – i.e., that WB exercises "complete management and control" over New Line and Katja and that they transact business at WB's "sole direction and for [its] sole benefit" – have been found wanting by the Supreme Court. See *Twombly*, 540 U.S. at 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, the court concludes that Gerritsen has failed to adequately allege liability based on the existence of an agency relationship.

---

[133] Complaint, ¶ 5.

[134] Opposition at 21.

**D. Whether Gerritsen is Entitled to Discovery**

In her opposition, Gerritsen asks that the court permit her to conduct discovery to develop facts supporting her vicarious liability claims; she contends that there are "other documents bearing on the corporate transaction" other than the Assignment Agreement proffered by defendants as Exhibit B to the Pearson Declaration.[135] There may well be additional documents that could be obtained through discovery. Gerritsen, however, has not met her burden of pleading a plausible claim for relief under Rule 8. Until she is able to do so, the court declines to authorize Gerritsen to conduct discovery. See *Iqbal*, 129 S.Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"); *Medved v. DeAtley*, No. 12-cv-03034-PAB-MEH, 2013 WL 4873054, *13 (D. Colo. Sept. 11, 2013) ("[A]s the Supreme Court noted, the Rule 8 pleading standard 'does not unlock the doors to discovery for a plaintiff armed with nothing more than conclusions.' . . . Thus, while discovery could help plaintiffs discover additional facts, the conclusory nature of plaintiffs' complaint and their failure to identify potential facts they may discover simply affirms that the facial plausibility of plaintiffs' claims against defendants is lacking in this case. Accordingly, because plaintiffs failed to plead their claims with the required plausibility or present any reason from which the Court may reasonably infer that they could uncover facts to state plausible claims, the court will deny plaintiffs' conditional motion for leave"); *Helstern v. City of San Diego*, No. 13-CV-0321-LAB (RBB), 2013 WL 3515963, *5 (S.D. Cal. July 11, 2013) ("The Court certainly appreciates what Helstern is trying to do here – summon some *evidence* that the County (or the Sheriff's Department) is liable for Helstern's alleged mistreatment – but she simply doesn't have any. The allegations come off as entirely speculative, and it's apparent enough to the Court that Helstern is desperate just to survive a motion to dismiss her *Monell* claim against the County so she can take discovery to see whether she plausibly has one. But the Court will not 'unlock the doors of discovery for a plaintiff armed with nothing more than conclusions,'" citing *Iqbal*); *Wright v. City of Dallas, Texas*, No. 3:09-CV-1923-B,

---

[135]See Pearson Decl., Exh. B. The court declined to consider Exhibit B in deciding the present motion because Gerritsen disputed its authenticity.

2010 WL 3290995, *4 n. 4 (N.D. Tex. July 19, 2010), report and recommendation adopted 2010 WL 3291816, *1 (N.D. Tex. Aug. 19, 2010) ("Plaintiff urges the Court to deny the motion to dismiss as premature because he is 'entitled to discovery . . . prior to any ruling from this Court.' Rule 8 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.' *Iqbal*, 129 S.Ct. at 1950; accord *Twombly*, 550 U.S. at 563 n. 8 (recognizing that 'before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct')").

## III. CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss Gerritsen's complaint.[136] Gerritsen may file an amended complaint within twenty (20) days of the date of this order if she is able to remedy the deficiencies the court has noted in this order.

Gerritsen may not plead new claims. Should the scope of any amendment exceed the leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f). See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); *DeLeon v. Wells Fargo Bank, N.A.*, No. 10-CV-01390-LHK, 2010 WL 4285006, *3 (N.D. Cal. Oct. 22, 2010) ("In cases like this one . . . where leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken"); see also *Kennedy v. Full Tilt Poker*, No. CV 09-07964 MMM (AGRx), 2010 WL 3984749, *1 (C.D. Cal. Oct. 12, 2010) (noting that the court had stricken a third amended complaint because plaintiffs' new claims and the addition of new defendants "exceeded the authorization to amend the court granted" and plaintiffs had not sought leave to add new claims or defendants as required by Rule

---

[136]Because Gerritsen's breach of contract and guaranty claims are not adequately pled, and her accounting claim is derivative of her breach of contract claims, the court grants defendants' motion to dismiss the accounting claim as well.

15); *Barker v. Avila*, No. 2:09-cv-0001-GEB-JFM, 2010 WL 31701067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims); *PB Farradyne, Inc. v. Peterson*, No. C 05-3447 SI, 2006 WL 2578273, *3 (N.D. Cal. Sept. 6, 2006) (striking, without leave to amend, a new theory of liability alleged in the third amended complaint because the new claim was "outside the scope of the leave to amend granted" when the court dismissed the second amended complaint); *Serpa v. SBC Telecommunications, Inc.*, No. C 03-4223 MHP, 2004 WL 2002444, *3 (N.D. Cal. Sept. 7, 2004) (striking a claim asserted for the first time in an amended complaint, since the new claim exceeded the scope of the court's order granting limited leave to amend).

DATED: January 30, 2015

Margaret M. Morrow

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE