KULIK GOTTESMAN & SIEGEL LLP
 Glen L. Kulik, Esq. (SBN 082170)
 Natalie N. Mutz, Esq. (SBN 273381)
15303 Ventura Boulevard, Suite 1400
Sherman Oaks CA  91403
Tel:   (310) 557-9200; (818) 817-3600
Fax:  (310) 557-0224
gkulik@kgslaw.com; nmutz@kgslaw.com

Attorneys for Plaintiff Terry T. Gerritsen

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY T. GERRITSEN, an individual, | Case No.  CV 14-03305-MMM (CWx) |
| Plaintiff, | (Hon. Margaret M. Morrow) |
| v. | **FIRST AMENDED COMPLAINT FOR** |
| WARNER BROS. ENTERTAINMENT, INC., A Delaware corporation; KATJA MOTION PICTURE CORP., a California Corporation; and NEW LINE PRODUCTIONS, INC., a  California corporation, | **1.   BREACH OF WRITTEN CONTRACT** |
| Defendants. | **2.   BREACH OF CONTINUING GUARANTY** |
| | **3.   ACCOUNTING** |
| | (Request for Jury Trial - Fed. R. Civ P. 38(b)) |

{FAC}

**FIRST AMENDED COMPLAINT**

Plaintiff Terry T. Gerritsen alleges:

1. This case concerns the damages suffered by plaintiff because defendants refuse to acknowledge that the motion picture *Gravity* ("Film") was based on a novel she wrote entitled *Gravity* ("Book"). Pursuant to a contract with Defendants Katja Motion Picture Corp. ("Katja") and New Line Productions, Inc. ("New Line"), which in 2008 were consolidated with and became units of Defendant Warner Bros. Entertainment, Inc. ("WB"), plaintiff should have received a production bonus, a percentage of the net proceeds, and a source material credit on the screen and in all paid advertisements for the Film, but she did not.

## THE PARTIES

2. Plaintiff Terry T. Gerritsen, known professionally as Tess Gerritsen ("Gerritsen"), is an individual domiciled in the State of Maine.

3. Katja is a corporation organized and existing under the laws of the State of California with its principal place of business located at 4000 Burbank Boulevard, Burbank, California.

4. New Line is a corporation organized and existing under the laws of the State of California with its principal place of business located at 4000 Burbank Boulevard, Burbank, California.

5. WB is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 4000 Burbank Boulevard, Burbank, California.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action by virtue of the provisions of 28 U.S.C. Section 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

7. Venue is proper in this action under the provisions of 28 U.S.C. Section 1391(a). Defendants reside in this judicial district which is also the location where a

substantial part of the events or omissions giving rise to the claim occurred.  Further, the contract which is the subject of the suit, as described below, expressly stipulates that all disputes between the parties will be litigated exclusively in the federal and/or state courts located in Los Angeles County.

## BACKGROUND OF THE PARTIES

8.     Gerritsen is an international best-selling, award-winning author whose novels have frequently appeared on the New York Times Best-Seller lists.  More than 25,000,000 copies of Gerritsen's books have been sold worldwide and from time to time her novels are purchased or optioned by television and motion picture production companies and studios. Currently, for example, the television series *Rizzoli and Isles* which airs on the TNT network, is based on a series of books Gerritsen wrote of the same name. Prior to her career as an author, Gerritsen was a practicing physician who received her undergraduate degree from Stanford University and her medical degree from the University of California at San Francisco.

9.     WB is engaged in the business of developing, producing, distributing, and marketing motion pictures, including the Film, which it assigned or otherwise allowed to be produced by its "Warner Bros. Pictures" unit.

10.    New Line was formed in 1967 by Robert Shaye ("Shaye").   Until February 28, 2008, New Line was a motion picture studio operated by Shaye and Michael Lynne ("Lynne") as Co-Chairmen and Co-Chief Executive Officers.

11.    After New Line was formed, it created Katja as a wholly owned subsidiary of New Line. New Line's stock ownership of Katja was not for the purpose of participating in the affairs of Katja in the normal and usual manner, but for the purpose of controlling Katja so that it could be used as a mere agency or instrumentality of New Line.  Katja was formed for the sole purpose of acquiring motion picture rights to literary properties and developing screenplays based on those properties. New Line would then decide whether it wanted to make a film

1    from the screenplay, and if so, New Line would produce, or designate another
2    related entity to produce, the film.  Gerritsen is informed and believes, and on that
3    basis alleges, that Katja has never produced any films, and New Line never intended
4    that Katja would produce any films.

5         12.    From its inception, Katja has been the alter ego of New Line.  There
6    was and is a complete unity of interest and ownership between the two companies.
7    They shared and still share the same offices, had the same employees, and operated
8    under the direction of the same officers and directors. They had the same phone
9    number.  They had the same representative reflected in the records of the California
10   Secretary of State. New Line representatives made all business decisions for Katja.
11   Gerritsen is informed and believes, and on that basis alleges, that New Line funded
12   Katja's operations and other than the money New Line provided, Katja had no
13   significant assets or resources and was thus at all times was undercapitalized for the
14   business in which it was and is engaged.

15        13.    At all times mentioned in this First Amended Complaint, WB, and New
16   Line (when it was a movie studio), have tried to shield themselves from liability by
17   creating a complicated web of "units" and "divisions" each with its own discrete
18   function.  For example, they have different units to own the studio lot, to acquire
19   literary material, to produce films, to distribute films, to market films, to sell
20   merchandise derived from films, and to release movie soundtracks, when in reality,
21   those units are all under the total control of the studio.  To mislead and frustrate
22   creditors, WB and New Line formed numerous wholly owned subsidiaries and they
23   engaged in mergers, consolidations, and/or acquisitions with other existing
24   companies, and they changed the names of the entities that are their units from time
25   to time. For example, Gerritsen is informed and believes, and on that basis alleges,
26   that at one time or another, New Line used the names New Line Productions, Inc.,
27   New Line Film Productions, LLC, New Line Cinema Corporation, New Line
28   Cinema, New Line Cinema, LLC, New Line Cinema Picturehouse Holdings, Inc.,

**FIRST AMENDED COMPLAINT**

New Line Distribution, Inc., New Line Distribution Services, Inc., New Line Home Entertainment, Inc., New Line International Releasing, Inc., New Line International, Inc., and New Line Television, Inc., several of which are listed in the records of the California Secretary of State as still active today. WB has operated under an even larger number of names.  The end result is a business structure so complicated that often the individuals who run the studio cannot even keep the relationships and their own multiple titles straight at any given time.

## GERRITSEN'S CONTRACT WITH NEW LINE AND KATJA

14.    In 1999, Gerritsen completed the Book which was published by Simon & Schuster in September 1999.  The Book is set in orbital space and features a female medical doctor/astronaut who is stranded alone aboard the International Space Station after a series of disasters kill the rest of the crew. The Book details the astronaut's struggle to survive. Writing the book was the most daunting challenge of Gerritsen's career, because even with her background in science and medicine, it took her months of research including visits to NASA facilities and interviews with scientists, engineers, flight surgeons, project managers, spaceflight historians, and numerous NASA personnel before she could even begin to write the Book. This research was necessary so that the depiction of NASA technology in the Book would be realistic, which is unusual for a novel set in space.

15.    Based on the manuscript seen by representatives of Katja and New Line before the Book was published, Katja, New Line and Gerritsen entered into a written contract in which Katja purchased the motion picture rights to the Book "and any and all versions thereof including the title(s), themes, contents, dialogue, characters, characterizations, elements, translations, adaptations and any and all versions thereof." A true and correct copy of the contract between Katja, New Line and Gerritsen dated March 18, 1999 ("Contract") is attached hereto as Exhibit 1 and incorporated herein by this reference.

{FAC}

**FIRST AMENDED COMPLAINT**

16.     Under paragraph 2 of the Contract, Katja paid Gerritsen $1,000,000 as the purchase price for the motion picture rights to the Book. In addition, the Contract provided for the following additional consideration to be paid to Gerritsen if a motion picture "based on" the Book (a "Picture") was produced: (a) Under Paragraph 2A, Gerritsen was entitled to a production bonus in the amount of $500,000; (b) Under Paragraph 2B, Gerritsen was entitled to contingent compensation in an amount equal to 2.5% of 100% of the "Defined Net Proceeds" of the Picture; and (c) Under Paragraph 15, Gerritsen was entitled to screen credit, on a separate card, in the main titles, and in the billing block of paid advertisements for the Picture.

17.     As alleged above in paragraphs 11 through 13, at the time the Contract was signed Katja was the alter ego of New Line.  New Line used Katja as part of its comprehensive business strategy to acquire literary material and develop the material into a viable motion picture screenplay ready for production, at which point the rights would be assigned to New Line or another entity dictated by New Line which would produce the actual picture.  When the Contract was signed, New Line and Katja never intended that Katja would produce the Picture, rather, they intended that Katja would develop the Book into a screenplay under New Line's supervision, and if, in the end, New Line liked the screenplay, the rights would be assigned by Katja to New Line or to another entity chosen by New Line to produce the Picture.

18.     Paragraph 11 of the Contract provided:

"**ASSIGNMENT**: Owner agrees that Company may assign this Agreement, in whole or in part, at any time to any person, corporation, or other entity, provided that unless this assignment is to a so-called major or mini-major production company or distributor or similarly financially responsible party or purchaser of substantially all of Company's stocks or assets which assumes in writing all

of Company's obligations, Company shall remain
secondarily liable for all obligations to Owner hereunder."

19. Since Katja was known to be a mere agent and instrumentality of New Line at the time the Contract was signed, on pages 16 and 17 of the Contract, Gerritsen required that New Line execute and deliver a Continuing Guaranty ("Guaranty") in which it guaranteed the "full and faithful performance" by Katja of all of Katja's obligations under the Contract.

## WB'S ACTIONS AS THE SUCCESSOR-IN-INTEREST, AGENT, AND ALTER EGO OF NEW LINE AND KATJA

20. On January 28, 1994, New Line and Katja were purchased by Turner Broadcasting System ("Turner"), which in turn was purchased by Time Warner in 1996. Thus, starting in 1996, Time Warner owned two separate motion picture studios: WB and New Line.

21. At the time Katja and New Line acquired the motion picture rights to the Book in 1999, both companies were owned by Time Warner, which also owned WB.

22. On or about February 28, 2008, Time Warner caused WB, New Line, and Katja to consolidate. By virtue of the consolidation, WB became and is still today the successor-in-interest to New Line and Katja.

23. Time Warner announced the consolidation in a press release dated February 28, 2008. The same day, Time Warner's Chief Executive Officer Jeff Bewkes sent a memorandum to Time Warner employees, which was publicly disclosed, announcing the consolidation, stating in part: "Today it was announced that New Line Cinema will be operated as a unit of Warner Bros. Entertainment. . . . We want to take our time to make sure that we understand New Line's business and properly align this valuable asset that's now affiliated with the Studio."

24. Also on February 28, 2008, Shaye and Lynne, New Line's departing Co-Chairmen, announced the consolidation in a memorandum to New Line's

employees which was widely published in the press, stating in part: "This afternoon, Time Warner is announcing that New Line will become a unit of Warner Bros. This is, of course, a very difficult and emotional time for all of us who have worked at New Line.  While there is not much we can say that can lessen the impact of this announcement, we did want you to know about the decision before you read about it in the press."

25.    Because Time Warner was the sole owner of WB, New Line and Katja, Gerritsen is informed and believes, and on that basis alleges, that no consideration was paid to New Line or Katja in connection with the consolidation, thus no money was made available for creditors of New Line and Katja. After the consolidation, New Line and Katja became a unit of WB and have been subject to WB's total control with regard to virtually every business decision. The reason for the consolidation of WB with New Line and Katja was that Time Warner no longer felt it was efficient or economically viable to own and operate two separate movie studios. Gerritsen is informed and believes and on that basis alleges, that since the date of the consolidation, WB, New Line, and Katja have operated in effect as a single entity.

26.    Following the consolidation, Time Warner, WB, and New Line and Katja engaged in a deliberate course of conduct that was intended to convey to those doing business with New Line and Katja that those entities had become fully absorbed by and merged into WB.  Time Warner issued press releases which were widely disseminated worldwide announcing the consolidation of WB and New Line and the impact of the consolidation. One major publication announced, "New Line Folds Into Warner Bros." Another proclaimed, "Warner Bros. Absorbs New Line Cinema."  A third publication reported:  "New Line, Warner Bros. to Merge." Yet another news outlet reported: "New Line Cinema to Become Unit of Warner Bros." The Los Angeles Times wrote, "Roll the Credits on New Line Cinema, . . . the company will lay off hundreds of its employees . . . and be merged into its corporate

sibling WB." Forbes announced, "It is the end of an era at New Line Cinema. . . [Time Warner] will merge New Line into fellow Time Warner subsidiary Warner Bros. Entertainment." Time Warner's corporate 10K filed for 2008 stated in part: "FILMED ENTERTAINMENT: . . . To increase operational efficiencies and maximize performance within the Filmed Entertainment segment, the Company reorganized the New Line business in 2008 to be operated as a unit of Warner Bros."

27. Since 2008, WB has exercised and continues to exercise complete management, control, ownership, and domination over New Line and Katja. WB's stock ownership of New Line and Katja was not for the purpose of participating in the affairs of those corporations in the normal and usual manner, but for the purpose of controlling them so that they may be used as a mere agency or instrumentality of New Line.

28. For example, as a result of the consolidation, Shaye and Lynne immediately stepped down and left the companies they had run for over 40 years, and WB fired approximately 450 New Line and Katja employees – nearly their entire work force. WB installed Toby Emmerich ("Emmerich"), who had been a production executive for Shaye and Lynne, as President of New Line and directed that he report to WB's Chief Executive Officer. Emmerich is currently listed as a "Divisional Executive" on WB's website. WB installed Edward Romano, who is Vice Chairman of WB, as Katja's Chief Executive Officer. Romano has been a WB employee since 1968.

29. After the consolidation, WB dictated that New Line would no longer operate as a motion picture studio. Instead, WB decided that New Line and Katja would be a production unit that would develop and produce those films which are assigned to it, or otherwise approved, by WB.

30. For many years prior to the consolidation of New Line and Katja with WB, the principal business office of New Line and Katja was located at 116 North Robertson Boulevard, Los Angeles, California. WB has caused New Line and Katja

to move to the studio lot owned by yet another WB division at 4000 Burbank Boulevard, Burbank, California. WB also closed the prior New York office of New Line and Katja.  Thus, WB, New Line, and Katja all share offices at the same movie studio lot in Burbank which is owned by yet another WB affiliate.   All three companies share the same business address.

31.    The California Secretary of State's registry of business entities identifies Jillaine Costelloe, who is a paralegal in the WB legal department, as the contact person for New Line and Katja. Ms. Costelloe's office is on the WB studio lot at 4000 Burbank Boulevard, Burbank, California.

32.    Since the consolidation, if one tries to access a website for New Line or Katja, one is automatically directed to the WB website. The only publicly listed URL for Katja is www.newline.com. If one enters that URL into a web-address bar, one is automatically redirected to WB's website, www.warnerbros.com. Thus, since the consolidation, New Line and Katja do not have their own websites and are merely a part of WB's website.

33.    New Line and Katja have no telephone number of their own that is accessible to the public. There is no listing for either entity with the phone company if one calls information. The only way for the public to reach New Line or Katja on the telephone is to call the WB main number at (818) 954-6000 or by a direct phone line in the WB system.

34.    The Board of Directors of New Line, and of Katja, consists of Romano, who is Vice Chairman of WB, and John Rogovin ("Rogovin"), who is Executive Vice President and General Counsel of WB.  Romano is also Chief Financial Officer of New Line and Chief Executive Officer of Katja.  Rogovin is Secretary of New Line and Katja. The Chief Financial Officer of Katja is Elizabeth Mason, who is employed as Senior Vice President of Taxation by WB.

35.    Gerritsen is informed and believes, and on that basis alleges, that other persons who have served as officers of New Line and Katja since the consolidation

**FIRST AMENDED COMPLAINT**

have also been WB employees, including: Edward Ruggiero, who has been Treasurer of New Line and Katja but is also Senior Vice President and Treasurer of WB and Time Warner; David Sagal, who has been an officer of New Line but is also Senior Vice President of Legal and Business Affairs for WB; Daniel Weinberger, who has been an officer of New Line but is also Vice President of Business and Legal Affairs for WB; Karen Fouts, who has been a Vice President of New Line and Katja but is also Vice President of Feature Production for WB; Annaliese Kambour, who has been a Vice President of New Line and Katja but is also Senior Vice President for WB and Time Warner; John E. Kinney, who has been an officer of New Line but is also a Vice President for WB and Time Warner; Janice Cannon, who has been a Vice President of New Line and Katja but is also a Vice President of WB and numerous other WB related entities; and Michael Disco, who has been a Vice President of New Line and Katja but is also a Vice President of WB.

36.     When a party enters into a contract with New Line pursuant to which that party is a profit participant in a New Line film, the accounting statements sent to the participants are issued by the WB Financial Contract Reporting and Administration Department on WB stationery.  When a participant conducts an audit of the accounting statements, all communications with respect thereto are held solely with WB participations accounting staff, and not with any New Line representatives.

37.     Those who desire to license a clip, still, or poster from a New Line motion picture are directed by the WB website to contact the Vice President of WB Clip and Still Licensing Department at 4000 Warner Boulevard, Burbank, CA 91522 or to email clipandstilldept@warnerbros.com. Those wishing to use New Line material in a commercial or print advertisement or on a consumer product are directed by the WB website to "Warner Bros. Consumer Products."  Those seeking licenses of remake, sequel, stage play or dialogue rights with respect to New Line motion pictures are directed by the WB website to the "WB Corporate Legal Department."

38.     From December 2003 until 2010, the New Line logo, which appeared on screen on many New Line motion pictures, contained the byline "A Time Warner Company."  Commencing in 2011 and continuing to the present, the New Line logo appears only after the viewer sees a WB shield with a banner reading "Warner Bros. Pictures" and a Time Warner byline fading in below.  Parts of the WB shield appear in the filmstrips and squares of the New Line logo for several seconds.

39.     The business affairs and legal executives of New Line and Katja are located on the WB lot in Burbank, California and can be reached only through the WB telephonic switchboard or direct lines in the WB system.  Gerritsen is further informed and believes, and on that basis alleges, that such executives are also employees of WB who report to senior WB executives.

40.     When New Line and Katja are sued, they are required to be represented, as in this case, by attorneys chosen by WB. Although there is at least a potential conflict of interest, the same law firm, directed by WB, is representing WB, New Line, and Katja in this lawsuit.

41.     Throughout the period 2008 to the present, WB has directed all business activities of New Line. For example, WB decides or must approve which movies New Line may produce. WB has dictated that New Line will produce certain genre-specific movies (such as, for example, horror films).  Otherwise, WB assigns or allows its films to be produced by WB's other production unit, "Warner Bros. Pictures." WB also determines how many movies New Line will produce in a year, and has altered the number periodically since the consolidation. For example, in or about February 2011, WB announced that it was downsizing New Line again and in the process terminating more New Line employees, and that the number of films New Line would produce in a year was being reduced from eight to four.   All movies produced by New Line must be exclusively distributed domestically and worldwide by WB.

42.     Prior to 2008, New Line owned and operated a record label known as New Line Records.   In or about December 2010, WB announced that it was assuming control over and changing the name of the record label to WaterTower Music. On the website for that company, WB states:   "WaterTower Music, Warner Bros.' in-house music label, was launched in January 2010 as a reimaging and rebranding of New Line Records to create music assets as diverse as the films, television shows, and interactive games they support.   Housed on the Burbank lot, in the offices occupied by Warner Bros. Records during its heyday in the 1960s . . . allows them to easily and efficiently communicate with colleagues across any Warner Bros. division."   At WB's direction, soundtracks from all WB films and television programs, including those produced by New Line, are sold exclusively through WaterTower Music.   Gerritsen is informed and believes, and on that basis alleges, that the music which appears in films produced by New Line is arranged and produced by WB employees who work in the WB feature film music department.

43.     In press releases, WB regularly speaks for and on behalf of New Line in the media. For example, on or about May 14, 2014, WB announced that a film called "IT," based on a book by Stephen King, which was originally going to be produced by WB Pictures, would be moved to and produced by New Line instead. A second example is WB's announcement on or about October 15, 2014 that WB entered into a contract with DC Comics under which New Line would be producing movies based on famous comic book characters. A third example is that WB announced on or about May 8, 2014 that WB was partnering with MGM to co-produce a movie with Reese Witherspoon and Sofia Vergara and was assigning the task of producing the motion picture to New Line. A fourth example is that on November 18, 2014, the success of the New Line film "Annabelle" was trumpeted in an announcement to the media made by WB.   In news articles published since 2008, in which New Line's name is mentioned, it is virtually always noted that New Line is a unit of WB.

Conversely, press releases are issued by WB in which New Line films are mentioned but there is no mention of New Line itself, only of WB.

44.     By virtue of a written agreement dated January 1, 2010, all intellectual property acquired by New Line at any time (in perpetuity) is deemed to be automatically transferred to and owned by WB.  WB paid no consideration to New Line for entering into this agreement, nor is WB obligated to pay any consideration in the future when intellectual property rights are acquired by New Line and automatically assigned to WB.  The express purpose of this agreement "is solely to vest in [WB] the benefits of specific rights-related provisions of Content Agreements" and "[WB] assumes no obligations under such . . . Agreements."

45.     When reports are issued on the domestic box office performance of WB films, they do not differentiate between films produced by WB Pictures and films produced by New Line.  For example, in an article which appeared in the Los Angeles times on February 18, 2015 discussing the generally poor performance of WB films in the past year, it was noted, "There were certainly hits for Warner Bros. in 2014, including 'Godzilla,' 'The Lego Movie,' and the final installment of the 'Hobbit' trilogy."  The "Hobbit" film was produced by New Line, not by Warner Bros. Pictures, yet New Line is not mentioned in the article.

46.     Based on the facts alleged above in paragraphs 9 through 45 of this First Amended Complaint, a de facto merger of WB, New Line, and Katja occurred in 2008, such that WB is a mere continuation of New Line and Katja and is legally responsible for the obligations of New Line and Katja under the Contract and Guaranty.

47.     Throughout the period 2008 to the present, New Line and Katja have been and still are alter egos of WB.  There is such a unity of interest and ownership that the individuality and separateness of defendants has ceased and in the particular circumstances presented by this case an adherence to the fiction of the separate existence of the corporate defendants would promote injustice.  WB's stock

ownership of Katja and New Line was not for the purpose of participating in the affairs of those corporations in the normal and usual manner, but for the purpose of controlling them so that they may be used as a mere agency or instrumentality of WB. Plaintiff is informed and believes, and on that basis alleges, that Katja has been and is undercapitalized for the business in which it is engaged and that the funds and resources of Katja are commingled with the funds and resources of WB and are all under WB's sole and complete control.

48.     In sum, since 2008, WB has used and abused the corporate structure of New Line and Katja to advance WB's own interests and in an attempt to avoid liabilities to third parties, which is intended to leave third parties without a remedy and is unconscionable.

## THE FILM IS BASED ON THE BOOK

49.     At or near the time of Katja's acquisition from Gerritsen of the motion picture rights to the Book, Katja and New Line engaged Artists Production Group ("APG") to produce the Picture. APG was the production affiliate of a management company known as Artists Management Group ("AMG").  Katja, New Line and APG sought to develop the Book into the Picture pursuant to the Contract (the "Gerritsen Gravity Project").  The development process involves the writing of a motion picture screenplay and the attachment of a director to supervise the process. Where the screenplay is based on a book, the director would have access to the book.

50.     Gerritsen is informed and believes, and on that basis alleges, that writer/director Alfonso Cuarón ("Cuarón") was attached to the Gerritsen Gravity Project and worked on developing the Book into the Picture. Gerritsen was not told of Cuarón's attachment at the time. Gerritsen is further informed and believes, and on that basis alleges, that: Cuarón first became aware of and had access to the Book because he was a client of AMG; AMG and APG, as affiliates, worked hand-in-hand such that whenever APG was going to develop a film, it offered AMG's small

number of director-clients (including Cuaron) the first opportunity to develop and direct the film; and, through this process, Cuarón was offered a chance to work on the Picture and was made aware of and had access to the Book.

51.     To assist in the development of the Gerritsen Gravity Project, Gerritsen wrote and delivered additional material that constituted a modified version of a portion of the Book.  The additional material written by Gerritsen included scenes of satellite debris colliding with the International Space Station, the destruction of the station, and the lone surviving female medical doctor/astronaut left drifting in her space suit, alone and untethered, seeking the means to return to earth. Since the Contract defined the literary property acquired by Katja to include the Book "and any and all versions thereof," this additional written work was also owned by Katja. This additional material was delivered to and was in the possession of AMG and APG.  Gerritsen is informed and believes and on that basis alleges that AMG and APG passed Gerritsen's additional material on to New Line, Katja, and Cuaron.

52.     Gerritsen is informed and believes, and on that basis alleges, that sometime after 2002, Cuarón and his son Jonas Cuarón (collectively, the "Cuaróns") wrote a screenplay entitled *Gravity* (the "Cuaróns' Gravity Project") that was based on the Book. The Cuaróns' Gravity Project featured a female medical doctor/astronaut who is stranded alone aboard the International Space Station after a series of disasters kill the rest of the crew. The Cuaróns' screenplay details the astronaut's struggle to survive. The depiction of NASA technology in the Film is realistic, which is unusual for a film set in space.

53.     On or about December 17, 2009, the Cuaróns granted all rights in the Cuaróns' Gravity Project to WB.  WB, in turn, assigned or otherwise allowed its Warner Bros. Pictures unit to produce the Film, rather than New Line.

54.     In or about 2011, Warner Bros. Pictures commenced production of the Film.  Cuarón was the Film's director. The production was supervised by Lynn Harris, who was Executive Vice President of Production for WB and Vice President

**FIRST AMENDED COMPLAINT**

of Production for New Line, at the time.  Harris had been Executive Vice President of Production for New Line in the period 2000 through 2002 when New Line and Katja were attempting to develop the Book into the Picture. The Film included scenes of satellite debris colliding with the International Space Station, the destruction of the station, and the surviving female astronaut left drifting in her space suit, alone and untethered, seeking the means to return to earth. The screenplay credit for the Film was "Written by Alfonso Cuarón & Jonas Cuarón." By according this form of credit, WB represented to the public that the material for the Film originated with the Cuaróns. The Film was released to the public in the United States on or about October 4, 2013. The Film's reported box office gross to date is over $700,000,000, which in the motion picture business is an exceptionally high amount.  The Film eventually won seven (7) Oscars.

55.    When Gerritsen first contacted WB to put WB on notice of her claim under the Contract and Guaranty, WB informed Gerritsen what she already knew: Even if the film *Gravity* had virtually copied the Book verbatim, Gerritsen could not sue for copyright infringement because WB owns the motion picture rights to the Book by virtue of the consolidation, or, alternatively, such rights are owned by New Line and Katja and those entities are not going to sue WB, the company that controls them.

56.    When WB realized Gerritsen's claim was based on the Contract, WB advised Gerritsen that she was not entitled to payment on a contract theory either, because WB assigned or otherwise allowed its Warner Bros. Pictures unit to produce the Film rather than its New Line unit.  In view of the foregoing facts, including without limitation WB's custom and practice of forming and acquiring numerous companies through whom WB really conducts its own business – companies fully controlled and directed by WB – in order to confuse the public and shield itself from liability; and the fact that WB routinely decides which of its units will produce a given film and moves projects around amongst the units to suit WB's purposes, it

would be unjust to all writers including Gerritsen to allow WB to avoid contractual liability by having a motion picture produced by one of its units and not the other.

## FIRST CLAIM FOR RELIEF

### (Breach of Written Contract Against Katja and WB)

57.     Gerritsen realleges and incorporates herein by this reference each and every allegation made above in paragraphs 1 through 56 of this First Amended Complaint.

58.     The Film was and is "based on" the Book within the meaning of paragraphs 2A, 2B and 15 of the Contract.  Because the Film retained the same title as the Book, under paragraph 15(a) of the Contract, Gerritsen was supposed to receive the following credit onscreen and elsewhere in all paid advertisements for the Film: "Based on the book by Tess Gerritsen." The production bonus of $500,000 was payable within 20 days after commencement of principal photography of the Film, which occurred in 2011. Given the huge box office receipts of the Film, Gerritsen is informed and believes, and on that basis alleges, that Defined Net Proceeds have accrued, and that she is entitled to her 2.5% share thereof. However, none of the defendants paid the production bonus of $500,000 or the Defined Net Proceeds compensation of 2.5% of 100%. None of the defendants accorded Gerritsen the contractually required credit. All of the foregoing failures to pay money and to accord credit constitute breaches of the Contract.

59.     WB and Katja are liable to Gerritsen under the Contract based on the following theories:

    (a)    By virtue of the consolidation of WB and Katja in 2008, WB became the successor-in-interest of Katja;

    (b)    Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and Katja consolidated and WB expressly or impliedly assumed the obligations in the Contract, such that WB

is obligated to perform the duties owed to Gerritsen by Katja under the Contract;

(c)     When Katja was consolidated with WB in 2008, WB became the mere continuation of Katja;

(d)     Since 2008, WB and Katja have been alter egos in that there has existed such a unity of interest and ownership between Katja and WB that their separate personalities no longer exist, and if they are not jointly held accountable for each other's acts as alter egos, an inequitable result will follow for the reasons described above in paragraphs 9 through 48 and 55 through 56; and

(e)     Since 2008, the nature and extent of WB's control over Katja has been so pervasive and continual that Katja is nothing more than an agent or instrumentality of WB notwithstanding the maintenance of separate corporate formalities.

60.     Katja knew that if a third party made a film based on the Book, and certainly if that third party was Katja's parent or affiliate company, Gerritsen would rely on Katja to secure and enforce Gerritsen's right to credit and payment under the Contract. Katja knew or should have known the Film was based on the Book. Accordingly, Katja should have objected to WB's production of the Film, or alternatively it should have insisted that WB pay Gerritsen the consideration due under the Contract, but it failed to do so. There was an implied covenant of good faith in the Contract under which Katja promised not to do anything to deprive or impede Gerritsen's receipt and enjoyment of the full benefits of the Contract.  By allowing WB to produce the Film without also insisting that WB honor Gerritsen's rights under the Contract, Katja acted in the best interests of WB as an agent and fiduciary of WB and breached the implied covenant of good faith and fair dealing in the Contract.

61.     Gerritsen has performed all of the terms and conditions of the Contract to be performed on her part. Without limiting the foregoing, she has notified defendants in writing of the breaches and provided them with the specified time within which to cure the breaches, as required by paragraph 21 of the Contract. Defendants have failed and refused to cure such breaches of the Contract.

62.     As a direct and proximate result of the foregoing breaches of contract, Gerritsen has been damaged in a sum which cannot presently be calculated with certainty but which is believed to exceed $10,000,000 according to proof at trial. These sums include, at a minimum and without limitation, the $500,000 production bonus that is owed under paragraph 2A of the Contract, the participation in net proceeds which is due and owing under paragraph 2B of the Contract, damages for deprivation of the credits agreed upon in paragraph 15 of the Contract, and prejudgment interest.

## SECOND CLAIM FOR RELIEF

### (Breach of Guaranty Against New Line and WB)

63.     Gerritsen realleges and incorporates herein by this reference each and every allegation made above in paragraphs 1 through 61 of this First Amended Complaint.

64.     Under paragraph 1 of the Guaranty, New Line guaranteed "full and faithful performance of all of Company's obligations pursuant to the Agreement [Contract]."

65.     WB and New Line have breached the Guaranty by failing to pay the consideration and afford the credit to which Gerritsen was due under the Contract.

66.     WB and New Line are liable to Gerritsen under the Guaranty based on the following theories:

(a)     By virtue of the consolidation of WB and New Line in 2008, WB became the successor-in-interest of New Line;

(b)     Under the terms of the contracts and related documents that were signed on or about February 28, 2008, WB and New Line consolidated and New Line expressly or impliedly assumed the obligations in the Guaranty, such that WB is obligated to perform the duties owed to Gerritsen by Katja under the Guaranty;

(c)     When New Line was consolidated with WB in 2008, WB became the mere continuation of New Line;

(d)     Since 2008, WB and New Line have been alter egos in that there has existed such a unity of interest and ownership between New Line and WB that their separate personalities no longer exist, and if they are not jointly held accountable for each other's acts as alter egos, an inequitable result will follow for the reasons described above in paragraphs 9 through 48 and 55 through 56; and

(e)     Since 2008, the nature and extent of WB's control over New Line has been so pervasive and continual that New Line is nothing more than an agent or instrumentality of WB notwithstanding the maintenance of separate corporate formalities.

67.     New Line knew that if a third party made a film based on the Book, and certainly if that third party was New Line's parent or affiliate company, Gerritsen would rely on New Line to secure and enforce her right to credit and payment under the Contract. New Line knew or should have known the Film was based on the Book. Accordingly, New Line should have objected to WB's production of the Film, or alternatively it should have insisted that WB pay Gerritsen the consideration due under the Contract, but it failed to do so. There was an implied covenant of good faith in the Contract under which New Line promised not to do anything to deprive or impede Gerritsen's receipt and enjoyment of the full benefits of the Contract.  By allowing WB to produce the Film without also insisting that WB honor Gerritsen's rights under the Contract, New Line acted in the best interests of WB as an agent

and fiduciary of WB and breached the implied covenant of good faith and fair dealing in the Contract and Guaranty.

68.     Gerritsen has performed all of the terms and conditions of the Guaranty to be performed on her part. Without limiting the foregoing, she has notified defendants in writing that the Contract was breached and the nature of the breach, and she provided them with the specified time within which honor the Guaranty as required by paragraph 5 of the Guaranty.  Defendants have failed and refused to make any payments under the Guaranty.

69.     As a direct and proximate result of the foregoing breaches of the Guaranty, Gerritsen has been damaged in a sum which cannot presently be calculated with certainty but which is believed to exceed $10,000,000 according to proof at trial. These sums include, at a minimum and without limitation, the $500,000 production bonus that is owed under paragraph 2A of the Contract, the participation in net proceeds which is due and owing under paragraph 2B of the Contract, damages for deprivation of the credits agreed upon in paragraph 15 of the Contract, and prejudgment interest.

70.     The prevailing party is entitled to recover its reasonable attorneys' fees and costs pursuant to paragraph 6 of the Guaranty.

### THIRD CLAIM FOR RELIEF

**(Accounting Against All Defendants)**

71.     Gerritsen realleges and incorporates herein by this reference each and every allegation made above in paragraphs 1 through 69 of this First Amended Complaint.

72.     Under Paragraph 2B of the Contract, Gerritsen is entitled to contingent compensation in an amount equal to 2.5% of 100% of the "Defined Net Proceeds" of the Film.  The term "Defined Net Proceeds" is defined in Exhibit DNP to the Contract ("Exhibit"). The Film has been a huge financial success, grossing in excess of $700,000,000 to date in box office receipts alone which does not include any

{FAC}

21

revenue from exploitation of ancillary rights such as music publishing and soundtrack royalties, cable and network television deals, DVD and Blu-ray releases, and the like.

73.     Under Paragraph 9 of the Exhibit, defendants were and are obligated to deliver written statements to Gerritsen reflecting the financial performance of the Film and any payments due Gerritsen under the Contract and Exhibit.  Defendants have failed to deliver any statements to Gerritsen and refuse to do so now.

74.     Under Paragraph 10 of the Exhibit, Gerritsen is entitled to audit the books and records of the Film, which are in the exclusive possession and control of defendants. Defendants have not recognized Gerritsen's right to conduct such an audit.

75.     The determination of the amount of Defined Net Proceeds which are due and owing by defendants to Gerritsen must be based on a complex analysis of financial data and documentation that is within defendants' exclusive possession and control.

76.     Defendants are in possession of money which they are obligated to remit to Gerritsen which they refuse to do.  Therefore, Gerritsen needs, and is entitled to, an accounting from defendants showing the amount of Defined Net Proceeds which are owing to her.

**WHEREFORE**, Gerritsen prays for judgment as follows:

**First and Second Claims**

1.     For damages believed to exceed $10,000,000 according to proof, including without limitation the $500,000 production bonus, damages resulting from deprivation of the contractually-mandated credit, and loss of the Defined Net Proceeds;

2.     For interest thereon at the maximum legal rate;

3.     On the second claim, for reasonable attorneys' fees and costs in accordance with paragraph 6 of the Guaranty;

1

## **Third Claim**

2        4.      For an accounting of the Defined Net Proceeds generated by the Film

3 and those sums due and owing to Gerritsen;

4

## **All Claims**

5        5.      For all costs allowable by law, including her reasonable attorney's fees;

6 and

7        6.      For such other and further relief as the court deems just and proper.

8

9 Dated:  February 19, 2015            KULIK GOTTESMAN & SIEGEL LLP

10

11                      By:   */s/ Glen L. Kulik*

12                               Glen L. Kulik

13                               Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{FAC}

23

**FIRST AMENDED COMPLAINT**

1

**REQUEST FOR JURY TRIAL**

2

3        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, to the extent

4   permitted by law, Plaintiff Terry T. Gerritsen hereby demands a trial by jury of all

5   claims, defenses and issues raised in this case.

6

7   Dated:  February 19, 2015              KULIK GOTTESMAN & SIEGEL LLP

8

9                                          By:   /s/ *Glen L. Kulik*

10                                              Glen L. Kulik
                                               Attorneys for Plaintiff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{FAC}

**24**